# EXHIBIT 8

# BRAUNHAGEY & BORDEN LLP

San Francisco & New York

**Marissa Benavides, Esq.**

benavides@braunhagey.com

April 15, 2026

**<u>VIA EMAIL</u>**

Jake Freed
Davis Wright Tremaine LLP
50 California St., 23rd Floor
San Francisco, CA 94111
Email: jakefreed@dwt.com

> **Re:** ***Greenberg**, et al. v. Amazon.com*, **Case No. 2:21-cv-00898-RSL (W.D. Wash.)**

Dear Mr. Freed:

We write to respond to your April 2, 2026, letter ("April Letter") and to seek clarification of your position, which appears at odds with the plain terms of Amazon's December 18, 2024 subpoena *deuces tecum* and does not reflect the parties' prior discussions regarding Instacart's response.

Immediately prior to your April Letter, Amazon demanded that Instacart produce data showing every single user transaction on the Instacart platform between January 31, 2020, and October 20, 2022, with each transaction broken down at a *per-unit level*. (*See* Ex. 1.) That means, for example, that Amazon seeks not only the data reflecting every single transaction conducted through Instacart's platform over a period of nearly three years, but also data breaking down the individual prices charged and paid for every single item within every single order placed. That is an astoundingly broad scope, which essentially demands production of the entirety of Instacart's order history for all of its users over a multi-year period.

In a February 3, 2026 email, Mr. Valera confirmed the scope of Amazon's demand, noting that Amazon is "seeking price and availability of *all consumer goods* and food items sold by third parties on Instacart's website during the relevant period" (emphasis added), and further confirmed "we are seeking transactional level data (e.g., transaction date, units sold, etc)" for all such consumer transactions on Instacart's platform. (Ex. 1.) Mr. Valera further confirmed the demand in a February 25, 2026 email where he stated, "the subpoena's request is not limited to a subset of consumer goods or food items like the Tier 1 requests were. Instead, it is for data relating to the price and availability of *all consumer goods* or food items between January 31, 2020, and October 20, 2022." (Ex. 1 (emphasis added); *see also* Ex. 2 (Nov. 11, 2025 ltr. from J. Goldmark to M. Benavides) (requesting ten categories of "transaction-level data" for "'consumer

April 15, 2026
Page 2

goods and food items sold by third-parties on [Instacart's] website' between January 31, 2020 and October 20, 2022").)

In response to these demands, which are consistent with the plain language of the December 2024 subpoena, Instacart objected that the burden of compliance was overwhelming and unjustified, for multiple reasons. (*See* Ex. 3.) Among other things, Instacart has repeatedly explained that it operates a platform that facilitates these transactions between customers and retailers, but that it is not itself a retailer and does not set the prices of these goods. We have reiterated that the retailers are the most reliable source of this information, as they control and can accurately report the prices of their items over time. Indeed, because the retailer receives payment for the consumer items, they are in the best position to explain any price fluctuations, discounts, promotions, or markups. Instacart functions merely as the conduit for the transactions between retailers and consumers.

Although we believe that these facts, which are not disputed, provide a sufficient basis on which to require that Amazon look to the retailers rather than Instacart for the information it seeks, Instacart did not rest on that objection alone. On April 1, 2026, Instacart provided additional information detailing the technical limitations that render compliance with Amazon's demand unduly burdensome, oppressive, and beyond any reasonable third-party discovery obligations. (Ex. 1 (April 1, 2026 email from M. Benavides to K. Cox).)

Your April Letter, however, failed to address any of our prior discussions. Instead, the April Letter contradicts Amazon's previous positions and the subpoena itself.

Both the subpoena and Amazon's prior representations state that Amazon demands per-unit transaction data for all consumer goods purchased through the Instacart platform from January 31, 2020 to October 20, 2022. (Ex. 2 (quoting Subpoena Request No. 13).) In response, Instacart raised concerns with Mr. Valera, Mr. Goldmark, and Ms. Cox that these demands were oppressively broad on their face; they seemingly conceded that such a broad and sweeping demand would exceed the reasonable scope of a subpoena under Rule 45, and accordingly, claimed to be interested in seeking ways to narrow the requests to accommodate Instacart's meritorious objections. (Ex. 1.)

Your April Letter appears to concede that "Amazon does not seek 'all transaction data for every item purchased by every customer through the Instacart platform from January 31, 2020 and [sic] October 20, 2022.'" Similarly, you say "Instacart has no burden to produce 'all transaction data for every item purchased by every customer through the Instacart platform from January 31, 2020 and [sic] October 20, 2022.'" However, in the same correspondence, you revert to claiming that Amazon seeks data responsive to its original overbroad subpoena demand, and you neither provide nor identify any narrowing proposal for Instacart to consider. Amazon is changing positions once again by reverting to a maximalist demand that is both contrary to Rule 45 and its prior representations. This drastic shift is both concerning and anathema to Amazon's obligation to meet and confer in good faith—particularly with a third party.

The April Letter equally dismisses objections to undue burden and overbreadth as irrelevant. Specifically, you write that "Amazon's subpoenas to other retailers do not relieve

April 15, 2026
Page 3

Instacart of its obligation to respond to Amazon's subpoena" and that Instacart "has relevant information regarding the availability and price of consumer goods and food items well beyond the scope of Amazon's 150 subpoenas." Critically, your response highlights the fundamental issue: Instacart is not a retailer, as you imply. What is more, the issue is not one of relevance; it is one of undue burden. Amazon has never explained why Instacart should be required to reproduce retailer sales information that Amazon can and should (and seemingly has) obtained directly from retailers, whether they have been subpoenaed or not. That Amazon may prefer to obtain the information from Instacart is of no moment.

Next, you dismiss the Herculean technical burden of Amazon's demands with a circular argument that because, in Amazon's view, the data "exists," it should not be burdensome to collect. That conclusory assertion not only flies in the face of Amazon's prior representations to the Court in this action (*see* Amazon Opp. Aldi Mot. Quash at 11 ("Amazon agrees that conducting discovery on every one of the billions of transactions in 'consumer goods' and 'food items' on Amazon.com would be monstrously burdensome.")), it also fails to address our most recent correspondence explaining why that assumption is incorrect, and further, that the burden of collecting this information would be enormous. At risk of explaining again: (1) the data sets exist in multiple separate storage blocks; (2) no extraction program exists to retrieve the data— Instacart's engineers would need to build one from scratch; (3) after designing the program, engineers would have to test and refine the program to ensure accuracy, which takes multiple iterations; (4) after ensuring accuracy of the program, the engineers would need to run the new extraction program repeatedly over subsets of the massive databases that are small enough for the program to manage; and (5) engineers would then need to compile and quality check the extracted data. This process would require weeks of dedicated engineering resources, which are valuable and in short supply, and would come at the expense of other, high-priority projects that require the undivided focus and commitment of the company's engineers.

Your April Letter attempts to dismiss this burden with a superficial reference to Eversight. For clarity, Instacart acquired Eversight in late 2022, after the relevant period. Furthermore, Eversight does not contain pricing data for transactions on the Instacart platform. Eversight was a retail pricing tool for customers, not a repository for the transactional data that Amazon seeks through its subpoena. Last, the April Letter repeatedly asserts that Amazon has narrowed its demands with regard to Instacart's data. We have no record of any such narrowed proposal. Again, please point us to any alternative that Amazon has offered since it began reengaging on these issues in November 2025 after months of silence and inaction. We would also ask that you identify with specificity any concrete proposals that you would put forward as part of any assertion that Amazon is eager "to work with Instacart to find a minimally burdensome way for it to get data from Instacart for the price and availability of consumer goods during the subpoena's relevant time period." As noted, we have not received any such proposals in writing and do not recall receiving any during the course of our several telephonic discussions with your colleagues either.

Given the lack of clarity created by your client's conflicting positions, we suggest a further meet and confer to occur during the week of April 27, 2026, and would suggest that you send any proposals for narrowing or minimizing the burden on Instacart at least five business

April 15, 2026
Page 4

days in advance of that discussion so that we have adequate time to review with our client.  In the meantime, Instacart continues to reserve all rights.

Very truly yours,

Marissa Benavides

# EXHIBIT 1

| | |
|---|---|
| **From:** | Cox, K"reisa |
| **To:** | Marissa Benavides; Valera, Nick |
| **Cc:** | Freed, Jake; Almeida, MaryAnn; Adam Cashman |
| **Subject:** | RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C |
| **Date:** | Thursday, April 2, 2026 7:34:37 PM |
| **Attachments:** | Greenberg - Letter to Instacart 4.2.26.pdf |

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

Please see the attached correspondence in response to your email below.

Thank you,

K'reisa

**K'reisa Cox**   She/Her/Hers
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8087  **E** kreisacox@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Wednesday, April 1, 2026 10:48 AM
**To:** Cox, K'reisa <KreisaCox@dwt.com>; Valera, Nick <NickValera@dwt.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

K'reisa,

First, thank you for the courtesy of waiting for Adam and me to finish our trial. We just wrapped at the end of last week and happily it was a good outcome. Second, I wanted to ask if we are missing any additional correspondence from your side. At the meet and confer we had discussed the possibility that Amazon would consider narrowing the scope of its document requests, but we don't appear to have received anything further from your side. If you sent one, can you please re-send?

Assuming Amazon's position remains as previously stated and has not been updated, we can now provide additional detail regarding the undue burden those document requests would impose on Instacart. Our client's engineering and data team has conducted an inquiry into obtaining the data your client is demanding—namely, all transaction data for every item purchased by every customer through the Instacart platform from January 31, 2020, and

October 20, 2022—and has determined that obtaining this data would require an extraordinarily large and time-intensive custom engineering operation requiring:

- Custom configuration of an extraction mechanism—including scoping, building, running, and validating the mechanism—to pull 33 months of platform-wide transactions comprised of hundreds of millions of order-item rows, because no such mechanism currently exists to obtain platform-wide item-level data at this scale;

- Actually running the extraction mechanism over the dataset in portions (because the dataset is so large in the aggregate — some 500 TB — that it is not maintained in one single block); and

- Weeks of fully dedicated work by Instacart's data team, assuming no separate work on any other of Instacart's data demands at the time; when factoring in the data team's regular workload required for maintenance of Instacart's core business, the timeline stretches to months.

There is a further technical limitation in that Instacart does not maintain data fields that map exactly onto the 12 categories you identified in your demands, so it would take additional time and resources to convert the data to a responsive set that maps to the 12 categories in the subpoena.

In short, the burden of responding to this subpoena far outweighs Instacart's third-party obligations here, especially where you confirmed that Amazon successfully subpoenaed most of the underlying vendors whose data you are attempting to collect through this subpoena to Instacart.

We remain willing to confer regarding a substantially narrowed scope of request that does not impose such undue and unreasonable burdens on Instacart. Please let us know if you would like to discuss further.

Thanks,
Marissa

Marissa R. Benavides
BRAUN**HAGEY** & BORDEN LLP
Direct: (646) 876-5766

---

**From:** Cox, K'reisa <KreisaCox@dwt.com>
**Sent:** Friday, March 6, 2026 1:09 PM
**To:** Valera, Nick <NickValera@dwt.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**\*\*\* EXTERNAL MESSAGE \*\*\***

Hi Marissa,

While you said that you would provide us an update by February 27, we still have not received any response from Instacart regarding Amazon's subpoena. We understand that you will be in trial for the rest of the month.

We will give you the professional courtesy of waiting until your trial is complete to declare impasse and file a motion to compel. To avoid that outcome, we need a clear response from Instacart on what it will produce and what it will not produce by April 1. If we do not have such a response by April 1, we will be at an impasse and Amazon will make a motion to compel.

Thank you,

K'reisa

**K'reisa Cox**    She/Her/Hers
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8087   **E** kreisacox@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, March 2, 2026 10:03 AM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

Marissa,

I'm following up on the thread below. You indicated that Instacart would provide an update by Friday, but we have not yet received a response.

As we've discussed, Amazon is seeking Instacart's position on whether it intends to produce responsive information to the subpoena, as well as any proposals for an efficient path to production. We need Instacart's response on these points as soon as possible.

If Instacart does not intend to provide the requested information, or if you believe we have reached an impasse, please confirm promptly so that we can address next steps—including moving to compel.

We look forward to your response on these issues.

Thank you.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Valera, Nick
**Sent:** Wednesday, February 25, 2026 3:44 PM
**To:** 'Marissa Benavides' <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

Marissa,

Thank you for following up. As we mentioned during our call, we are ultimately seeking Instacart's data for price and availability of consumer goods and food items between January 31, 2020, and October 20, 2022. The court has determined that this information—including from third parties—is "critical" to Amazon's defenses.

Per our November 11, 2025 letter, we ask Instacart to produce specific data fields including, for example, net unit price, unit size, and product description. We understand Instacart might not have data for certain fields, so we are willing to work with Instacart on substitute fields as needed.

To reiterate, the subpoena's request is not limited to a subset of consumer goods or food items like the Tier 1 requests were. Instead, it is for data relating to the price and availability of all consumer goods or food items between January 31, 2020, and October 20, 2022.

Additionally, during our call, you mentioned Instacart believes other retailers' productions to Amazon would provide us with the information that we are requesting from Instacart. We asked you to provide the basis for Instacart's belief, and we look forward to Instacart's response. That said, we do not see how Instacart's belief could be true.  It is not likely that an Instacart retailer would have the price consummated in the gross transactional value for a customer order completed on Instacart, including the price shown on Instacart, taxes, local fees, customer fees, and other fees.

Additionally, thank you for confirming that Instacart does not have documents responsive to Requests 5-6. Could you confirm that it also does not have documents responsive to Request 7, as well as Requests 15–17?

We look forward to Instacart's update this Friday.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Tuesday, February 24, 2026 7:19 PM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

Nick,

Thanks for the call today. As I noted, we're willing to confer with our client again regarding data collection, but before we do that I want to confirm my understanding that Amazon's request is for the unit price and transaction data of every consumer product sold through Instacart from Jan 31, 2020-Oct 21, 2022. Is that correct?

Thanks,
Marissa

Marissa R. Benavides

**B R A U N H A G E Y & B O R D E N** LLP

Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Wednesday, February 18, 2026 2:20 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

That's fine, but we will need Instacart's responses to the points from our February 3 call as well as an expected production date. I will follow up with our availability next Tuesday.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Wednesday, February 18, 2026 10:31 AM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

Nick,

Our client is still in the process of running down certain information regarding data storage and accessibility to facilitate our discussion. We're aiming to have additional information as soon as possible, but as of right now we don't have an update for a further meet and confer. Can we

push to next Tuesday? I'm free from 12-2pm ET and 3:30-5pm ET that day.

Thanks,
Marissa

Marissa R. Benavides
**BRAUNHAGEY & BORDEN** LLP
Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Tuesday, February 3, 2026 5:00 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

Thank you for taking the time to discuss Amazon's subpoena today. As we discussed, Amazon is now seeking all Tier 1 and Tier 2 requests in Amazon's subpoena to Instacart in accordance with the court's discovery orders attached to our November 11, 2025 letter to you.

A few other notes from our call:
- We requested that you confirm with your client whether it has responsive documents to Request Nos. 6-7.
- As I explained, as part of Request No. 13, we are seeking price and availability of all consumer goods and food items sold by third parties on Instacart's website during the relevant period.
- Per the Request, and our November 11, 2025 letter, we are seeking transactional level data (e.g., transaction date, units sold, etc.)—we can work with Instacart to determine the best way to produce this data from Instacart.
- You said you will need to check with your client regarding a response to Amazon's requests.

Consistent with the court's orders, this information is highly relevant to Amazon's defenses against Plaintiffs' lawsuit. Accordingly, we need Instacart to provide its production as soon as possible. While we are in the process of compelling other third parties, we would prefer to work with Instacart and to avoid having to go to the court for its production.

Given that you said you are out next week, we look forward to discussing on February 18, 2026, at 3pm EST. Thanks, again, for your time.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Friday, January 23, 2026 1:29 PM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

---

Nick,

I'm unavailable during those times, but can connect on Monday, February 2 from 11am-2pm PT or Tuesday, February 3 from 12pm-2pm PT. Let me now if either of those times work.

Thanks,
Marissa

Marissa R. Benavides
**B R A U N HAGEY & B O R D E N** LLP
Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Wednesday, January 21, 2026 3:34 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Freed, Jake <JakeFreed@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

We still have not received any response to Amazon's November 11, 2025 letter to Instacart regarding its subpoena's tier 2 requests. Please let us know your availability for the following dates and times to meet and confer regarding Amazon's subpoena to Instacart:

January 29: 9-10am PST; 12-4pm PST

January 30: 9am-10:30am; 2:30-4pm PST

Thank you.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Valera, Nick
**Sent:** Tuesday, December 23, 2025 3:55 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Freed, Jake <JakeFreed@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

Marissa,

Thank you for the update, we understand the holidays are an especially busy time. We will plan to talk to you regarding Amazon's subpoena, and its Tier 2 requests, in the first couple weeks of January.

Please note that Amazon requested for Instacart to produce documents in response to its Tier 2 requests in the subpoena within 30 days of receipt of its letter emailed on November 12, 2025. We look forward to discussing.

Happy holidays!

Nick


**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Monday, December 8, 2025 1:31 PM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Freed, Jake <JakeFreed@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

---

Nick,

Thanks for following up. Our team is heads down this month on a couple major matters. We'll get back to you on this after the holidays.

Best,
Marissa

Marissa R. Benavides
**B R A U N**HAGEY **& B O R D E N** LLP
Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, December 1, 2025 1:58 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Freed, Jake <JakeFreed@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C


**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

I hope you had a good Thanksgiving. We have not received any response from Instacart regarding our recent letter requesting for Instacart to comply with Amazon's Subpoena's Tier 2 requests for the *Greenberg* lawsuit. Could you let me know if Instacart plans to comply with Amazon's request, and if so, by when? If you would like to discuss, please let me know your availability for later this week. Thank you.

Nick

**Nick Valera**   He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Valera, Nick
**Sent:** Wednesday, November 12, 2025 7:55 AM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Freed, Jake <JakeFreed@dwt.com>; Cox, K'reisa <KreisaCox@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

Marissa,

Please see the attached correspondence. Amazon is now requesting that Instacart comply with Amazon's subpoena's Tier 2 requests. These requests are for a broader range of products and related data. Based on our prior conversations, we understand that Instacart does not set pricing for third parties' products that are sold over its website. But we would like to discuss these additional requests, as well as follow up on your promise to investigate further into our Tier 1 requests, including Requests No. 6-7. Please let us know your availability to confer on Amazon's requests early next week. Thank you.

Nick

**Nick Valera**   He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Valera, Nick
**Sent:** Friday, July 18, 2025 4:05 PM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Mehta, Shalika <ShalikaMehta@dwt.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

Hi Marissa,

In short, we disagree with your characterization of Amazon's discovery efforts—I can assure you that we have sought information from literally hundreds of retailers to gather relevant information for Amazon's defenses. Regarding your statement of our "sporadic demands," our desire has been to minimize any burden on third parties (hence, the reason that we reserved without demanding responses to our requests for the subpoenas' second tier products in the first place). That said, we are evaluating the court's orders, entered today. In the meantime, could you please give us an update on your investigation mentioned below, in number 2?

Thank you.

Nick

**Nick Valera**     He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Wednesday, July 2, 2025 11:34 AM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Mehta, Shalika <ShalikaMehta@dwt.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

[EXTERNAL]

Nick,

Thanks for your email. We are surprised to receive a follow up request from you after our discussions and resolution of this subpoena six months ago. As you know, Instacart is not a retailer or seller of

products, and as such has no information to provide relating to your requests focused on pricing and product offerings. To the extent you are seeking burdensome data from Instacart relating to *third party* retailers' transactions, you have also not explained why you cannot obtain that information from the retailers themselves. Moreover, it appears from our prior discussions that you are focused in part on non-grocery products such as bleach, flea & tick spray, and disinfecting wipes. As the majority of retailers on the Instacart platform sell grocery items, this request is even more far afield. We can only conclude from your sporadic demands and requests for information Instacart simply does not have that Amazon does not have serious need for the information demanded, or alternatively, that it has not yet sought production of that information from the primary sources.

In any event, we would like to clarify a few points in your email.

1. You state "[I]t appears that we are not going to make any progress at this time for Amazon's requests for documents related to Instacart's pricing of the Tier 1 products." Your statement appears to deliberately ignore what we have spent six months telling you (which you previously acknowledged)—*viz.,* that Instacart does not "price [] Tier 1 products." We cannot be at an impasse on this RFP when we have confirmed to you in our subpoena objections, by email, and through meet-and-confer that Instacart does not have documents relating to something it does not do.

2. As you note, Amazon has not previously sought to meet and confer on RFPs 6 and 7. We consider this Amazon's first effort to do so. Based on our initial investigation, we do not believe Instacart has documents "related to price gouging, unusual price increases," including "fair pricing, including policies governing sales by authorized third-parties. . . ." We are continuing our investigation and will let you know if our understanding changes in any material respect.

3. Regarding RFP No. 4, we already explained the inappropriate nature of the request during our prior meet-and-confer, which we repeat here. Amazon cannot burden Instacart with a subpoena demanding the confidential transactional data of nonparty, third-party retailers who use the Instacart platform when the appropriate targets for such a subpoena are the third-party retailers themselves. You advised during our meet-and-confer that Amazon has served some hundred plus subpoenas to nonparty retailers in relation to this action. Amazon should pursue those subpoenas rather than burdening Instacart with demands for third-party data.

   We advised you of this position previously, yet your message fails to address it. Instead, your response cites inapposite case law and fails to offer any compelling reason why Instacart should bear that burden in light of Amazon's failure to seek this information from the retailers themselves. That is improper. Under Rule 26, a court must limit discovery if it is unreasonably duplicative, if it can be obtained from a source that is more convenient or less burdensome, or if the burden of producing it outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(C). And "[t]he Ninth Circuit has long held that nonparties subject to discovery requests deserve extra

protection from the courts." *Lemberg Law LLC v. Hussin*, 2016 WL 3231300, at *5 (N.D. Cal. June 13, 2016) (citation omitted). Rule 45 also specifically instructs that a party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

Amazon's demand that Instacart locate, compile, and produce years of transactional data pertaining to potentially hundreds of nonparty retailers—to the extent that data is available—runs afoul of Rule 45's limitations both on grounds of burden to Instacart and violation of Instacart's business relationships with those nonparty retailers. This burden is particularly heavy when you consider the tens of thousands of non-Tier 1 products sold by retailers that Instacart would have to parse to locate any data on the products you seek. And you still have not clarified whether Amazon has sought the demanded data from those nonparty retailers in the first instance, as it is required to do.

We trust this resolves your follow-up inquiry, and you will seek any further discovery from more appropriate parties (*i.e.,* entities that actually sell products and set prices), rather than continuing to burden Instacart. Should you have any follow-up concerns, we require that you provide in writing your position in response to all issues raised in this and prior correspondence to avoid further inefficiencies and waste of resources.

Regards,

Marissa R. Benavides
**B R A U N** **HAGEY** **&** **B O R D E N** LLP
Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Wednesday, June 4, 2025 7:11 PM
**To:** Laura Shapiro <lshapiro@braunhagey.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**\*\*\* EXTERNAL MESSAGE \*\*\***

Laura,

I hope you have been well. Unfortunately, we do not yet have an order from the Court narrowing the scope of discovery in this case. There is a pending motion for protective order from a nonparty recipient and Amazon has moved to compel discovery from Plaintiff's nonparty relations.

So Amazon is moving forward with collecting documents responsive to Amazon's subpoena, including to Instacart. Based on your former emails, after our one meet and confer, I think it's best to clarify where we are in this process.

First, it appears that we are not going to make any progress at this time for Amazon's requests for documents related to Instacart's pricing of the Tier 1 products. We understand that we are at an impasse on this RFP, but please let me know if you disagree.

Second, we have not substantively discussed, and your prior emails have not addressed, Amazon's other requests, including its request for Instacart's records relating to price gouging (RFPs 6, 7) including documents related to policies Instacart had in place "related to price gouging, unusual price increases," including "fair pricing, including policies governing sales by authorized third-parties. . . ." If Instacart did not have policies relating to price gouging, including for sales by **third-parties** on its website, please confirm this. Instacart's objections do not state Instacart does not have this information.

Third, we believe Instacart has documents responsive to RFP 4. This RFP requests "[t]ransactional data for Purchases of the Tier 1 Products sold by … **third-parties** on your website," including for information related to the identity of the purchaser,  products sold, and the location of purchasers. Instacart's objections to this RFP state that "the requests [sic] seeks information that does not exist … or is the proprietary information of third-party vendors. . . ." Your responses have not addressed RFP 4. Please clarify what "proprietary information" Instacart has of third-party vendors.

Finally, your prior emails suggest that Instacart was accidentally included in Amazon's subpoenas. Instacart was targeted on the belief that it has relevant information to the subpoena's request. Additionally, your objections and former emails raise burden on Instacart as a nonparty. But "[a] non-party witness is subject to the same scope of discovery under Rule 45 as would be a party to whom a request is addressed pursuant to Rule 34." *Henry v. IAC/InterActive Grp.*, No. C05-1510RSM, 2007 WL 9775385, at *1 (W.D. Wash. July 12, 2007). You have not proposed any modification to the subpoenas, but Amazon is open to discussing how to minimize their burden.

You also state in your communications that you do not believe Instacart has information "directly relevant" to its litigation. As you know, "directly relevant" is not the standard for a Rule 45 subpoena—Amazon has a right to request the *relevant* information in its subpoena, and Instacart has an obligation to produce that relevant information. Again, we are happy to work with you to minimize any burden on Instacart for its responses—but we intend to collect

documents responsive to the subpoena as is Amazon's right.

Please provide us with your responses in writing by next Friday, June 13th. Once we have that baseline, we would be happy to discuss potential modifications.

Thank you.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323   **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Laura Shapiro <lshapiro@braunhagey.com>
**Sent:** Tuesday, April 15, 2025 4:26 PM
**To:** Valera, Nick <NickValera@dwt.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** Re: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

---

Nick,

We're willing to meet and confer next week but are concerned with Amazon's shifting positions regarding the information it claims to be seeking. This is the first time you have referred to 'fees' as purportedly relevant information—you didn't raise it on our last meet and confer nor did you request information about 'fees' anywhere in your subpoena. We don't see any basis on which Amazon can demand information about Instacart's fees, nor do we understand how Instacart's service fees are relevant to Amazon's discovery into vendors' direct pricing of Tier 1 products.

More broadly,  we have engaged in good faith despite it being abundantly clear from our interactions that Amazon's subpoena to Instacart is not grounded in any informed inquiry but rather a byproduct of its issuance of hundreds of third-party subpoenas to any business that touched the products at issue. We had hoped that Amazon would understand by this point that Instacart does not have information that is directly relevant to your litigation or that is of sufficient uniqueness and value that it justifies imposing a multi-year production burden on us

as a non-party.

While we're willing to meet and confer again, we expect you to set forth the entirety of what you are currently seeking from Instacart so that we can evaluate appropriately. It is not conducive to go back and forth in this manner, considering Instacart is a non-party. Please provide dates and times next week that you and your team are available to discuss further.

Regards,

Laura


Laura Shapiro

**B R A U N H A G E Y & B O R D E N** LLP
Direct: (415) 796-0701

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, April 14, 2025 5:10 PM
**To:** Laura Shapiro <lshapiro@braunhagey.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C


**\*\*\* EXTERNAL MESSAGE \*\*\***

Laura,

Thanks for your response. We understand that Instacart provides an online platform for third party sellers to sell products, and it collects a fee on purchases.  As such, we understand Instacart's fees to affect the ultimate price a customer pays for a product he or she purchases via Instacart. And based on a current search of Instacart's website, it appears to offer via various retailers – and presumptively collect fees for – Tier 1 products. This information is responsive to Amazon's subpoena.

Even if that were not the case, we think Instacart would at least have information responsive, for example, to RFP No. 4.

We request to meet and confer again.  Please let us know your availability for later this week or early next week.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP
**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Laura Shapiro <lshapiro@braunhagey.com>
**Sent:** Thursday, March 27, 2025 3:47 PM
**To:** Valera, Nick <NickValera@dwt.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** Re: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

**[EXTERNAL]**

---

Hi Nick,

We're concerned from your email that there may still be some misunderstanding regarding Instacart's business model. Given you were not familiar with Instacart prior to our phone conversation, we want to make sure we're clear: Instacart is not a product vendor. As we explained in our objections and again in our phone conversation, Instacart does not "offer products" to consumers. Instead, Instacart offers a means to place delivery and pick-up orders with product vendors. Those vendors choose which products to offer and the price at which they offer them. **Instacart does not directly price and sell products.**

Nevertheless, we offered to have our client review its internal records to determine whether it directly affected the prices of the specific Tier 1 products during the relevant time period. Our client has completed its review and has confirmed that it did not directly affect the price of the Tier 1 products.

We understand that this information resolves the matter of the subpoena for the time being. Please let us know if you have any further questions.

Thanks,

Laura


Laura Shapiro

**B R A U N HAGEY & B O R D E N** LLP
Direct: (415) 796-0701

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Friday, March 21, 2025 5:57 PM
**To:** Laura Shapiro <lshapiro@braunhagey.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C


**\*\*\* EXTERNAL MESSAGE \*\*\***

Laura,

Thank you for your follow-up email.  As we have stated, while reserve all of our requests under the subpoena to Instacart for Tier 1 and Tier 2 products, for now, we are just seeking information regarding the Tier 1 products.

We understand your position that Instacart acts as an intermediary between retailers and consumers for the sale of products. You said you would confirm whether Instacart affects prices of products it offers on its platform, specifically, Tier 1 products.

I am not tracking your statement regarding "direct pricing" and "third parties," because if Instacart affected pricing of any Tier 1 products listed on its platform during the relevant period, we would like to discuss.

We look forward to reconnecting next week.

Thank you.

Nick

**Nick Valera**  He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Laura Shapiro <lshapiro@braunhagey.com>
**Sent:** Tuesday, March 18, 2025 1:11 PM
**To:** Valera, Nick <NickValera@dwt.com>; Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Almeida, MaryAnn
<MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika
<ShalikaMehta@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Mehta, Shalika
<ShalikaMehta@dwt.com>
**Subject:** Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart - Follow Up M&C

[EXTERNAL]

Hi Nick and Shalika,

Thanks for taking the time to meet just now. Please allow this email to serve as a
memorialization of our conversation.

We explained that Instacart operates a digital platform that provides customers with the ability
to order products from nearby retailers for pickup and delivery. Retailers with storefronts on
Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or
reseller of products, nor was it during the COVID-19 pandemic.

You confirmed that Amazon is currently seeking direct pricing information regarding Tier 1
products and, at this time, does not intend to seek additional documents or information from
third parties that did not directly price or sell Tier 1 products. With that understanding, we have
agreed to go back to our client on the question of whether Instacart has ever had any role in the
direct pricing of Tier 1 products.

We will circle back next week.

Thank you,

Laura

Laura Shapiro

**B R A U N H A G E Y & B O R D E N** LLP

Direct: (415) 796-0701

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Tuesday, March 18, 2025 6:42 AM
**To:** Marissa Benavides <benavides@braunhagey.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Great, thank you.

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Marissa Benavides <benavides@braunhagey.com>
**Sent:** Tuesday, March 18, 2025 6:41 AM
**To:** Valera, Nick <NickValera@dwt.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>; Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** Re: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**[EXTERNAL]**

---

Noon today still works. My colleague Laura Shapiro will be joining so please include her in the calendar invite.

Thanks,
Marissa

Marissa R. Benavides

**B R A U N HAGEY & B O R D E N** LLP

Direct: (646) 876-5766

**New York**

118 W 22nd Street, 12th Floor

New York, NY 10011

Tel. (646) 829-9403

Fax. (646) 403-4089

**San Francisco**

747 Front Street, 4th Floor

San Francisco, CA 94111

Tel: (415) 599-0210

Fax: (415) 276-1808

This message is intended only for the confidential use of the intended recipient(s) and may contain protected information that is subject to attorney-client, work product, joint defense and/or other legal privileges. If you are not the intended recipient, please contact me immediately at the phone number listed above and permanently delete the original message and any copies thereof from your email system. Thank you.

On Mar 18, 2025, at 9:38 AM, Valera, Nick <NickValera@dwt.com> wrote:

**\*\*\* EXTERNAL MESSAGE \*\*\***

Thanks, Marissa. I can do noon today. If that has filled up for you, I am also wide open tomorrow.

**Nick Valera**    He/Him/His

**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com

**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610

**DWT.COM**

**From:** Marissa Benavides <Benavides@braunhagey.com>
**Sent:** Monday, March 17, 2025 9:09 AM
**To:** Valera, Nick <NickValera@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**[EXTERNAL]**

Nick,

I forgot you're on PT time. I have a conflict at 11am PDT but can do 10am or 12pm.

Thanks,
Marissa

Marissa R. Benavides
**BRAUNHAGEY & BORDEN** LLP
Direct: (646) 876-5766

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, March 17, 2025 10:52 AM
**To:** Marissa Benavides <Benavides@braunhagey.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

Thank you. Could we do tomorrow at 11 A.M. PST?

Best,
Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <Benavides@braunhagey.com>
**Sent:** Monday, March 10, 2025 3:02 PM
**To:** Valera, Nick <NickValera@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>

**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

[EXTERNAL]

Nick,

At the risk of approaching scheduling comedy I am unfortunately off on Friday. My next blocks of availability are Monday 9-11am and Tuesday 9am-1pm.

Thanks,
Marissa

Marissa R. Benavides
**B R A U N HAGEY & B O R D E N** LLP
Direct: (646) 876-5766

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, March 10, 2025 5:27 PM
**To:** Marissa Benavides <Benavides@braunhagey.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

Our firm has its retreat this week starting on Wednesday. Do you have any availability on Friday?

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <Benavides@braunhagey.com>
**Sent:** Monday, March 10, 2025 10:24 AM
**To:** Valera, Nick <NickValera@dwt.com>; Adam Cashman

<cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith
<osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

[EXTERNAL]

Nick,

Unfortunately I now have another call at that time. I'm free Wednesday from 11am-12pm PT and Thursday from 9am-1pm PT.

Thanks,
Marissa

Marissa R. Benavides
**BRAUNHAGEY & BORDEN** LLP
Direct: (646) 876-5766

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, March 10, 2025 9:59 AM
**To:** Marissa Benavides <Benavides@braunhagey.com>; Adam Cashman
<cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith
<osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Marissa,

Are you still available at 1pm tomorrow for a call? Thanks.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <Benavides@braunhagey.com>

**Sent:** Thursday, March 6, 2025 10:45 AM
**To:** Valera, Nick <NickValera@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**[EXTERNAL]**

Nick,

We're available from 10am-12pm PT on Monday and 1-3pm PT on Tuesday. Let us know if either of those windows work.

Thanks,
Marissa

Marissa R. Benavides
B R A U N **H A G E Y** & B O R D E N LLP
Direct: (646) 876-5766

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Thursday, March 6, 2025 12:18 PM
**To:** Marissa Benavides <Benavides@braunhagey.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Hi Marissa,

Following up on my email from Monday. Please let me know if you can talk tomorrow or early next week.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Valera, Nick
**Sent:** Monday, March 3, 2025 4:13 PM
**To:** 'Marissa Benavides' <Benavides@braunhagey.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryannAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>; Mehta, Shalika <ShalikaMehta@dwt.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

Hi Marissa,

It was a busy month, apologies for not getting back to you. Could we get something on the calendar for this week?

Thanks.

Nick

**Nick Valera**    He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

**From:** Marissa Benavides <Benavides@braunhagey.com>
**Sent:** Tuesday, January 28, 2025 2:32 PM
**To:** Valera, Nick <NickValera@dwt.com>; Adam Cashman <cashman@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>
**Subject:** RE: Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**[EXTERNAL]**

Nick,

Thanks for your email. Unfortunately this week is tough in terms of scheduling. My calendar opens up considerably next Wednesday 2/5—do you have any availability that day between 9am-3pm PT?

Thanks,

Marissa

Marissa R. Benavides
**BRAUNHAGEY & BORDEN** LLP
Direct: (646) 876-5766

---

**From:** Valera, Nick <NickValera@dwt.com>
**Sent:** Monday, January 27, 2025 7:34 PM
**To:** Adam Cashman <cashman@braunhagey.com>; Marissa Benavides <Benavides@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Cc:** Almeida, MaryAnn <MaryAnnAlmeida@dwt.com>; Olivia Smith <osmith@braunhagey.com>
**Subject:** Greenberg et al. v. Amazon, Inc. - Amazon Subpoena to Instacart

**\*\*\* EXTERNAL MESSAGE \*\*\***

Adam,

I am following up regarding Amazon's subpoena to Instacart in the matter *Greenberg et al. v. Amazon*, No. 21-cv-898. We have received Instacart's objections, thank you. Do you have time to meet and confer on this issue sometime this week (except for Friday)? Please let me know times that would work for you.

Best,
Nick

**Nick Valera**   He/Him/His
**Associate,** Davis Wright Tremaine LLP

**P** 206.757.8323  **E** nickvalera@dwt.com
**A** 920 5th Avenue, Suite 3300, Seattle, WA 98104-1610
**DWT.COM**

---

**From:** Olivia Smith <osmith@braunhagey.com>
**Sent:** Friday, January 17, 2025 9:09 PM
**To:** Goldmark, John <JohnGoldmark@dwt.com>
**Cc:** Adam Cashman <cashman@braunhagey.com>; Marissa Benavides <Benavides@braunhagey.com>; Laura Shapiro <lshapiro@braunhagey.com>
**Subject:** Greenberg et al. v.
https://url.us.m.mimecastprotect.com/s/JFtLCpYzLNiJBz1EsPfvSG1Jh6?domain=amazon.com, Inc. | Case No. 2:21-cv-00898-RSL

**[EXTERNAL]**

Counsel:

Attached please find documents for service in the above-captioned matter. Hard copies to follow in the mail.

Regards,
Olivia Smith
Litigation Legal Assistant
**B R A U N HAGEY & B O R D E N** LLP
Direct: (415) 491-7063

**San Francisco**

747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
Fax: (415) 276-1808

**New York**

118 W 22nd Street, 12th Floor
New York, NY 10011
Tel. & Fax: (646) 829-9403

This message is intended only for the confidential use of the intended recipient(s) and may contain protected information that is subject to attorney-client, work product, joint defense and/or other legal privileges.  If you are not the intended recipient, please contact me immediately at the phone number listed above and permanently delete the original message and any copies thereof from your email system.  Thank you.

# EXHIBIT 2



Suite 3300
920 Fifth Avenue
Seattle, WA  98104-1610

**John Goldmark**
206-757-8068 tel
206-757-7068 fax

johngoldmark@dwt.com

November 11, 2025

<u>**VIA EMAIL**</u>
cashman@braunhagey.com
lshapiro@braunhagey.com
benavides@braunhagey.com

Adam Cashman
Laura J. Shapiro
BraunHagey & Borden LLP
747 Front St, 4th floor
San Francisco, CA 94111

Marissa Benavides
BraunHagey & Borden LLP
200 Madison Ave, 23rd floor
New York, NY 10016

> Re: *Greenberg et al. v. Amazon.com*, Case No. 2:21-cv-00898-RSL (W.D. Wash.) ("Lawsuit")

Dear Ms. Benavides:

As you know, we are defending Amazon.com, Inc. ("<u>Amazon</u>") in a class-action lawsuit pending in the Western District of Washington (the "<u>Court</u>"), in which the named Plaintiffs allege on behalf of themselves and a putative class of "[a]ll persons who purchased any consumer good or food item . . . on Amazon.com between January 31, 2020 and October 20, 2022 whose price was set at an unfair level" that Amazon violated the Washington Consumer Protection Act, RCW § 19.86, *et seq*.  We served Instacart with the attached Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "<u>Subpoena</u>," Exhibit 1) in connection with the Lawsuit on December 18, 2024.

Amazon previously agreed to allow subpoena recipients in the Lawsuit to limit their responses to documents related to the products that form the basis of the Plaintiffs' individual claims ("<u>Tier 1 Requests</u>").  We conferred with you regarding Instacart's objections to the Tier 1 Requests.  Instacart maintained its objections, as we understand them, based on its representation that it does not set product pricing for the products third parties sell on its website, as well as its objections to Amazon's requests for information (specifically, RFP No. 4) from Instacart that it

Instacart
November 11, 2025
p. 2

believed Amazon could request from other parties.  In your July 2, 2025 email to Amazon, you represented regarding RFP Nos. 6-7 that "[w]e are continuing our investigation and will let you know if our understanding changes in any material respect."  In Amazon's July 18, 2025 response, we explained that we disagreed with your characterization of Amazon's discovery efforts and requested an update regarding your investigation into RFP Nos. 6-7.  We did not receive any response.

As you are aware, Amazon reserved the right to later seek documents related to all consumer goods and food items, which are the products that form the basis of Plaintiffs' class allegations ("Tier 2 Requests").  In December 2024, it filed a motion for a protective order to limit the scope of discovery to just the products described in the Tier 1 Requests.  *See Greenberg*, ECF No. 178.

On July 18, 2025, the Court denied Amazon's motion for a protective order and ordered Amazon to produce data related to all consumer goods[1] and food items sold during the period.  *See Greenberg*, ECF No. 177 at 6, 8 (Exhibit 2).  On the same day, the Court issued an order on third-party subpoena recipient ALDI Inc.'s motion to quash, holding that "the prices at which Aldi offered consumer goods and food items for sale . . . is critical to Amazon's defenses."  *See Greenberg*, ECF No. 178 at 5 (Exhibit 3).  In its decision, the Court "presume[d] that Amazon is no longer willing to forego discovery regarding the sale of consumer goods and food items or to limit the Aldi locations at issue."  *Id.* at 5 n.3.  That presumption was correct.  Since the Court has now definitively ruled that this type of data is relevant to the case, Amazon needs the same from third parties—including Instacart.

Amazon now seeks data and documents responsive to both Tier 1 and Tier 2 Requests, no longer limiting its requests to Subpoena Request Nos. 1–9, and asks that Instacart produce the requested documents and data within 30 days of receipt of this letter. In seeking Tier 2 discovery, Amazon specifically seeks the following types of data and information held by the Court to be relevant to Amazon's defense:

-   *Pricing data.*  Instacart is required to produce data as described in Subpoena Request No. 13, indicating the price and availability of "consumer goods and food items sold by third-parties on your website" between January 31, 2020 and October 20, 2022.  In its order, the Court explained that third parties' prices and availability are "relevant to plaintiffs' price gouging claim and Amazon's defenses thereto" including because it will "inform the jury's determination of whether plaintiff could reasonably have avoided the injury of which she complains."  Exhibit 3 at 4.  This relevance extends to all "consumer goods" and "food items" to match the current scope of discovery, as confirmed by the Court.  Exhibit 2 at 6.

---

[1] The Court defined "consumer goods" to mean "all items sold for personal consumption or use."  *Greenberg*, ECF No. 177 at 6.

Instacart
November 11, 2025
p. 3

Consistent with its approach to the Tier 1 Requests, Amazon seeks information about price and availability through transaction-level data containing the following key fields:

- o Transaction date,

- o Store location (e.g., street address, city, county, state, and zip code), if relevant,

- o Shipping location (e.g. state, city, and zip code of customer) for eCommerce sales,

- o Net unit price (sales price accounting for discounts, refund/return of products, or shipping cost, etc.),

- o Units sold (sales quantity accounting for refund/return of products),

- o Product UPC,

- o Product description,

- o Product categories (e.g., general ledger groups and any intermediate groupings/classifications of related products; can be multiple fields),

- o Unit size information, and

- o Purchase channel indicating brick-and-mortar sales or online/eCommerce sales if relevant.

Amazon also requests any supplemental documentation on the fields related to price and quantity which explain whether the pricing is per-unit and whether discounts, refund/return of products, and shipping cost (if applicable) are already taken into consideration.

- *COVID-19 Protocols and Policies*.  To the extent Instacart has COVID-19 protocols and policies responsive to Subpoena Request No. 9, it is now required to produce them. The Court held that third-party retailers' protocols and policies are relevant to Plaintiffs' price gouging claim and Amazon's defense since such policies would inform whether Plaintiffs could have safely shopped at a given retailer during the pandemic. Exhibit 3 at 4.

- *Anti-Price Gouging Policies and Actions.*  Finally, Instacart is required to produce its anti-price gouging policies and actions responsive to Subpoena Request Nos. 15 and 16 to the extent that any exist.  The Court held that third parties' "anti-price gouging policies/actions" are "critical to Amazon's defenses" and may inform the standard of care across retailers.  Exhibit 3 at 4 n.2, 5.

Instacart
November 11, 2025
p. 4


        We are available to discuss these requests and continue our productive conversations to date.  Thank you for your attention to this matter.

                              Very truly yours,

                              DAVIS WRIGHT TREMAINE LLP

                              John Goldmark


Attachment: Exhibit 1 (Subpoena), Exhibit 2 (ECF No. 177), and Exhibit 3 (ECF No. 178)

**EXHIBIT 1**



Suite 3300
920 Fifth Avenue
Seattle, WA 98104-1610

**John Goldmark**
206-757-8068 tel
206-757-7068 fax

johngoldmark@dwt.com

December 18, 2024

Maplebear, Inc.
d/b/a Instacart
50 Beale Street #600
San Francisco, CA
94105

Re:     *Greenberg v. Amazon.com*, Case No. 2:21-cv-00898-RSL (WDWA)

Dear Sir or Madam:

In connection with the above captioned matter, please see the attached Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "<u>Subpoena</u>"), served pursuant to Federal Rule of Civil Procedure 45.

We represent Amazon.com, Inc. ("<u>Amazon</u>") in a class-action lawsuit brought by five named plaintiffs against Amazon in the District Court for the Western District of Washington (the "<u>District Court</u>"), alleging on behalf of themselves and a putative class of "[a]ll persons who purchased any consumer good or food item . . . on Amazon.com between January 31, 2020 and October 20, 2022 whose price was set at an unfair level" that Amazon violated the Washington Consumer Protection Act. Wash. Rev. Code § 19.86 *et seq.*

On November 4, 2024, Amazon moved the District Court to strike Plaintiffs' class allegations. *See* ECF No. 73 (the "<u>Motion to Strike</u>"). If granted, only the five named plaintiffs' individual claims based on their individual purchases would remain in the case. As such, our requests for documents are divided into two groups. Tier 1 Requests seek documents related to the products that form the basis of the Plaintiffs' individual claims (*i.e.* those products that Plaintiffs themselves purchased), while Tier 2 Requests relate to broader categories of products that form the basis of Plaintiffs' class allegations (*i.e.*, all consumer goods and food items).

Until the Motion to Strike is ruled upon, the District Court gives some additional guidance, or Amazon otherwise decides, you can limit your responses only to the Tier 1 requests. We reserve our rights to seek your responses to the Tier 2 requests under any of the above circumstances.

December 18, 2024
Page 2

If you have any questions or concerns, I can be reached by phone at (206) 757-8068, or by e-mail at johngoldmark@dwt.com.

Very truly yours,

DAVIS WRIGHT TREMAINE LLP

John Goldmark

Attachment - Subpoena

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

| | | |
|---|---|---|
| ALVIN GREENBERG et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2:21-cv-00898-RSL |
| AMAZON.COM, INC. | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                               Maplebear, Inc., d/b/a Instacart

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A attached.

| Place: 920 5th Ave #3300, Seattle, WA 98104 | Date and Time: |
|---|---|
| | 1/3/2025 10:00 am |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   12/18/2024

*CLERK OF COURT*

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                         *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Amazon.com, Inc.
_____ , who issues or requests this subpoena, are:

John Goldmark, 920 5th Ave #3300, Seattle, WA 98104, johngoldmark@dwt.com, (206) 757-8068

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:21-cv-00898-RSL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFINITIONS

1.      "Action" means the above-captioned civil action.

2.      "Communication(s)" is defined as the transmittal of facts, ideas, thoughts, opinions, data, inquiries or other information, whether orally or in writing or by any other means, between or among two or more persons or entities, and includes correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, email, and postings of any type.

3.      "Complaint" means the Second Amended Complaint filed in this Action on September 20, 2024 (ECF No. 66) (attached hereto as Exhibit A).

4.      "Related to" means containing, evidencing, setting forth, identifying referring to, regarding, describing, mentioning, or constituting.

5.      "COVID-19 Pandemic" refers to the pandemic of the COVID-19 virus that spanned, for purposes of these Requests, January 31, 2020 to October 20, 2022.

6.      "Document" shall be construed as broadly as allowed by the applicable rules to include any tangible thing, including without limitation the original and any non-identical copy of any written, typed, recorded, or graphic matter, however produced, reproduced, or stored, in whatever form, including without limitation any writings, drawings, graphs, charts, sound recordings, video recordings, photographs, printouts, books, publications, computer disks, computer files, electronic mail messages, any manner of mechanical, electrical, or electronic transcription or encoding of words, numbers, or information, together with all programs and manuals necessary to interpret such encoded information, and all other data compilations from

which information can be obtained or translated through detection devices into reasonably usable form.

7.    "Government Entity" means any federal, state, or foreign governmental criminal, civil, or regulatory agency or authority, or any current or former officer, employee or agent thereof.

8.    "Plaintiff" and "Plaintiffs" mean the named plaintiffs identified in the Complaint, those and their agents, counsel, successors, relatives, and assigns.

9.    "Tier 1 Products" mean the products that Plaintiffs allegedly purchased at unfair prices, *see* Complaint at 5–23, specifically: bleach, active dry yeast, flea & tick spray, instant or ramen noodles, rice, vegetable glycerin, disinfecting wipes, and distilled water.

10.    "Purchase(s)" means to obtain in exchange for money or its equivalent.

11.    "Research" means any inquiry, investigation, or examination aimed at the discovery and interpretation of facts.

12.    "Relevant time period" means the period from January 1, 2017 to the present.

13.    "Record(s)" shall be construed broadly and incorporate the definition of "Document" as defined above.

14.    "You" and "Your" refer the person(s) or entity(ies) responding to these discovery requests.

### INSTRUCTIONS

1.    The Definitions above apply to these Instructions and to each Request.

2.    Unless otherwise specified, the responsive period for each request is from January 1, 2017 through the date of these Requests.

2

3.       In accordance with Rule 45 of the Federal Rules of Civil Procedure, the Documents to which these Requests for Production relate include any and all Documents that are in Your possession, custody, or control, regardless of location.

4.       You shall produce all Documents in the manner in which they are maintained in the usual course of business, including in their native electronic format, or organized and labeled to correspond to each separately numbered Request.  A request for a Document shall be deemed to include a request for any and all file folders within which the Document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document, in addition to the Document itself.

5.       Documents shall be produced and Bates numbered in such a way as to identify the applicable file folder and/or source from which each responsive Document came or was obtained.

6.       Confidential, proprietary, or private information shall be produced in a manner consistent with the Stipulated Protective Order (ECF No. 42) (attached hereto as Exhibit B). Instructions for designating protected material can be found in Section 6 therein.

7.       Documents shall be produced in a manner consistent with the Order Regarding Discovery of Electronically Stored Information in the Action (ECF No. 45) (attached hereto as Exhibit C).

8.       In accordance with Rule 26 of the Federal Rules of Civil Procedure, these Requests are continuing in character and require You to amend or supplement Your responses if You obtain further or different responsive Documents.

9.       You must answer each Request separately and fully, unless it is objected to, in which event the objection(s) should be specifically stated.

3

10. Documents attached to each other should not be separated.

11. If You claim any ambiguity in interpreting either a Request or a Definition or Instruction, You should not use that claim as a basis for refusing to respond, but shall set forth as part of their response the language deemed to be ambiguous and identify the interpretation Plaintiffs have applied or will apply in responding.

12. If You have no Documents responsive to a request, You must say so in Your response.

13. If You withhold any Document, or any portion of any Document, under any claim of privilege, immunity, or protection, You shall provide a written privilege log that sets forth information explaining the nature of the claim.

14. For the purpose of construing the scope of these Requests, the terms used shall be given their most expansive and inclusive interpretation.

15. Each Paragraph of these Requests should be construed independently, and no other Request or Paragraph shall be referred to or relied on for the purpose of limiting the scope of any Request.

16. The words "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

17. The singular form of a word shall be construed to include the plural, and the plural form of a word shall be construed to include the singular, to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

18.     "All" shall be construed to mean and include the word "any," and "any" shall be construed to mean and include the word "all," to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

## TIER 1 REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     All Documents and/or data related to Your pricing of the Tier 1 Products during the COVID-19 Pandemic, in stores and online, including but not limited to any price increases or decreases.

2.     All Documents and/or data related to Your Costs for the Tier 1 Products sold by You during the COVID-19 Pandemic, in stores and online, including but not limited to Your unit costs associated with sales in stores and online, and any cost increases or decreases incurred by You.

3.     All Documents and/or data related to Your inventory of the Tier 1 Products during the COVID-19 Pandemic, including but not limited to Documents and/or data reflecting decreasing inventory or out-of-stock Tier 1 Products.

4.     Transactional data for Purchases of the Tier 1 Products sold by You or by third-parties on your website made between January 1, 2017 and the present sufficient to show, at least, (i) products sold, (ii) transaction date and time, (iii) SKU, (iv) price, (v) any applicable discount, (vi) identity of the purchaser, (vii) identity of the seller, to the extent that the Tier 1 Products were sold by a third-party on your website, (viii) geographic location of the purchaser and/or the store location from which the purchase was made, (ix) margin, (x) cost of acquisition, (xi) shipping cost, (xii) whether the product is new or used, and (xiii) mode of purchase, *e.g.*, whether the purchase was made in-store by the consumer, through a delivery app, through Your website for pickup, or online.

5

5.    All Documents and/or data related to Your analysis of competitors' prices for Tier 1 Products during the COVID-19 Pandemic.

6.    All Documents and/or Communications related to any policies, procedures, processes, or controls You had in place during the Relevant Time Period related to price gouging, unusual price increases, avoiding inventory shortages or exhaustion, purchase limits for individual products or categories of products, limitations on price increases, and/or fair pricing, including policies governing sales by authorized third-parties, where applicable. This request is limited to policies, procedures, processes or controls applicable to the Tier 1 Products.

7.    All Documents and/or Communications related to any actions taken by You to prevent, remediate and/or remove products that were subject to price gouging and/or unfair pricing, or actions taken by You to manage inventories, including by imposing or removing purchase limits or price caps for products in high demand. This request is limited to actions taken by You with respect to any of the Tier 1 Products.

8.    All data for Your discount offers on the Tier 1 Products between January 1, 2017 and the present, in store and online.

9.    Documents or data related to any changes to Your health and safety protocols implemented in response to the COVID-19 Pandemic at each of your brick-and-mortar retail locations that sold Tier 1 Products during the Relevant Time Period, including changes to Your standard operating hours, reduced-contact or contactless shopping options, social distancing requirements, face covering requirements, cleaning and sanitization protocols, and employee trainings and guidance offered on such health and safety protocols.

6

**TIER 2 REQUESTS FOR PRODUCTION OF DOCUMENTS**

10.     All Documents and/or data related to Your pricing of Your consumer goods and/or food items during the COVID-19 Pandemic, in stores and online, including but not limited to any price increases or decreases.

11.     All Documents and/or data related to Your Costs for consumer goods and food items sold by You during the COVID-19 Pandemic, in stores and online, including but not limited to Your unit costs associated with sales in stores and online, and any cost increases or decreases incurred by You.

12.     All Documents and/or data related to Your inventory of consumer goods and food items during the COVID-19 Pandemic, including but not limited to Documents and/or data reflecting decreasing inventory or out-of-stock consumer goods or food items.

13.     Transactional data for Purchases of Your consumer goods and food items or consumer goods and food items sold by third-parties on your website made between January 1, 2017 and the present sufficient to show, at least, (i) products sold, (ii) transaction date and time, (iii) SKU, (iv) price, (v) any applicable discount, (vi) identity of the purchaser, (vii) identity of the seller, to the extent that the consumer goods or food items were sold by a third-party on your website, (viii) geographic location of the purchaser and/or the store location from which the purchase was made, (ix) margin, (x) cost of acquisition, (xi) shipping cost, (xii) whether the product is new or used, and (xiii) mode of purchase, *e.g.*, whether the purchase was made in-store by the consumer, through a delivery app, through Your website for pickup, or online.

14.     All Documents and/or data related to Your analysis of competitors' prices for consumer goods and food items during the COVID-19 Pandemic.

15.     All Documents and/or Communications related to any policies, procedures, processes, or controls You had in place during the Relevant Time Period related to price gouging,

7

unusual price increases, avoiding inventory shortages or exhaustion, purchase limits for individual products or categories of products, limitations on price increases, and/or fair pricing, including policies governing sales by authorized third-parties, where applicable.

16.     All Documents and/or Communications related to any actions taken by You to prevent, remediate and/or remove products that were subject to price gouging and/or unfair pricing, or actions taken by You to manage inventories, including by imposing or removing purchase limits or price caps for products in high demand.

17.     All data for Your discount offers on consumer goods and food items between January 1, 2017 and the present, in store and online.

# EXHIBIT A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, JULIE HANSON, CHRISTINA KING, and RONNELL ROBERTSON, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>    Defendant. | Case No. 2:21-cv-00898-RSL<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

SECOND AMENDED CLASS ACTION COMPLAINT
010923-11/2753066 V1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................................1

II. JURISDICTION AND VENUE............................................................................................4

III. PARTIES ...............................................................................................................................5

    A.  Plaintiffs ...................................................................................................................5

        1.  Alvin Greenberg, Ph.D. ...............................................................................5

        2.  Michael Steinberg........................................................................................8

        3.  Julie Hanson ...............................................................................................11

        4.  Christina King .............................................................................................14

        5.  Ronnell Robertson.......................................................................................21

    B.  Defendant ................................................................................................................23

    C.  History of Fair Pricing............................................................................................23

IV. FACTUAL ALLEGATIONS ..............................................................................................26

    A.  Outbreak of COVID-19...........................................................................................26

    B.  Emergency Declarations and Lockdowns ...............................................................28

    C.  Hoarding and Retail Scarcity...................................................................................31

    D.  Consumers Turn Increasingly to Online Purchasing, and Amazon in
        Particular..................................................................................................................33

    E.  Amazon Raised Prices Excessively During the COVID-19 Pandemic.....................36

    F.  Amazon is Responsible for Unlawful Price Increases on All Products Sold
        on Its Platform .........................................................................................................56

    G.  End of Emergency Lockdowns ...............................................................................65

    H.  Amazon Price-Gouged Its Way to Unprecedented Revenues During the
        COVID-19 Crisis......................................................................................................65

V.  CHOICE OF LAW ALLEGATIONS .................................................................................66

VI. CLASS ACTON ALLEGATIONS .....................................................................................66

VII. CLAIMS FOR RELIEF......................................................................................................69

FIRST CAUSE OF ACTION  VIOLATION OF WASHINGTON CONSUMER
        PROTECTION ACT ("WCPA") (WASH. REV. CODE § 19.86) ......................................69

SECOND AMENDED CLASS ACTION COMPLAINT – i
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

SECOND CAUSE OF ACTION NEGLIGENCE ..............................................................................72

THIRD CAUSE OF ACTION UNJUST ENRICHMENT ...............................................................73

PRAYER FOR RELIEF .................................................................................................................74

JURY TRIAL DEMANDED ...........................................................................................................74

SECOND AMENDED CLASS ACTION COMPLAINT – ii
010923-11/2753066 V1



For their Second Amended Class Action Complaint against Defendant Amazon.com, Inc. ("Amazon"), Plaintiffs Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.    With this action, Plaintiffs seek to hold Amazon accountable for its unlawful price gouging during the COVID-19 pandemic. As Amazon announced on its website on March 23, 2020, "Price gouging has no place in our stores."[1] And as the Washington Supreme Court held on August 8, 2024, price gouging is not allowed under Washington's Consumer Protection Laws.[2] This lawsuit seeks to hold Amazon accountable for price gouging.

2.    Throughout the pandemic, consumers turned increasingly to online retailers, and Amazon in particular, to fulfill their essential needs. With medical experts warning about the ease of infection in public settings, and "stay home" orders prevailing in most parts of the country, consumers recognized during the pandemic that retail excursions can have perilous consequences for themselves or loved ones, no matter what precautions are taken. In that moment, Amazon's services were essential. Without venturing into public and risking exposure, and under emergency stay-at-home orders, and with just a few clicks, Americans could purchase a wide range of consumer goods from Amazon that would be delivered directly to their homes.

3.    Amazon's sales have never been higher, and since the COVID-19 pandemic began, its sales in some categories (*e.g.*, home items) increased ***more than 1,000 percent***.[3] Correspondingly, Amazon's profits have skyrocketed. Jeff Bezos's personal wealth increased by $75 billion (or approximately $205 million per day) in 2020.[4]

---

[1]  Amazon, "Price gouging has no place in our stores," ABOUTAMAZON.COM (Mar. 23, 2020), https://www.aboutamazon.com/news/company-news/price-gouging-has-no-place-in-our-stores.

[2]  *Greenburg v. Amazon.com Inc.*, No. 101858-4 (Wash. Sup. Ct. Aug. 8, 2024).

[3]  *See* Dana Mattioli & Sebastien Herrera, *Amazon Struggles to Find Its Coronavirus Footing. 'It's a Time of Great Stress.'*, WALL STREET J. (Mar. 31, 2020), https://www.wsj.com/articles/amazon-struggles-to-find-its-coronavirus-footing-its-a-time-of-great-stress-11585664987.

[4]  *See* Kate Taylor, *A chart shows how Jeff Bezos's net worth exploded by $75 billion in 2020, reaching $188 billion before he stepped down as Amazon's CEO*, BUS. INSIDER (Feb. 2, 2021),

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

4. While Amazon provided needed services during the pandemic, this does not place it above the law. Like every seller, Amazon has a legal obligation under Washington (and other) laws to ensure that its pricing does not exploit consumers facing emergency conditions. That is, price gouging is not just immoral, it is a manifest violation of the Washington Consumer Protection Act ("WCPA").

5. To be sure, there is some price fluctuation in any dynamic market. This, however, is not a case about ordinary price fluctuation. It is about Amazon leveraging a pandemic to profit unfairly off consumers in real need. Available data show that Amazon's price increases have been anything but normal. Just by way of example, after COVID-19 was declared a nationwide public health emergency by the United States Department of Health and Human Services ("HHS"),[5] certain Amazon prices increased as follows:

- **Face Masks:** Increases up to *1,800 percent*, from $4.21 to $79.99;
- **Cold Remedies:** Increases up to *1,523 percent*, from $4.65 to $79.00;
- **Toilet Paper:** Increases up to *1,044 percent*, from $17.48 to $200;
- **Pain Reliever:** Increases up to *233 percent*, from $18.75 to $62.40;
- **Black Beans:** Increases up to *521 percent*, from $3.54 to $21.99;
- **Baking Soda:** Increases of more than *1,500 percent*, from $3.08 to $50.00;
- **Flour:** Increases up to *400 percent*, from $22.00 to $110.00;
- **Yeast:** Increases up to *625 percent*, from $7.02 to $50.95; and
- **Disinfectant Wipes:** Increases of more than *745 percent*, from $20.71 to $174.96.

6. All of these (and many more) Amazon price increases are flagrantly unlawful under Washington law. While the WCPA does not codify a specific threshold for price gouging, many states with comparable consumer-protection regimes set the bar at 10%. *See, e.g.*, Cal. Penal Code § 396(b), Ark. Code § 4-88-303(a), W. Va. Code §46A-6J-3. Others set it at 15%. *See, e.g.*, Or. Admin R. 401.965(3). Others bar *any* price increase during a declared emergency. *See* Haw. Rev. Stat. Ann

https://www.businessinsider.com/amazon-ceo-jeff-bezos-net-worth-explodes-in-2020-chart-2020-12.

5 *See* HHS, *Determination that a Public Health Emergency Exists* (dated Jan. 31, 2020, eff. Jan 27, 2020), available at https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx.

SECOND AMENDED CLASS ACTION COMPLAINT – 2
010923-11/2753066 V1



§ 127A-30(a)(1). A bill being once considered by Washington's legislature would render unlawful prices increases of 15% or more during a declared emergency.[6]

7.      The Washington Attorney General has recognized that charging excessive prices during the COVID-19 pandemic "is a violation of the Consumer Protection Act, RCW 19.86.020" as it currently exists.[7] Invoking the WCPA, the Washington Attorney General has issued numerous cease-and-desist letters barring "price gouging during this emergency."[8] Whether or not further price gouging legislation is enacted, courts likewise have an obligation to enforce the plain terms of the WCPA, including its freestanding prohibition on "unfair" acts or practices. And price gouging to profit off a pandemic is about as "unfair" as a business practice can get.

8.      Prior to this action, Amazon has acknowledged price gouging on its platform during the pandemic, but it has deflected responsibility by blaming third-party suppliers who use Amazon to market their goods. Indeed, Amazon knew how to identify price gouging and represented to its customers that "we have dynamic, automated systems in place that locate and remove unfairly priced items" and that Amazon had removed "well over half a million of offers from our stores due to coronavirus-based price gouging." This public relations campaign surfaced two important facts. *First*, when a third party markets a product on Amazon, Amazon controls virtually every aspect of the sale, ***including the price ceiling***, and can identify price gouging and stop it. Further, when Amazon sells products supplied by third parties at excessive prices, Amazon is responsible. *Second*, and most brazenly, Amazon inflated prices on its own inventory of products throughout the pandemic. These are products Amazon supplies and sells directly to consumers. For example, a study by the Public Interest Research Group ("PIRG") shows that, in February 2020, Amazon had increased prices on its own inventory by more than 50 percent on one-sixth of public health products used to combat COVID-

---

[6]     *See* SB 5191, 67th Leg., Reg. Sess. (Wash. 2021), text and status available at https://app.leg.wa.gov/billsummary?BillNumber=5191&Year=2021 (last visited Sept. 19, 2024).

[7]     *See* Bob Ferguson, Wash. Att'y Gen., Notices to Cease and Desist (Mar. 26, 2020), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/DemandLetters032620.pdf; *see also Greenberg v. Amazon*, Case No. 101858-4 (Wa. Sup. Ct.), Brief of Amicus Curiae Attorney General of the State of Washington (Dec. 4, 2023).

[8]     *See id.*



19.[9] Later in September 2020, Public Citizen tracked Amazon pricing on 10 essential products that Amazon markets directly (e.g. masks, toilet paper, disinfectant, etc.) and identified markups from 48% to 1,010%.[10] In short, while claiming to combat third-party price gouging, Amazon has jacked prices on its own inventory of products to profiteer off consumers in desperate need.

9.     To safely obtain essential goods during the COVID-19 crisis, Plaintiffs Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson purchased items from Amazon at excessive and unfair prices that vastly exceeded the prices prevailing before the pandemic—increases ranging from 53% to 826%. Amazon profited unlawfully from these sales and Plaintiffs were harmed commensurately. On behalf of themselves, and a proposed Class of consumers similarly situated, Plaintiffs seek damages, restitution, injunctive relief, and all other available remedies.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal courts for any class action in which any member of the Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of interest and costs. Plaintiffs allege that the total claims of individual class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6). Plaintiffs are citizens of California, whereas Defendant is a citizen of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, the total number of class members is greater than 100, as required by 28 U.S.C. § 1332(d)(5)(B). Federal subject matter jurisdiction thus exists.

11.     Amazon has minimum contacts with the United States, this judicial district, and Washington. Amazon maintains its headquarters in Washington and has intentionally availed itself of

---

[9]   *See* U.S. Pub. Interest Research Grp. Ed. Fund, *Analysis: Coronavirus spike most surgical mask, sanitizer prices at least 50% on Amazon* (last updated July 28, 2020), https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon.

[10]   Public Citizen, *Prime Gouging: How Amazon Raised Prices to Profit from the Pandemic* at 12 (Sept. 2020), available at https://www.citizen.org/wp-content/uploads/Prime-Gouging-report.pdf.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

the laws of Washington by conducting a substantial amount of business in the state. This Court accordingly has personal jurisdiction over Amazon.

12. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because Amazon is headquartered and resides in this District. Venue is further appropriate in this district pursuant to the forum selection clause in Amazon's online "conditions of use," which are available when a consumer signs up for an Amazon account and makes purchases. The conditions provide that "[a]ny dispute or claim relating in any way to your use of any Amazon Service will be adjudicated in the state or Federal courts in King County, Washington, and you consent to exclusive jurisdiction and venue in these courts."

### III. PARTIES

**A. Plaintiffs**

**1. Alvin Greenberg, Ph.D.**

13. Plaintiff Alvin Greenberg, Ph.D., is 74 years old and resides in San Rafael, California. San Rafael is in Marin County.

14. Dr. Greenberg is a toxicologist. He served previously as Chair of the Bay Area Air Quality Management District Hearing Board, a Member of the California Occupational Health and Safety Standards Board (appointed by the governor), and Assistant Deputy Chief for Health, Cal-OSHA.

15. Following the January 31, 2020 declaration of a national COVID-19 emergency by the HHS, Marin County issued a Shelter-in-Place Order on March 16, 2020.[11] Consistent with prevailing guidance from health experts, the order instructed residents such as Dr. Greenberg to "self-isolate in their place of residence to the maximum extent feasible."[12] Marin County officials implored residents

---

[11] *See* Matt Willis, MD, MPH, Health Officer of the Cty. of Marin, *Order of the Cty. Health Officer of the Cty. of Marin to Shelter in Place* (Mar. 16, 2020), available at https://coronavirus.marinhhs.org/sites/default/files/Files/Shelter%20in%20Place/Shelter%20 in%20Place%20Order%2016%20March%202020.pdf.

[12] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 5
010923-11/2753066 V1



to leave their homes "as infrequently as possible and only for approved activities."[13] While discouraging avoidable excursions, Marin County officials reminded residents that they could still "go online, purchase items, and have them delivered to [their] home."[14] This guidance was reiterated by the California Department of Health, which on March 16, 2020, advised individuals over the age of 65, such as Dr. Greenberg, to "[r]emain at home until further guidance is issued" and to "[c]onsider on-line ordering for food and other supplies."[15]

16. Marin County renewed its Shelter-in-Place Order on March 31, 2020, expanding it to make social distancing mandatory.[16] The Shelter-in-Place Order was further renewed by subsequent pronouncements, and California's statewide shelter-in-place order remained in effect until June 15, 2021.[17]

17. On or around April 21, 2020, Dr. Greenberg spoke with his girlfriend, Julie Hoemke, who resides in San Jacinto, California. Ms. Hoemke lives with three of her children and a granddaughter who, at that time, was six months old. Consistent with guidance from public health officials, Ms. Hoemke had been regularly disinfecting the surfaces of her home to protect herself and family from COVID-19. She had been using bleach for this purpose but had run out of her supply. Ms. Hoemke visited and called multiple retailers in her vicinity—including grocery stores, Home Depot, Lowes, and Walmart—in hopes of securing a replacement supply of bleach. The retailers, however, were all sold out of bleach and other disinfectants.

---

[13] Marin Health & Human Servs., *Frequently Asked Questions*, https://coronavirus.marinhhs.org/faqs/en (last visited June 29, 2021) (FAQ: "What can I do to slow the spread of COVID-19").

[14] *See id.* (FAQ: "Can I still order the things I need online from businesses and have them delivered to my home?").

[15] *See* Cal. Dep't of Pub. Health, *COVID-19 Public Health Guidance: Self-Isolation for Older Adults and Those Who Have Elevated Risk* (Mar. 16, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf.

[16] *See* Lisa Santora, MD, MPH, Deputy Health Officer of the Cty. Of Marin, *Order of the Cty. Health Officer of the Cty. Of Marin to Shelter in Place* (Mar. 31, 2020), available at https://coronavirus.marinhhs.org/sites/default/files/2020-03/marin_final-superseding-shelter-in-place-order.pdf.

[17] *See Safely reopening California*, https://covid19.ca.gov/safely-reopening/ (June 22, 2021 update).

SECOND AMENDED CLASS ACTION COMPLAINT – 6
010923-11/2753066 V1



18. Hearing this, Dr. Greenberg endeavored to locate bleach that could be shipped to Ms. Hoemke. Dr. Greenberg did not, however, feel safe visiting retail outlets in and around his San Rafael home. COVID-19 was spreading at this time and at 74 years of age, and with asthma, Dr. Greenberg recognized that he was at heightened risk of experiencing complications should he come into contact with the virus. Heeding public health guidance, Dr. Greenberg instead looked online for a supplier of bleach. The only online retailer he could locate with any bleach in stock was Amazon, which on April 21, 2020, was selling three-bottle containers of Clorox Concentrated Germicidal Bleach for $58.19. From his professional training, Dr. Greenberg was generally aware that bleach is effective in combatting viruses. Dr. Greenberg had also reviewed the CDC's and EPA's websites to confirm as much. The particular Clorox product Dr. Greenberg located on Amazon features a higher concentrate of sodium hypochlorite, the active ingredient that kills viruses.

19. Dr. Greenberg recognized immediately that $58.19 was an exorbitant price for three bottles of Clorox Concentrated Germicidal Bleach. But under the circumstances, he saw no meaningful choice but to purchase it from Amazon. Even if this product could be obtained from stores in his area, and there was no assurance of that given retail scarcity of COVID-combatting products, as indicated by Ms. Hoemke's inability to find bleach at local retailers, Dr. Greenberg did not feel safe venturing into retail outlets, nor would this have been consistent with public health guidance. The only alternative was to wait in hopes that other online retailers would restock the product, but it was unclear when (if ever) this would occur. At the time, Amazon itself purported to only have six boxes of Clorox Concentrated Germicidal Bleach remaining. With COVID-19 spreading rapidly, and the safety of his girlfriend and family imperiled, Dr. Greenberg did not believe that waiting was an option. Dr. Greenberg accordingly purchased the product at the listed price of $58.19. Dr. Greenberg paid for the bleach out of pocket and has not been reimbursed.

20. The price Dr. Greenberg paid for Clorox Germicidal Bleach vastly exceeded the price that prevailed on Amazon prior to the pandemic. On January 31, 2020, when Health and Human Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective

SECOND AMENDED CLASS ACTION COMPLAINT – 7
010923-11/2753066 V1



January 27, 2020), the specific product Dr. Greenberg purchased sold on Amazon for **$21.74**.[18] By April 21, 2020, when Dr. Greenberg made his purchase, the price had jumped to **$58.19**, which represents a *168%* increase above the January 31, 2020 price.[19]



### 2. Michael Steinberg

21. Plaintiff Michael Steinberg lives in Oakland, California, which is in Alameda County. Following the January 31, 2020 declaration of a national emergency by the HHS, Alameda County declared a State of Emergency on March 1, 2020.

22. To prevent a larger outbreak of COVID-19, on March 16, 2020, Alameda County issued a Shelter-in-Place Order, which instructed its citizens to "self-isolate in their places of residence to the maximize extent feasible."[20] On that same day, similar orders were issued by five surrounding Bay Area counties, as well as the City of Berkeley, with a total population exceeding six million people

---

[18] *See* https://keepa.com/#!product/1-B06XZJH8XJ (last visited Oct. 22, 2021). For brevity, links to specific product price-tracking websites are abbreviated to their URLs.

[19] *Id.*

[20] Dr. Erica Pan, Interim Health Officer of the Cty. of Alameda, *Order of the County Health Officer to Shelter in Place* (Mar. 16, 2020), http://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf.

SECOND AMENDED CLASS ACTION COMPLAINT – 8
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

covered by the orders. A California statewide shelter-in-place order remained in effect through June 15, 2021.

23. While discouraging avoidable excursions, like in Marin County, Alameda County officials informed residents that they could still "go online, purchase items, and have them delivered to [their] home."[21] The Alameda County Interim Health Officer has explained that sheltering in place is necessary because of, among other things, "evidence of continued significant community transmission of COVID-19 within the County and throughout the Bay Area," that "the virus can survive for hours to days on surfaces and be indirectly transmitted between individuals," "[b]ecause even people without symptoms can transmit the infection, and because evidence shows the infection is easily spread, gatherings and other direct or indirect interpersonal interactions can result in preventable transmission of the virus."[22]

24. Consistent with these orders and prevailing guidance from medical experts, Mr. Steinberg limited trips outside the home during the COVID-19 pandemic. He also sought to prepare more meals at home to minimize contact with outside food vendors, which includes making his own bread.

25. Although fearful when leaving his home, Mr. Steinberg during the pandemic attempted to purchase yeast, a necessary ingredient for bread, at local grocery stores. But at points during the pandemic, yeast was unavailable or exceedingly difficult to procure. John Heilman, vice president of yeast manufacturing for AB Mauri, makers of Fleischmann's Yeast, told USA Today that the two to three weeks of dry yeast buffer inventory Fleischmann's had on hand "was gone almost instantly" after

---

[21] *See* Alameda Cty. Health Care Servs. Agency, *Alameda County FAQs for Shelter in lace Order* at 21 (updated Apr. 29, 2020, eff. May 4, 2020), available at https://www.albanyca.org/home/showpublisheddocument/44444/637239184942130000 (FAQ: "Can I still order the things I need online and have them delivered to my residence?").

[22] *See id.* at 3, ¶ 9.

SECOND AMENDED CLASS ACTION COMPLAINT – 9
010923-11/2753066 V1



the beginning of the COVID-19 pandemic, and estimated on April 23, 2020, that it would take approximately one to two months to get store shelves stocked again.[23]

26.    In April 2020, Mr. Steinberg was unable to locate yeast at local grocery stores and looked for supply on the internet. On April 3, 2020, Mr. Steinberg saw a sales listing for a two-pound pouch of Red Star Active Dry Yeast on Amazon for **$39.97**. He looked online at the website of another large retailer but could not find any yeast for sale.

27.    Mr. Steinberg was unable to find yeast elsewhere, he understood the government directives to shelter in place, and he recognized the importance of making food at home in the midst of the pandemic. Thus, he felt that he had no meaningful choice but to purchase yeast on Amazon and accept the terms Amazon was offering, and he did so.

28.    Nonetheless, Mr. Steinberg was still very upset about the price of yeast on Amazon, a basic household staple, and believed that he was being exploited because there was nowhere else to buy it. So, in the week following his April 3, 2020 purchase, he complained to Amazon about the price and the apparent price gouging. He made multiple phone calls, but the calls got him nowhere. It seemed that each Amazon agent he spoke with had no idea what was going on, apart from noting his prior call and concern. They read from what seemed to be a script, which was nonresponsive to anything he was trying to communicate. At some point he was told that the yeast he purchased was not returnable because it is a food product. When Mr. Steinberg complained about the price jump and pointed out that he believed the Amazon website tracks prices, a person he thinks was a supervisor said that he had no access to that information, and that it is up to another department to figure out whether a price is appropriate. Feeling frustrated but out of options, Mr. Steinberg kept the yeast and received no discount or rebate.

29.    The price Mr. Steinberg paid for Red Star Active Dry Yeast vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when Health and Human Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective January 27, 2020), the

---

[23] Jessica Guynn & Kelly Tyko, *Dry yeast flew off shelves during coronavirus pantry stocking. Here's when you can buy it again*, USA TODAY (updated Apr. 30, 2020), https://www.usatoday.com/story/money/food/2020/04/23/coronavirus-pantry-baking-yeast-shortage/3004274001/.

SECOND AMENDED CLASS ACTION COMPLAINT – 10
010923-11/2753066 V1


HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

specific product Mr. Steinberg purchased sold on Amazon for **$7.02**.[24] By April 3, 2020, when Mr. Steinberg made his purchase, the price had jumped to **$39.97**, which represents a ***469%*** increase over the January 31, 2020 price.[25]



### 3. Julie Hanson

30. Plaintiff Julie Hanson lives in Diamond Springs, California, which is in El Dorado County.

31. Following the HHS' January 31, 2020 declaration of a national COVID-19 emergency, El Dorado County issued a Shelter-in-Place directive on March 19, 2020.[26] California's

---

[24] *See* https://keepa.com/#!product/1-B005KR0MZG (last visited Oct. 22, 2021). The price for this product reached as high as $99.95 during the pandemic.

[25] *Id.*

[26] *See* Nancy J. Williams, Public Health Officer, El Dorado Cty. Health & Human Servs. Agency, *Directive of the El Dorado County Public Health Officer Restricting Activities in Response to COVID-19 Outbreak* (Mar. 19, 2020). available at https://www.edcgov.us/Government/hhsa/ Documents/El%20Dorado%20-%20shelter-in-place%20directive%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.pdf (last visited July 1, 2020).



Governor Newsom issued a statewide Shelter-in-Place Order the same day.[27] As with the statewide directive, El Dorado County's Order was designed to ensure "that the maximum numbers of people self-isolate in their place of residence to the greatest extent feasible."[28] Action was needed, El Dorado County concluded, because of "evidence of increasing occurrence of COVID-19 in the surrounding counties and the State of California."[29] Officials warned in particular that individuals with underlying health conditions faced enhanced "risk for serious health complications, including death, from COVID-19."[30] El Dorado County's Shelter-in-Place Order came on the heels of statewide guidance from the California Department of Health, which highlighted the "elevated risk" for health-compromised individuals and advised them to "[c]onsider on-line ordering for food and other supplies" to keep themselves and loved ones healthy.[31]

32. Ms. Hanson is 57 years old and suffers from underlying health conditions, some of which heighten the risk she will experience adverse, and potentially fatal, consequences should she come in contact with the novel coronavirus. Ms. Hanson has Parkinson's disease and bronchiectasis, a lung condition that causes coughing due to scarred tissue in the bronchi, or the passages that let air into the lungs. Severe bronchiectasis can lead to respiratory and heart failure. Ms. Hanson was also in a head-on vehicle collision in 2018, which has impaired her mobility.

33. Prior to the outbreak of COVID-19, Ms. Hanson was just beginning to regain mobility sufficient to shop outside her home. But as COVID-19 spread through California in February 2020, Ms. Hanson decided, particularly in light of her health conditions, that it was not safe for her to make retail excursions. This decision comported with public health guidance, including subsequent directives issued by El Dorado County and California health officials, regarding the need to self-

---

[27] *See* Cal. Exec. Order N-33-20 (Mar. 19, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (last visited July 1, 2020).

[28] *See* El Dorado Cty., *supra* note 26.

[29] *See id.*

[30] *See id.*

[31] *See* Cal. Dep't of Pub. Health, *supra* note 15.

SECOND AMENDED CLASS ACTION COMPLAINT – 12
010923-11/2753066 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

isolate, particularly for persons with underlying health conditions. To meet her daily needs, and to provide for her family, Ms. Hanson turned to Amazon and the home delivery it offers. Since the outbreak of COVID-19, Ms. Hanson has purchased certain items from Amazon for herself, and others for daughters who live in their own residences and receive support from Ms. Hanson.

34. On or around April 14, 2020, Ms. Hanson became aware that one of her daughters, Sabrina Gates, had acquired a kitten and was experiencing an outbreak of fleas in her own household. Like her mother, Ms. Gates generally stayed inside her home throughout the COVID-19 pandemic to protect herself and particularly her diabetic son.

35. Ms. Hanson undertook to locate products that might alleviate her daughter's flea infestation. Ms. Hanson has had many pets in her lifetime and has found flea sprays manufactured by Zodiac to be particularly safe and effective at treating houses for fleas. She was able to find Zodiac Flea & Tick Spray listed on Chewy.com, an online pet-supply retailer, but the product was not available for shipment. Ms. Hanson subsequently found the same product on Amazon and, on April 30, 2020, purchased it for the price of $14.19. Ms. Hanson paid out of pocket and has not been reimbursed. This product was supplied by Amazon itself (not a third-party retailer).

36. The price Ms. Hanson paid for Zodiac Flea & Tick Spray vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Ms. Hanson purchased sold on Amazon for **$8.99**.[32] By April 30, 2020, when Ms. Hanson made her purchase, the price had increased to **$14.19**, representing a **58%** increase over the January 31, 2020 price.[33]

---

[32] *See* https://keepa.com/#!product/1-Bpara B001OVGJUO (last visited Oct. 22, 2021).

[33] *See id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 13
010923-11/2753066 V1





#### 4. Christina King

37. Plaintiff Christina King lives in Mesa, Arizona. Mesa is in Maricopa County.

38. As COVID-19 spread through Arizona in early 2020, Maricopa County was at the epicenter of the evolving crisis. The first known case of COVID-19 in Arizona was a student at Arizona State University in Maricopa County who had travelled to Wuhan China and was diagnosed upon his return.[34] The virus spread rapidly, and with great alarm, through the community in the weeks that followed.

39. On March 11, 2020, Arizona Governor Doug Ducey announced a state of emergency due to the continuing outbreak of COVID-19.[35] Less than a week later, on March 17, 2020, Mesa Mayor John Giles declared a state of emergency in Mesa.[36] Just two days later, with COVID-19

---

[34] *See* Arizona Department of Health Services, News Release (Jan. 26, 2020) available at https://www.azdhs.gov/director/public-information-office/index.php#news-release-012620 (last visited Oct. 22, 2021).

[35] *See Declaration of Emergency* (March 11, 2020) available at https://azgovernor.gov/sites/default/files/declaraton_0.pdf (last visited Oct. 22, 2021).

[36] *See Proclamation and Declaration of Emergency* (March 17, 2020), available at https://www.mesaaz.gov/home/showpublisheddocument/37274/637200547492300000,

SECOND AMENDED CLASS ACTION COMPLAINT – 14
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

spreading exponentially, Mayor Giles closed all recreational, entertainment, sports, and fitness venues, while also shutting down restaurants and bars to onsite consumption.[37] Mayor Giles urged residents to avoid social gatherings of ten or more people and "to practice social distancing in their daily lives."[38] Similar guidance was issued in neighboring Maricopa communities, including Phoenix.

40.     As with the rest of the country, Maricopa County has experienced a shortage of essential products during the pandemic, with disruptions in the supply chain and hording emptying retail shelves. The situation became so dire that, on March 19, 2020, Governor Ducey called in the National Guard to help retail stores restock their shelves, to the extent possible.[39] Shortly thereafter, Governor Ducey closed Arizona schools and, on March 30, 2020, he issued a statewide "stay home" order in hopes of quelling the transmission of COVID-19.[40]

41.     The outbreak of COVID-19 posed acute risks to Mrs. King, who has a compromised immune system due to chemotherapy treatment she completed in January 2020. Mrs. King also interacts regularly with elderly parents and in-laws who live nearby. From the outset of the pandemic, Mrs. King has been particularly concerned about contracting and transmitting COVID-19 to these family members, who, given their advanced age, are at heighted risk of experiencing severe and potentially fatal health effects. Mrs. King's mother is also immunocompromised as a result of having lupus.

---

last visited Oct. 22, 2021.

[37] *See City of Mesa, Arizona Second Proclamation of the Mayor Under the Declaration of Emergency* (March 19, 2020) available at http://www.leagueaz.org/e/covid_19/links/mesa_proclamation_soe_2.pdf (last visited Oct. 22, 2021).

[38] *Id.*

[39] *See* State of Arizona, Department of Emergency and Military Affairs, *Frequently Asked Questions for AZ National Guard COVID-19 Response Task Force Logistics* (March 23, 2020) available at https://azgovernor.gov/sites/default/files/azngtaskforcelogisticsfaqs_2020-03-23_0.pdf (last visited Oct. 22, 2021).

[40] *See* Office of the Governor Doug Ducey*, Executive Order: 2020-18* (March 30, 2020) available at https://azgovernor.gov/sites/default/files/eo_2020-18_stay_home_stay_healthy_stay_connected_1.0.pdf (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 15
010923-11/2753066 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

42.     Mrs. King has turned increasingly to online retail during the pandemic. She did this to protect herself and family from COVID-19, including the elderly parents and in-laws she needed to help in obtaining essential items. In addition, Mrs. King has been unable to find many of the products she and her family require at brick-and-mortar retail outlets in her vicinity, making online retailers the primary option. Mrs. King's elderly parents and in-laws do not frequently shop online due to concerns about identity theft, and thus Mrs. King purchases and distributes items to them when she can.

43.     When Mrs. King shops online she typically compares prices across multiple platforms, including Vitacost, Target, Sprouts, Costco, Amazon, and others. But throughout the pandemic, Mrs. King observed that essential goods were often unavailable on many of these platforms, or were available only for short periods of time before supplies were exhausted. In many instances, Mrs. King found that the products she seeks (including essential items to combat COVID-19) were available only on Amazon.

44.     Amazon repeatedly price gouged Mrs. King during the pandemic, including on at least the five purchases detailed below.

45.     Around March 20, 2020, Mrs. King's mother expressed her dismay about the number of products that were out of stock at local stores, including beef ramen noodles. Recognizing that her mother was growing increasingly nervous about product shortages, Mrs. King looked online for an available supply of beef ramen noodles that could be delivered safely to her home. Amazon is not Mrs. King's preferred retailer for food items, but she had difficulty finding this product on other online stores. Eventually, Mrs. King found a 12-pack of Marachan beef ramen noodles on Amazon for $38.89. Mrs. King believed $38.89 was an inflated price, and this was not the exact product Mrs. King's mother preferred. But having been unable to find ramen noodles anywhere else, Mrs. King had no alternative to Amazon and made the purchase. Mrs. King paid out-of-pocket for this item and was not reimbursed.

46.     The price Mrs. King paid Amazon for a 12-pack of Marachan instant noodles vastly exceeded Amazon's price prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

King purchased sold on Amazon for **$4.20.** The **$38.89** price Mrs. King paid on March 20, 2020 represents an **826%** increase over the January 31, 2020 price.[41]



47.     Also in March 2020, Mrs. King was looking to purchase a supply of rice, a staple for her own family. Like many staples, rice was in short supply at this time. Mrs. King could not locate any rice at her local grocery outlets, so again she checked online. Mrs. King searched several online stores, but they were all sold out of rice. Ultimately, Mrs. King found a four-pack of 32-ounce containers of RiceSelect Jasmati rice on Amazon. This was substantially more rice than Mrs. King wanted to purchase. And Mrs. King believed the price Amazon was charging—$44.95—was inflated. But given her inability to find rice at grocery outlets or online stores, and given the importance of safely obtaining food staples for her family, Mrs. King did not believe she had a meaningful choice. She purchased the rice on March 20, 2020.

48.     The price Mrs. King paid vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$20.82.** The **$44.95** price Mrs. King paid on March 20, 2020, represents an **116%** increase over the January 31, 2020 price.[42]

---

[41]  *See* https://keepa.com/#!product/1-B003OB69PC (last visited Oct. 22, 2021).

[42]  *See* https://keepa.com/#!product/1-B000EH4XYS (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

49. Mrs. King also experienced great difficulty obtaining hand sanitizer during the pandemic, an essential product that leading public health officials have recommended be used, and used liberally, to stop the spread of COVID-19. Due to the shortage, many people have endeavored to make their own hand sanitizer, and various tutorials have been published on the internet showing how this can be done. Having encountered one of those tutorials, and unable to find hand sanitizer anywhere for purchase, Mrs. King decided to buy the ingredients needed to mix her own.

50. One ingredient used in homemade hand sanitizer is vegetable glycerin, a product that Mrs. King had not recalled seeing at retail stores in her area, or online for that matter. On March 13, 2020, she looked on Amazon and found a 16-ounce bottle of NOW Solutions Vegetable Glycerin selling for $11.54. This product was supplied by Amazon itself (not a third-party retailer). With her supply of hand sanitizer dwindling, and concerned about the health and safety of her family, Mrs. King purchased the vegetable glycerin from Amazon. Mrs. King saw no reasonable alternative in the circumstances.

51. The price Mrs. King paid for this particular vegetable glycerin product vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs.

SECOND AMENDED CLASS ACTION COMPLAINT – 18
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

King purchased sold on Amazon for **$5.79.** The **$11.54** price Mrs. King paid on March 20, 2020 represents an **99%** increase over the January 31, 2020 price.[43]



52. Throughout the pandemic, Mrs. King also sought to protect herself and family by using cleaning and disinfectant products on the surfaces of her home. This was consistent with guidance from public health authorities. At various points during the pandemic, however, Mrs. King observed shortages of disinfectants at physical and online stores.

53. Throughout March 2020, Mrs. King was having particular difficulty locating disinfectants, and, specifically, disinfecting wipes. Her parents were having the same difficulty and they collectively agreed that, if anyone found a supply, they would purchase extra to share.

54. Typically, Mrs. King tries to purchase cleaning products from eco-friendly manufacturers, including Seventh Generation. Mrs. King was unable to find any Seventh Generation disinfectants at this time, however. Thus, she broadened her search to look for disinfectants of any type. She found none in physical stores, or at various online stores she recalls searching, including OfficeMax, Staples, Vitacost, and Amazon.

55. After several days of searching, Mrs. King found a supply of Clorox disinfecting wipes that had become available on Amazon—specifically a 2-pack of Clorox Commercial Solutions Disinfecting Wipes that Amazon was selling for $90. This product was supplied by Amazon itself

---

[43] *See* https://keepa.com/#!product/1-B0019LWU2K (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 19
010923-11/2753066 V1



(not a third-party retailer). Although Clorox is not Mrs. King's brand of choice, and while she believed the price was substantially inflated, Ms. King also recognized that she had no meaningful choice given the scarcity of disinfectants and her inability to buy disinfecting wipes from any other retailer. In these circumstances, and mindful of how critical disinfectants are to combat COVID-19, Mrs. King purchased the Clorox wipes from Amazon.

56.     The price Mrs. King paid for these particular Clorox disinfecting wipes grossly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$54.63.** The **$90.00** price Mrs. King paid on March 20, 2020, represents an **65%** increase over the January 31, 2020 price.[44]



57.     Mrs. King was also price gouged on water, an essential item that was particularly essential in her circumstances. Mrs. King's husband has sleep apnea, a condition in which breathing stops during sleep, leading to a host of health complications. One treatment for sleep apnea is use of a continuous positive airway pressure, or "CPAP," machine during sleep. CPAP machines, including the machine used by Mrs. King's husband, require distilled water during operation. Distilled water, however, was difficult to find during the pandemic.

---

[44]    *See* https://keepa.com/#!product/1-B077ZMMT9D (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 20
010923-11/2753066 V1



58. In March 2020 in particular, Mrs. King was unable to locate any supply of distilled water. She looked both at physical stores, and online, and found none available. The only supply she could locate was a package of 24 bottles of Smartwater distilled water available on Amazon. This was substantially more distilled water than she required for her husband's CPAP machine. The price Amazon was charging—$56.76—also appeared exceedingly high to Mrs. King. But recognizing that distilled water was not available elsewhere, and having tried for some time to find it, Mrs. King concluded that she had no alternative but to purchase this product from Amazon. Without the water, her husband's CPAP machine could not operate.

59. The price Mrs. King paid for Smartwater distilled water grossly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$37.20.** The **$56.76** price Mrs. King paid on March 25, 2020 represents a **53%** increase over the January 31, 2020 price.[45]



### 5. Ronnell Robertson

60. Plaintiff Ronnell Robertson lives in Hickory, North Carolina. Hickory is in Catawba County.

---

[45] *See* https://keepa.com/#!product/1-B073WWZ22T (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 21
010923-11/2753066 V1



61.     North Carolina reported its first case of COVID-19 on March 3, 2020.[46] The virus spread rapidly in North Carolina thereafter. On March 10, 2020, governor Roy Cooper declared a state of emergency, instructing, among other things, that employers and employees "use teleworking technologies to the greatest extent possible."[47] A week later, governor Cooper closed all restaurants and bars to sit-down service.[48]

62.     As the virus spread across North Carolina, Mr. Robertson had difficulty obtaining essential consumer goods, including goods needed to combat the virus and its transmission. Around March 17, 2020, Mr. Robertson sought out a supply of disinfectant wipes that he could use to sanitize surfaces in his home and office. Given the extreme risks posed by COVID-19, Mr. Robertson was particularly interested in obtaining a medical-grade disinfectant. The retail outlets in his area, however, were sold out of all types of disinfectant wipes.

63.     Mr. Robertson searched online and, on March 17, 2020, found a supply of CaviWipes on Amazon. This particular product is marketed as a powerful disinfectant for use in medical settings. Recognizing that disinfectants were in scarce supply, and not likely to appear at other retail outlets (online or brick-and-mortar) any time soon, Mr. Robertson purchased eight packages of CaviWipes on Amazon at $26.99 per package.

64.     Although Mr. Robertson recognized that $26.99 was an inflated price for this product, he did not believe he had any choice given the imminent health risks posed by the spreading coronavirus and his inability to procure a supply of disinfectants elsewhere. To keep himself and his family safe, Mr. Robertson made the purchase.

---

[46]  *See* North Carolina Department of Health and Human Services, Press Release (March 3, 2020) available at https://web.archive.org/web/20200407230739/https://www.ncdhhs.gov/news/press-releases/north-carolina-identifies-first-case-covid-19 (last visited Oct. 22, 2021).

[47]  *See* Office of Governor Roy Cooper, *Governor Cooper Declares State of Emergency to Respond to Coronavirus COVID-19* (March 10, 2020) available at: https://governor.nc.gov/news/governor-cooper-declares-state-emergency-respond-coronavirus-covid-19 (last visited Oct. 22, 2021).

[48]  *See* Office of Governor Roy Cooper, *Governor Cooper Issues Executive Order to Close Sit-Down Service at Restaurants and Bars and Make State Unemployment Benefits More Widely Available* (March 17, 2020) available at: https://governor.nc.gov/news/governor-cooper-issues-executive-order-close-sit-down-service-restaurants-and-bars-and-make (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 22
010923-11/2753066 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

65. The price Mr. Robertson paid for CaviWipes vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mr. Robertson purchased sold on Amazon for **$9.99**.[49] By March 17, 2020, when Mr. Robertson made his purchase, the price had jumped to **$26.99**, which represents a **170%** increase over the January 31, 2020 price.[50]



## B.      Defendant

66. Defendant Amazon.com Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Seattle, Washington. Amazon is the world's largest online retailer.

## C.      History of Fair Pricing

67. From ancient times, societies have imposed a duty on merchants to sell in good faith. The Hebrew culture was the first to prescribe fair dealing as an essential ethical tenant.[51] The Hebrew Talmud, for example, provides that "if thou sell [ought] unto your neighbour, or buyest ought of thy

---

[49] *See* https://keepa.com/#!product/1-B0054OCHQW (last visited Oct. 22, 2021).

[50] *Id.*

[51] Hon. Sheldon Gardner & Robert Kuehl, *Acquiring on Historical Understanding of Duties to Disclose, Fraud, and Warranties*, 104 Com. L.J. 168, 170 (1999).

SECOND AMENDED CLASS ACTION COMPLAINT – 23
010923-11/2753066 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

neighbour's, hand, ye shall not oppress one another."[52] Talmudic scholars interpreted this verse to prohibit overcharges and undercharges,[53] and ruled that in any transaction in which the profit exceeded one-sixth, the transaction would be null and void.[54] Jewish law was skeptical that self-regulating markets could ensure fair prices, and accordingly intervened to adjust prices that, at least in legal terms, it deemed "unfair."[55] Aspects of Jewish law, at least those touching on good faith dealing and full disclosure, found their way into Roman law and consequently, into the Civil Code countries of France, Germany, and others.[56]

68. The major Western religious traditions also address the issue of "fair" prices. The Catechism of the Catholic Church prohibits merchants from making pricing decisions that take unfair advantage of those in need.[57] Essentially the same prohibition found its way into the secular norms of early European markets, where merchants and their customers believed that there was indeed an intrinsically fair price that could be objectively determined.[58] Market actors believed that, unfair

---

[52] *Leviticus* 25:14.

[53] Hershey H. Friedman, *Biblical Foundations of Business Ethics*, 3 J. MARKETS & MORALITY 43, 48 (2000).

[54] *Id.* at 49 (citing the Babylonian Talmud, *Bava Metzia*, 50b). Interestingly, Talmudic scholars seemed to have a relatively sophisticated understanding of the workings of the law of supply and demand, Professor Friedman relates the story of Shmuel, the Talmudic sage, who was concerned with sellers raising the prices of myrtle branches prior to Sukkot. *Id.* He warned the myrtle branch merchants that unless they maintained stable prices, he would allow holiday observers to use myrtle branches with broken tips. *Id.* (citing Babylonian Talmud, *Sukkah*, 34b). Clearly Shmuel understood the role of increased supply as a moderating influence on price.

[55] MEIR TAMARI, "WITH ALL YOUR POSSESSIONS": Jewish Ethics and Economic Life 87, 87-88 (1987).

[56] Saul Litvinoff, *Good Faith*, 71 TUL. L. REV. 1645, 1651-55 (1997).

[57] Catechism of the Catholic Church, pt. 3, § 2, ch. 2, art. 7, *available at* https://www.usccb.org/sites/default/files/flipbooks/catechism/580/ (last visited Sept. 19, 2024) ("Even if it does not contradict the provisions of civil law, any form of unjustly taking and keeping the property of others is against the seventh commandment; thus, deliberate retention of goods lent or of objects lost; business fraud; paying unjust wages; forcing up prices by taking advantage of the ignorance or hardship of another."); *see also Deuteronomy* 25:13-16.

[58] EDWARD CAHILL, FRAMEWORK OF A CHRISTIAN STATE 43 (1930) ("According to medieval teaching on the other hand, the price of a commodity was supposed to be determined by objective value alone; and could not be justly influenced by the special need or ignorance of buyer or seller.").

SECOND AMENDED CLASS ACTION COMPLAINT – 24
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

pricing could best be avoided by trading in an open, transparent market.[59] Similarly, Islamic law prohibits both *Bay' al-mudtarr*, the exploitation of need by, for example, charging an exorbitantly high price,[60] and *Ihtikar*, which is hoarding, or withholding supplies of essential goods and services with a view to raising prices.[61]

69.     Not surprisingly, given this deep-rooted history of prohibiting price gouging, price gouging is specifically called out in many state statutes. More than 35 states have dedicated price-gouging laws. Because there is no federal law protecting consumers from price gouging, states provide the only defense from unscrupulous sellers. While statutes and prohibitions vary across the states, they consistently include three facets. First, price increases are generally only prohibited when there is a declared emergency (hurricanes, earthquakes, flooding, or pandemics). Second, price increases are only generally prohibited on a specific set of products that are deemed necessary or essential. Third, the price increase must be due to the presumed increase in demand because of the emergency and not due to some other factor such a regular seasonal price increase or a new supplier.

70.     The amount of increase in prices that violate price gouging statutes vary from state to state. Some state price-gouging laws designate a specific percentage increase over which a price increase would be considered gouging. The prohibited percentages range from 10% to 25%. Other state laws use less precise language to describe prohibited price increases such as: "excessive," "grossly exceeds," "unreasonable," "exorbitant," or "unconscionable."

71.     Price gouging is regulated in Washington by the state's Consumer Protection Act, which proscribes "unfair" commercial practices. As the Washington Supreme Court recently observed in answering questions certified by this Court, price gouging is generally understood as "a situation

---

[59] JEAN FAVIER, GOLD & SPICES; OF COMMERCE IN TILE MIDDLE AGES 103 (Caroline Higgitt trans., 1998) "[T]o the medieval mind, price gouging … [was a] sin of greed, which was to be warded off by trading in an open market, observable by all.").

[60] Mohammad Nejatullah Siddiqi, Lecture to the UCLA Int'l Inst., Islamic Banking and Finance (Fall 2001), transcript available at http://www.isop.ucla.edu/article4.asp?parentid=15056 (last visited Oct. 22, 2021.

[61] MISHKAT, book xii, ch. viii. ("Those who bring grain to a city to sell at a cheap rate are blessed, and they who keep it back in order to sell at a high rate are cursed.").

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

where a retailer or a supplier takes advantage of increases in demand by charging exorbitant prices for necessities after a natural disaster or other state emergency."[62] The Washington Supreme Court confirmed that Price gouging can be deemed "unfair" under the CPA and, where the facts are in dispute or the plaintiff "advances a case-specific unfairness claim that is not regulated by statute or by some other well-established public policy," this unfairness determination is to be made by a jury.[63]

## IV.    FACTUAL ALLEGATIONS

### A.    Outbreak of COVID-19

72.    In late 2019, an outbreak of respiratory illness resulting from a novel coronavirus was first identified in Wuhan City, Hubei Province, China. That illness, now known as COVID-19, has spread across the world. COVID-19 was designated a pandemic by the World Health Organization, the first pandemic resulting from a coronavirus. As of the date of this Second Amended Complaint, more than 750 million confirmed cases of COVID-19 have been reported across the globe, and almost 7 million people have died from their illness.[64]

73.    The first diagnosed case of COVID-19 in the United States was a Washington state resident who had traveled to Wuhan.[65] That diagnosis occurred on January 21, 2020. Within days, there was a second diagnosis in Chicago and another in Orange County.[66] Alarm spread rapidly within the public health community and the general population at large. On January 23, 2020, the World Health Organization confirmed that the coronavirus was being transmitted human-to-human and recommended that "all countries should be prepared for containment, including active surveillance,

---

[62]  *See Greenberg v. Amazon*, Case No. 101858-4 (Wa. Sup. Ct.), Op. at 6 (quotation marks omitted).

[63]  *Id.* at 57.

[64]  *See* World Health Organization, *Coronavirus (COVID-19) Dashboard,* available at https://covid19.who.int/ (last visited August 28, 2021).

[65]  *See* Alan J. Stein, *First confirmed case of COVID-19 in the United States is diagnosed in Snohomish County on January 20, 2020*, HISTORYLINK.ORG (Apr. 20, 2020), https://historylink.org/File/21018.

[66]  *See* Stacey Baca et al., *Coronavirus diagnosed in Chicago woman; 2nd case in US*, ABC 7 CHICAGO (Jan. 24, 2020), https://abc7chicago.com/coronavirus-chicago-in-ohare/5875738/.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

early detection, isolation and case management, contract tracing and prevention."[67] The following week, several cases of human-to-human transmission were confirmed in the United States.

74. On January 31, 2020, the HHS declared a public health emergency (effective January 27, 2020).[68] At the same time, the United States imposed entry restrictions on foreign nationals and quarantined United States citizens who had been evacuated from Hubei province.[69] The virus, however, continued to spread rapidly, with new cases being reported across the country (and world). Washington state was an early epicenter, with an outbreak occurring at a long-term care center in Kirkland, Washington.[70]

75. Things took a particularly dire turn on February 26, 2020, when health officials confirmed that a California patient had tested positive for COVID-19 despite having no known exposure to the virus through travel or contact with an affected individual. This was the first confirmation that COVID-19 was being transmitted in the United States through "community spread," suggesting that untold numbers of citizens were also affected but asymptomatic or otherwise not being tested for COVID-19.

76. On February 29, a Washington man was the first reported COVID-19 death.[71] The virus continued to spread exponentially. The CDC has reported that during a three-week stretch between late February and early March 2020, COVID-19 cases in the United States "increased more than 1,000-

---

[67] *See* Kyle Hicks, *3rd US case of new coronavirus confirmed in Orange County, California, officials say*, ABC 7 DENVER (updated Jan. 26, 2020), https://www.thedenverchannel.com/news/national/3rd-us-case-of-new-coronavirus-confirmed-in-orange-county-california-officials-say.

[68] *See* Dep't Health & Human Servs., Press Release, *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus* (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited Oct. 22, 2021).

[69] *See* Alex Leary & Brianna Abbott, *U.S. Imposes Entry Restrictions Over Coronavirus*, WALL STREET J. (updated Jan. 31, 2020), https://www.wsj.com/articles/u-k-reports-first-coronavirus-cases-as-china-allies-limit-ties-11580467046.

[70] *See* Nicole Acevedo & Minyvonne Burke, *Washington state man becomes first U.S. death from coronavirus*, NBC NEWS (updated Feb. 29, 2020), https://www.nbcnews.com/news/us-news/1st-coronavirus-death-u-s-officials-say-n1145931.

[71] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

fold."[72] By March 17, 2020, COVID-19 had been detected in all 50 states[73] and 91 people had died from COVID-19 in the United States.[74] Today, more than 1 million people in the United States have died from COVID-19, and no aspect of American life has gone unchanged.[75]

**B.      Emergency Declarations and Lockdowns**

77.      Following the HHS' January 31, 2020 declaration of a national public health emergency related to COVID-19, state governments issued their own declarations of emergency. The first statewide proclamation was issued by California Governor Gavin Newsom on March 19, 2020.[76] Declarations in other states followed in rapid succession.

78.      Consistent with guidance from public health officials,[77] state governments typically coupled (or followed) their declarations of emergency with "stay home," "shelter-in-place," or other types of lockdown orders requiring residents to remain in their homes to the extent feasible. By April 20, 2020, 45 states had some form of "stay home" order in place, covering approximately 95% of the

---

[72] *See* Anne Schuchat, MD, CDC COVID-19 Response Team, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States*, February 24–April 21, 2020, 69 MORBIDITY & MORTALITY WEEKLY REP. (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm.

[73] *See* Associated Press, *West Virginia, the last US state without coronavirus, confirms 1st case*, FOX 8 NEWS (updated Mar. 17, 2020), https://myfox8.com/news/coronavirus/west-virginia-the-last-us-state-without-coronavirus-confirms-1st-case/.

[74] *See* Will Feuer, *US coronavirus cases surpass 5,000, up fivefold from a week ago*, CNBC (updated Mar. 17, 2020), https://www.cnbc.com/2020/03/17/us-coronavirus-cases-surpass-5000-up-fivefold-from-a-week-ago.html.

[75] *See* CDC, *Covid Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#maps_deaths-total (last visited Sept. 19, 2024).

[76] *See* Cal. Exec. Order N-33-20, *supra* note 27.

[77] *See, e.g.*, Ros Krasny et al., *Fauci says it's time to 'hunker down'*, ARKANSAS DEMOCRAT GAZETTE (updated Mar. 16, 2020), https://www.arkansasonline.com/news/2020/mar/16/fauci-says-it-s-time-to-hunker-down-202/ (National Institute of Allergy and Infectious Diseases (NIAID) director Dr. Fauci instructing Americans to "stay home" during March interviews with major news outlets); Dean Cole & Alison Main, *Top infectious disease expert4 doesn't rule out supporting temporary national lockdown to combat coronavirus*, CNN (updated Mar. 15, 2020), https://www.cnn.com/2020/03/15/politics/anthony-fauci-national-lockdown-bars-restaurants-cnntv/index.html (Dr. Fauci informing the public in March 2020 that he would "like to see a dramatic diminution of the personal interaction that we see").

---

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

United States population.[78] As the NEW YORK TIMES put it, "In a desperate race to stunt the spread of the coronavirus, millions of Americans have been asked to do what would have been unthinkable only a few months ago: Don't go to work, don't go to school, don't leave the house at all, unless you have to."[79]

79.     Although the wording differed, state governments across political stripes echoed this resounding theme:

- Gov. Eric J. Holcomb (Indiana): "Hoosiers, hunker down."[80]

- Gov. Ned Lamont (Connecticut): "At this critical time it is essential that everyone just stay home."[81]

- Gov. Brad Little (Idaho): "Our health care and public safety workers are putting themselves in harm's way to respond to the coronavirus emergency, and we owe it to them to do our part by following this statewide stay-home order."[82]

- Gov. Larry Hogan (Maryland): "This is a deadly public health crisis—we are no longer asking or suggesting that Marylanders stay home, we are directing them to do so."

- Gov. Tim Walz (Minnesota): "We are asking you—because it is going to take cooperation and collaboration—stay home."[83]

- Gov. Bill Lee (Tennessee): "[B]ecause with personal liberty comes great personal responsibility, all Tennesseans must do their part by staying at home whenever possible."[84]

---

[78] *See* Sara Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (updated Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[79]   *Id.*

[80]   *See* IndyStar, *Indiana coronavirus updates: Governor orders Hoosiers to stay at home starting Wednesday* (updated Mar. 24, 2020), https://www.indystar.com/story/news/health/2020/03/23/indiana-coronavirus-updates-indianapolis-covid-19-latest-news/2896967001/.

[81]   *See* Gov. Ned Lamont, Press Release, *Governor Lamont Signs Executive Order Asking Connecticut Businesses and Residents: 'Stay Safe, Stay Home'* (Mar. 20, 2020), *see* https://www.housedems.ct.gov/wood/article/covid-19-update-320.

[82]   *See* State of Idaho, *Statewide Stay-Home Order* (updated Mar. 27, 2020), *see* https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[83]   *Stay at home: These states have issued orders for residents not to go out amid COVID-19 pandemic*, FOX 10 PHOENIX (updated Apr. 9, 2020), https://www.fox10phoenix.com/news/stay-at-home-these-states-have-issued-orders-for-residents-not-to-go-out-amid-covid-19-pandemic.

[84]   *See* Tenn. Exec. Order No. 22 (Mar. 30, 2020), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

- Gov. Phil Scott (Vermont): "Vermonters are directed to stay at home or in their place of residence, leaving only for essential reasons."[85]

- Gov. Jay Inslee (Washington): "The more of us who stay home, the fewer of us who will be infected by COVID-19 and the more lives that will be saved."[86]

- Gov. Chris Sununu (New Hampshire): "We can't stress this enough – you should stay at your house unless absolutely necessary."[87]

- Gov. Michelle Lujan Grisham (New Mexico): "This is quite frankly an instruction to stay home."[88]

- Gov. Kate Brown (Oregon): "Stay Home, Save Lives."[89]

- Gov. Ralph Northam (Virginia): "Our message to Virginians is clear: stay home."[90]

80. Although statewide "stay home" orders generally authorized residents to shop outside the home for essential items if necessary, prominent health officials encouraged consumers to shop online to protect themselves and arrest the spread of COVID-19. In this regard, during the pandemic the CDC advised all Americans to "[o]rder food and other items online for home delivery or curbside pickup (if possible)" and to "[o]nly visit the grocery store, or other stores selling household essentials, in person when you absolutely need to," as "[t]his will limit your potential exposure to others and the

---

[85] *See* VTDigger, *'Stay home,' Scott orders; relief measures pass,* VT. CMTY. NEWSPAPER GRP. (updated Apr. 2, 2020), https://www.vtcng.com/state_and_world/state_news/stay-home-scott-orders-relief-measures-pass/article_4a53daee-6f74-11ea-9b66-ef84b25aca39.html.

[86] *See* Austin Jenkins & Tom Banse, *Washington Gov. Inslee Announces Statewide Stay-At-Home Order*, OPB (Mar. 23, 2020), https://www.opb.org/news/article/washington-governor-inslee-coronavirus-stay-at-home-order/.

[87] *See* Gov. Chris Sununu (@GovChrisSununu), TWITTER (Mar. 26, 2020, 12:04 PM), https://twitter.com/govchrissununu/status/1243252555599265792.

[88] *See* Dan McKay (@mckaydan), TWITTER (Mar. 23, 2020, 2:30 PM), https://twitter.com/mckaydan/status/1242201996028870656.

[89] *See* Or. Exec. Order No. 20-12 (Mar. 23, 2020), https://govsite-assets.s3.amazonaws.com/jkAULYKcSh6DoDF8wBM0_EO%2020-12.pdf.

[90] *See* Gov. Ralph S. Northam, Press Release, *Governor Northam Issues Statewide Stay at Home Order* (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702-en.html.

SECOND AMENDED CLASS ACTION COMPLAINT – 30
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

virus that causes COVID-19."[91] As for individuals sick with COVID-19, or potentially exposed, the CDC instructed as follows: "Do not leave your home, except to get medical care. Do not visit public areas."[92]

**C.      Hoarding and Retail Scarcity**

81.      The ability to shop outside the home was further curtailed, particularly in the early stages of the pandemic (but also in subsequent waves), by hoarding and retail scarcity. As COVID-19 spread through the United States, and government efforts to combat the virus intensified, consumers began to stockpile essential items. By late January 2020, there were already reports that consumers were buying out retail stock of surgical masks and N95 respirators.[93] The research firm Nielsen found that the sale of medical supplies and rubbing alcohol surged nearly twenty percent after the first reported case of COVID-19 in the United States on January 30, 2020.[94]

82.      In February and March 2020, the reports of stockpiling, scarcity, and hoarding escalated. Nielsen found that sales of medical supplies and rubbing alcohol jumped 65 to 85 percent after there was a report of person-to-person transmission of COVID-19 on February 29. The firm also found that powdered milk sales jumped 85 percent, and rice and bean sales increased 25 to 37 percent.[95] For the week ending on March 7, 2020, compared to the same week a year earlier, sales of hand sanitizer, aerosol disinfectants, and multipurpose cleaners were 470, 385.3, and 148.2 percent higher,

---

[91]    *See* Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Running Essential Errands* (updated July 30, 2020), https://stacks.cdc.gov/view/cdc/91347/ cdc_91347_DS1.pdf (last visited June 19, 2021).

[92]    *See* Centers for Disease Control & Prevention, *What to Do If You Are Sick* (updated Mar. 17, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last visited Oct. 22, 2021).

[93]    *See* Scottie Andrew, *There's been a run of surgical masks in the US because of the coronavirus scare. You don't need them, physicians say*, CNN (updated Jan. 28, 2020), https://www.cnn.com/2020/01/28/health/coronavirus-us-masks-prevention-trnd/index.html.

[94]    *See* Michael Finney & Randall Yip, *Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries*, ABC 7 NEWS (Mar. 18, 2020), https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/.

[95]    *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 31
010923-11/2753066 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

respectively.[96] In keeping, on March 18, a news station in the San Francisco Bay Area posted an article online, "Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries."[97] The article discussed "one of the most visible reaction[s] to the coronavirus – empty shelves at the grocery stores," and interviewed a local shopper who had gone to a large grocery store hoping to buy paper towels and toiletries, but came away with nothing.[98] The article's authors interviewed a marketing professor, Michal Strahilevitz, to explain the hoarding and scarcity: "when something becomes scarce, everybody wants more of it because they're afraid next time . . . [t]here won't be any toilet paper at all."[99]

83. On March 13, 2020, the NEW YORK TIMES reported that shoppers were "flood[ing] stores across the nation and emptied shelves, looking to stockpile groceries and household items to prepare for uncharted territory."[100] "They grabbed milk and aspirin, paper towels and spaghetti. Cans of soup and bottles of laundry detergent. Olive oil and sanitizing wipes. With futures suddenly thrust into the unknown, they did what felt reassuring: panic shop."[101]

84. A second wave of COVID-19 cases in November 2020 brought a second wave of hoarding and retail scarcity. On November 17, the NEW YORK POST reported that, "[w]ith COVID-19 cases surging across the US, panic buying is back in vogue — as evidenced by a sea of empty shelves in supermarkets across the nation in scenes reminiscent of earlier this year, according to reports."[102]

---

[96] *See* Camila Domonoske & Avie Schneider, *Here's What's Been Flying Off Store Shelves*, NPR (Mar. 16, 2020), https://www.npr.org/2020/03/16/816404689/spiking-demand-for-sanitizer-canned-goods-leaves-stores-struggling-to-keep-up.

[97] *See* Finney & Yip, *supra* note 94.

[98] *Id.*

[99] *Id.*

[100] *See* Corina Knoll, *Panicked Shoppers Empty Shelves as Coronavirus Anxiety Rises*, N.Y. TIMES (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/nyregion/coronavirus-panic-buying.html.

[101] *Id.*

[102] *See* Yaron Steinbuch, *COVID-19 panic buying: Toilet paper, essentials fly off shelves again*, N.Y. POST (updated Nov. 17, 2020), https://nypost.com/2020/11/17/covid-19-panic-buying-toilet-paper-essentials-fly-off-shelves/.

SECOND AMENDED CLASS ACTION COMPLAINT – 32
010923-11/2753066 V1

**D.     Consumers Turn Increasingly to Online Purchasing, and Amazon in Particular**

85.     In response to retail shortages and to limit exposure to the coronavirus, more consumers have been doing their shopping online, increasing consumer demand and reliance on online retailers. According to a Nielsen survey, in mid-March 2020, when the concerns over COVID-19 transmission rapidly escalated, approximately "one-quarter of shoppers said they expected to shop online more frequently—or for the first time—to avoid germs in public places."[103] The data confirm that this has occurred. The following graph shows a large increase in March 2020 sales of consumer packaged goods ("CPG"), in store and online as compared to the same month a year prior, with an astonishing 91 percent increase for online sales. In the two weeks ending on March 21, 2020 upwards of 35 percent more people had shopped online for CPG items as compared with a typical week.[104]



---

[103]  *See* NielsenIQ, *Tracking the unprecedented impact of COVID-19 on U.S. CPG shopping behavior* (Mar. 30, 2020), https://nielseniq.com/global/en/insights/analysis/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/.

[104]  *See id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 33
010923-11/2753066 V1



86. Data released by the Commerce Department shows that, overall, United States online "sales hit $791.70 billion in 2020, up 32.4% from $598.02 billion in the prior year."[105] As observers have noted, "[e]commerce thrived in 2020 because of store closures and shoppers' fear of contracting the coronavirus in public. And figures from Q1 2021 show that the coronavirus was still making an impact on retail spending. Online sales increased 39% year over year in Q1 2021, nearly triple the 14% increase in Q1 2020, and faster than Q3 2020 and Q4 2020."[106]

87. An unprecedented demand on internet retailers has also led to product scarcity online, with some retailers out of stock and experiencing shipping problems, including large delays.[107] Consumers thus have become only more reliant on Amazon—the world's largest online retailer—for essential consumer goods. Indeed, by July 2020, Amazon's sales accounted for **almost half of all United States retail e-commerce**.[108] By comparison, Amazon's nine largest competitors had only a 1.1 to 6.6 percent share.[109]

88. Industry observers have universally recognized that Amazon saw "unprecedented demand amid widespread coronavirus-related shutdowns."[110] As one observer put it, with "millions of Americans ordered to remain home, Amazon is now, more than ever, a lifeline for essentials for millions of people rather than just a convenient option for online shopping."[111] By April 2020,

---

[105] *See* Digital Commerce 360, *Coronavirus adds $105 billion to US ecommerce in 2020* (June 16, 2021), https://www.digitalcommerce360.com/article/coronavirus-impact-online-retail/.

[106] *See id.*

[107] *See* Katie Evans, *A viral surge: How the coronavirus is impacting shipping and delivery of online orders*, DIGITAL COMMERCE 360 (Mar. 20, 2020), https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/.

[108] *See* eMarketer, *Amazon Now Has Nearly 50% of US Ecommerce Market* (July 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[109] *Id.*

[110] *See* Sergei Klebnikov, *Jeff Bezos Gets $6.4 Billion Richer As Amazon Stock Hits A New Record High*, FORBES (updated Apr. 14, 2020), https://www.forbes.com/sites/sergeiklebnikov/2020/04/14/jeff-bezos-gets-63-billion-richer-as-amazon-stock-hits-a-new-record-high/.

[111] *See* Jason Del Rey, *Amazon was already powerful. The coronavirus pandemic cleared the way to dominance.*, VOX (Apr. 10, 2020), https://www.vox.com/recode/2020/4/10/21215953/amazon-fresh-walmart-grocery-delivery-coronavirus-retail-store-closures.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

consumer spending on Amazon had increased nearly 100 percent over 2019.[112] Fueled by the pandemic, Amazon's sales increased $318.41 billion over 2020 as a whole, a 44.1% increase that eclipsed already bullish forecasts for Amazon's growth.[113]

89.    One reason Amazon has seen its sales increase is that it can supply essential goods that are not always available on retail shelves in the COVID-19 era. And in terms of product diversity, Amazon sells twelve million products on the Amazon.com platform, with a particularly large range of consumer goods.[114] In 2018, it was estimated that Amazon had 1.5 billion items listed for sale and over 200 million users.[115]

90.    On March 4, 2020, Senator Edward J. Markey (D-Massachusetts) wrote a letter to Amazon CEO Jeff Bezos about reports of price gouging on Amazon.[116] He stated that "[i]nternet-based retailers such as Amazon.com have a particular responsibility to guard against price gouging in current circumstances as consumers—who are finding the shelves of local brick-and-mortar stores bare, and who may wish to avoid venturing into crowded stores and shopping malls—turn to the internet."[117] Consistent with Senator Markey's observation, and heeding the official guidance described above, consumers turned to Amazon—the world's dominant online retailer—throughout the pandemic to obtain the goods they required to survive and endure.

---

[112] *See* Facteus, *Facteus Insight Report on Consumer Spending and Transactions (FIRST)* (June 3, 2020), https://first.facteus.com/reports/first-report-6-3-2020 (last visited Oct. 22, 2021).

[113] *See* Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, EMARKETER (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

[114] *See* 60pi, *How Many Products Does Amazon® Carry?* (May 2016), https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore (last visited July 2, 2020).

[115] *See* Neel Mehta et al., *Amazon changes prices on its products about every 10 minutes – here's how and why they do it*, BUSINESS INSIDER (Aug. 10, 2018), https://www.businessinsider.com/amazon-price-changes-2018-8.

[116] *See* Sen. Edward J. Markey, Letter to Jeffrey P. Bezos, Amazon.com, Inc. (Mar. 4, 2020), https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf (last visited July 2, 2020).

[117] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 35
010923-11/2753066 V1

**E.      Amazon Raised Prices Excessively During the COVID-19 Pandemic**

91.      As the world's largest online retailer, Amazon maintains its own inventory of products, which it sells directly to consumers across the country. These Amazon-supplied products account for approximately 32 percent of the revenue from of all products sold on Amazon.[118] In addition, Amazon sells products provided by third-party suppliers. These third-party product sales account for approximately 68 percent of the sales revenue on the Amazon.com platform.[119]

92.      As the COVID-19 pandemic spread, Amazon's prices for many essential goods spiked dramatically. In his March 4, 2020 letter to Amazon CEO Jeff Bezos, Senator Markey described "disturbing news reports of coronavirus-inspired price gouging on Amazon.com," including that bottles of Purell hand sanitizer, "typically sold for less than $10 per box," were "listed at $400," and similarly inflated prices existed for face masks.[120] Senator Markey explained that, as "first steps," Amazon had announced the prior week that it had removed listings for price gouging and reiterated that third-party suppliers must comply with Amazon's "fair pricing policies," but that there had been "continued reports of price gouging and a lack of transparency," which left consumers exposed to unfair trade practices.[121] He referenced a third-party Amazon supplier whose goods were sold on Amazon and described Amazon's enforcement policy as "haphazard."[122]

93.      On March 11, 2020, the United States Public Interest Research Group Education Fund ("PIRG") published a study showing that prices for half of certain public-health products sold on Amazon—particularly, products in high demand during the COVID-19 crisis—had increased by more than 50 percent in February above their 90-day average.[123] These price increases were not limited to products supplied by third parties. Of the essential products PIRG evaluated, nearly one in six supplied by Amazon itself increased in price by more than 50 percent above the 90-day average.

---

[118]  *See* eMarketer, *supra* note 108.

[119]  *Id.*

[120]  *See* Markey, *supra* note 116.

[121]  *Id.*

[122]  *Id.*

[123]  *See* U.S. Pub. Interest Research Grp. Ed. Fund, *supra* note 9.

SECOND AMENDED CLASS ACTION COMPLAINT – 36
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

94.    Referencing the PIRG study, attorneys general from 33 states sent Amazon a letter on March 25, 2020, calling on Amazon to eliminate price gouging on its platform. The attorneys general, including Washington's, noted that "[a]s COVID-19 spreads throughout the country, it is especially important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[124] The letter implored Amazon to take action to abide by and enforce "the nation's consumer protection laws."[125]

95.    Other industry observers have analyzed Amazon's pricing data and concluded that Amazon "doubled its own prices on essential goods as the COVID-19 pandemic grew between early January and mid-March [2020]."[126] At one point in March 2020, observers noted, Amazon "listed a four-pack of its own brand of toilet paper for $72."[127] Consumers confirmed these unconscionable prices, reposting the listings online hoping to warn others that Amazon itself was "participating in price gouging":[128]

---

[124] *See* Letter from 33 state attorneys general to Jeff Bezos (Mar. 25, 2020), https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf.

[125] *Id.*

[126] *See* Adam Walser, *Data shows Amazon raised prices during pandemic alongside sellers accused of price gouging*, ABC 10 NEWS (updated Mar. 28, 2020), https://www.10news.com/news/coronavirus/data-shows-amazon-raised-prices-during-pandemic-alongside-sellers-accused-of-price-gouging.

[127] *Id.*

[128] *See* u/cpotter, *Amazon themselves participating in price gouging. $72 for toilet paper.*, REDDIT (Mar. 14, 2020), https://www.reddit.com/r/mildlyinfuriating/comments/fiuwuo/amazon_themselves_participating_in_price_gouging/.

SECOND AMENDED CLASS ACTION COMPLAINT – 37
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



Amazon themselves participating in price gouging. $72 for toilet paper.

96.     A September 2020 study by Public Citizen confirmed that, "[w]hile the initial media and law enforcement focus of price gouging was on third-party sellers, . . . Amazon is directly selling items at significantly above the regular market price despite publicly stating that the company is fighting price gouging."[129] Public Citizen identified pandemic price increases by Amazon on its own inventory that ranged from 48% to 1,010%.[130] The study concluded that "Amazon has misled the public, law enforcement, and policymakers about price increases during the pandemic."[131] The study identified examples of price gouging as follows:

> Note: All products in this section were listed as "sold by Amazon," and not sold by third-party vendors.

---

[129]  Public Citizen, *supra* note 10 at 12.

[130]  *Id.*

[131]  *Id.* at 4.

SECOND AMENDED CLASS ACTION COMPLAINT – 38
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Figure 1: Examples of Price Gouging on Products Sold by Amazon

| Product | Amazon Price | Expected Price | Date Range | % Increase |
|---|---|---|---|---|
| Disposable Face Masks, package of 50 | $39.99 | ~$4.00 | April 1 – Aug. 16 | 1000% |
| Hand Sanitizer | $35.38 | ~$24.00 | May 10 – Aug. 16 | 48% |
| Disinfectant Spray | $13.04 | $6.99 | Aug. 1, 2019 – Aug. 16, 2020 | 87% |
| Antibacterial Soap | $7.00 | $1.49 | May 19 – Aug. 16, 2020 | 470% |
| Nitrile Disposable Gloves | $29.95 | $8.91 | Aug. 1, 2019 – Aug. 2020 | 336% |
| Toilet Paper | $36.39 | $6.89 | May 26 – Aug. 16, 2020 | 528% |
| Paper Towels | $46.94 | $15.49 | May 1 – Aug. 16, 2020 | 303% |
| Flour | $80.35 | $18.88 | May 1 – Aug. 16, 2020 | 425% |
| Sugar | $5.56 | $1.07 | May 1 – Aug. 16, 2020 | 520% |
| Corn Starch | $8.99 | $0.89 | Feb. 1 – Aug. 16, 2020 | 1010% |

SOURCE: AUTHOR OBSERVATIONS OF PRICES AT AMAZON.COM, KEEPA.COM CAMELCAMELCAMEL.COM AND OTHER RETAIL SITES AS NECESSARY.

97. Although certain offending listings have been removed, Plaintiffs' independent investigation has confirmed that Amazon sold products at unlawfully inflated amounts during the COVID-19 crisis, including before and after Amazon claimed to have cracked down on price gouging, and Amazon continues to do so. Moreover, these price increases occurred both on products supplied by third parties and on products supplied by Amazon.

98. Notably, both Mrs. King and Ms. Hanson were gouged on products supplied by Amazon directly. The Clorox Disinfecting Wipes that Mrs. King purchased at a 65% markup were supplied by Amazon (not a third party), as was the vegetable glycerin she purchased to make hand sanitizer (99% price increase). The flea spray that Ms. Hanson purchased at a 58% price increase was likewise supplied by Amazon. Additional examples of unconscionable price increases on Amazon's own inventory abound, including the following:

SECOND AMENDED CLASS ACTION COMPLAINT – 39
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Aleve Back & Muscle Pain Tablet, Pain Reliever**: Increased **233 percent**, from $18.75 to $62.40, immediately after the January 31, 2020 declaration of a national emergency by the HHS.[132]



Aleve Back and Muscle Pain Tablets, Fast Acting All Day Targeted Relief for Headache, Muscle, and Back Pain, Naproxen Sodium Capsules, 220 mg, 250 Count
https://3cmls.co/US/B07WDK2Z85

---

[132] *See* https://camelcamelcamel.com/product/B07WDK2Z85 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B07WDK2Z85 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Curad Alcohol Prep Pads:** Increases of more than *157 percent*, from less than $7 to $17.99, following the January 31, 2020 declaration of a national emergency by the HHS.[133]



---

[133] *See* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **North 760008A Silicone Full Facepiece Respirators – Face Piece Only:** Increases of **61 percent**, from $169.02 to $271.79, following the January 31, 2020 declaration of a national emergency by the HHS.[134]



---

[134] *See* https://camelcamelcamel.com/product/B00142BRF0 (last visited Oct. 22, 2021); https://keepa.com/#!product/1-B00142BRF0 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Faraon Black Beans, 4 lb:** Increases up to ***223 percent***, from $4.98 to $16.07, following the January 31, 2020 declaration of a national emergency by the HHS.[135]



[135] *See* https://camelcamelcamel.com/product/B07BBW3N81 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B07BBW3N81 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of *111 percent*, from $4.68 to $9.86 following the January 31, 2020 declaration of a national emergency by the HHS.[136]



---

[136] *See* https://camelcamelcamel.com/product/B000KOPX4O (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B000KOPX4O (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Lysol Disinfecting Wipes:** Increases exceeding **86 percent**, from less than $12 to $22.36, following the January 31, 2020 declaration of a national emergency by the HHS.[137]



[137] *See* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B00Q70RCW6 (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 45
010923-11/2753066 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Germ Guardian Pluggable Air Purifier & Sanitizer:** Increases of **91 percent**, from $34.99 to $66.99, following the January 31, 2020 declaration of a national emergency by the HHS.[138]



99.     Additional excessive price increases on Amazon's own inventory of products following the HHS' declaration of a national emergency include, but are not limited to, the following:

| OTHER PRICE INCREASES ON AMAZON INVENTORY DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| Clorox Hydrogen Peroxide Disinfecting Wipes | 217%[139] |
| Curad Alcohol Prep Pads | 176%[140] |

---

[138]   *See* https://camelcamelcamel.com/product/B000G2BESO (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B000G2BESO (last visited Oct. 22, 2021).

[139]   *See* https://camelcamelcamel.com/product/B00K3U1B64 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B00K3U1B64 (last visited Oct. 22, 2021).

[140]   *See* https://keepa.com/#!product/1-B00KOSP454 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 46
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| | |
|---|---|
| Cottonelle Flushable Wet Wipes | 156%[141] |
| Dynarex Alcohol Prep Pad | 122%[142] |
| GoYoga Yoga Mat | ~99%[143] |
| Hibiclens Antibacterial / Antiseptic Skin Cleanser | 97%[144] |
| Aleve Arthritis Cap Pain Relief | ~90%[145] |
| Meyenberg Whole Powdered Goat Milk | 82%[146] |
| Spectrum Essential Organic Ground Flaxseed | 66%[147] |
| StarKist Chunk Light Tuna in Water | 59%[148] |
| Ice Mountain 199% Natural Spring Water | 54%[149] |
| Medline Iodine Pads | ~52%[150] |
| KIND Bars, Dark Chocolate Nuts & Sea Salt | 36%[151] |
| Tide PODS Free and Gentle Laundry Detergent | 30%[152] |
| 3M Full Facepiece Reusable Respirator 6700 | 23%[153] |

---

[141] *See* https://camelcamelcamel.com/product/B07B46WWN2 (last visited July 4, 2020). Price increase estimated based on data available July 4, 2020. Pricing history for this product is no longer available on camelcamelcamel.com.

[142] *See* https://keepa.com/#!product/1-B005BFL0RQ (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B005BFL0RQ (last visited Oct. 22, 2021).

[143] *See* https://camelcamelcamel.com/product/B01IZDFWY2 (last visited Oct. 22, 2021).

[144] *See* https://keepa.com/#!product/1-B00EV1D79A (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B00EV1D79A (last visited Oct. 22, 2021).

[145] *See* https://camelcamelcamel.com/Aleve-Arthritis-Naproxen-Reliever-Headache/product/B07ZV5V19T (last visited Oct. 22, 2021).

[146] *See* https://keepa.com/#!product/1-B004K69OMU (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B004K69OMU (last visited Oct. 22, 2021).

[147] *See* https://keepa.com/#!product/1-B00DOKFLYI (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00DOKFLYI (last visited Oct. 22, 2021).

[148] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited Oct. 22, 2021).

[149] *See* https://keepa.com/#!product/1-B01KCNJHYO (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/Ice-Mountain-Natural-8-ounce-plastic/product/B01KCNJHYO (last visited Oct. 22, 2021).

[150] *See* https://camelcamelcamel.com/product/B075KKP2BR (last visited Oct. 22, 2021).

[151] *See* https://keepa.com/#!product/1-B07PMTGM3C (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B07PMTGM3C (last visited Oct. 22, 2021).

[152] *See* https://keepa.com/#!product/1-B07JMK7STT (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B07JMK7STT (last visited Oct. 22, 2021).

[153] *See* https://keepa.com/#!product/1-B007JZ1K1C (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B007JZ1K1C (last visited Oct. 22, 2020).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

100. In addition to increasing prices on its own inventory during the COVID-19 pandemic, Amazon sold third-party-supplied products at vastly inflated prices and, by taking a share of the transaction proceeds, profited from the excess. Just by way of example:

- **Disposable 3-Layer Face Masks:** Increase of *1,800 percent*, from $4.21 to $79.99, following the January 31, 2020 declaration of a national emergency by the HHS.[154]



<hr>

[154] *See* https://camelcamelcamel.com/product/B07W13JQW9 (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 48
010923-11/2753066 V1



- **Arm & Hammer Pure Baking Soda, 5 lb.**: Increase of *1,523 percent*, from $3.08 to $50.00 following the January 31, 2020 declaration of a national emergency by the HHS.[155]



- **Dynarex Corporation Surgical Procedure Masks**: Increase of *376 percent*, from $11.71 to $55.78, following the January 31, 2020 declaration of a national emergency by the HHS.[156]

Dynarex Corporation 2201-50 Surgical Procedure Mask w/ Ear Loop 50-Pack

[155] *See* https://keepa.com/#!product/1-B00HNSJSX2 (last visited Oct. 22, 2021).

[156] *See* https://camelcamelcamel.com/Dynarex-Corporation-2201-50-Surgical-Procedure/product/B00QO4MKN6 (last visited Oct. 22, 2021). Base price of $11.71 identified on camelcamelcamel.com as of July 4, 2020.

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

- **Disposable Earloop Face Masks:** Increases exceeding ***500 percent***, from less than $20 to $120, following the January 31, 2020 declaration of a national emergency by the HHS.[157]



- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of ***1,599 percent***, from less than $4.65 to $79.00, following the January 31, 2020 declaration of a national emergency by the HHS.[158]



---

[157]  *See* https://camelcamelcamel.com/product/B078718WVB (last visited Oct. 22, 2021). Base price of less than $20 identified on camelcamelcamel.com as of July 4, 2020.

[158]  *See* https://keepa.com/#!product/1-B000KOPX4O (last visited Oct. 22, 2021); *vsee also* https://camelcamelcamel.com/product/B000KOPX4O (Oct. 22, 2021).

---

SECOND AMENDED CLASS ACTION COMPLAINT – 50
010923-11/2753066 V1



- **Goya Black Beans Dry 14 oz.:** Increases up to ***521 percent***, from $3.54 to $21.99, following the January 31, 2020 declaration of a national emergency by the HHS.[159]



<hr />

[159] *See* https://keepa.com/#!product/1-B00IMLRH9G (last visited Oct. 22, 2021). Amazon also sold its own inventory of this product in 2020 at prices up to $14.47, roughly four times the price prevailing prior to the pandemic. *See id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **King Arthur Flour:** Increases up to *400 percent*, from $22.00 to $110.00, following the January 31, 2020 declaration of a national emergency by the HHS.[160]



---

[160] *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B078P9TBNW (last visited Oct. 22, 2021). Amazon sold its own inventory of this product during 2020 at prices exceeding $70, roughly three times the pre-pandemic price. *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Logitech HD Pro Webcam C920:** Increase of at least *423 percent*, from less than $65.99 to $345, following the January 31, 2020 declaration of a national emergency by the HHS.[161]



---

[161] *See* https://camelcamelcamel.com/product/B006JH8T3S (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B006JH8T3S (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Ivermectin**: Although not approved by the FDA or WHO 9, the antiparasitic drug Ivermectin has been promoted in certain circles as a treatment for COVID-19 and an alternative to vaccines. Demand for the drug increased in 2021, and prices on Amazon skyrocketed. For example, an injectable solution of Ivermectin manufactured by Noromectin was available on Amazon for $93.54 when, on January 31, 2020, the HHS declared a national emergency. By September of 2021, the price had reached $200, a **_114 percent_** increase.[162]



101.     Additional excessive price increases on third-party supplied Amazon sales include, but are not limited to, the following:

| OTHER PRICE INCREASES ON THIRD-PARTY-SUPPLIED PRODUCTS DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| Quilted Northern Ultra Plush Toilet Paper 18 Rolls | 1,044%[163] |

---

[162] _See_  https://camelcamelcamel.com/product/B078YFPF64?context=search  (last  visited  Oct.  22, 2022); _see also_ https://keepa.com/#!product/1-B078YFPF64 (last visited Oct. 22, 2022).

[163] _See_ https://keepa.com/#!product/1-B07F1KLYVH (last visited Oct. 22, 2021);
_see also_ https://camelcamelcamel.com/product/B07F1KLYVH (last visited Oct. 22, 2021).



| Nishiki Medium Grain Rice | 880%[164] |
| Lysol Disinfecting Wipes | ~745%[165] |
| Advil Coated Tablets Pain Reliever and Fever Reducer | 656%[166] |
| Curad Alcohol Prep Pads | 542%[167] |
| StarKist Chunk Light Tuna in Water | 517%[168] |
| Kraft Easy Mac Microwavable Macaroni and Cheese | 485%[169] |
| Barilla Pasta, Spaghetti | 381%[170] |
| Planters Salted Peanuts (48 Pack) | 368%[171] |
| Almond Milk | 330%[172] |
| Kraft Macaroni & Cheese | 315%[173] |
| Bounty Select-A-Size Paper Towels | 319%[174] |
| Chef Boyardee, Spaghetti & Meatballs | 295%[175] |
| Asian Best Jasmine Rice | 255%[176] |

---

[164] *See* https://keepa.com/#!product/1-B00852ZN2U (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00852ZN2U (last visited Oct. 22, 2021).

[165] *See* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B00Q70RCW6 (last visited Oct. 22, 2021).

[166] *See* https://keepa.com/#!product/1-B0000VLK4O (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B0000VLK4O (last visited Oct. 22, 2021).

[167] *See* https://keepa.com/#!product/1-B00KOSP454 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

[168] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited Oct.22, 2021). https://camelcamelcamel.com/product/B00FWUO2IE (last visited Oct. 22, 2021).

[169] *See* https://keepa.com/#!product/1-B005ECO3H0 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B005ECO3H0 (last visited Oct. 22, 2021).

[170] *See* https://keepa.com/#!product/1-B00WBGKJPW (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00WBGKJPW (last visited Oct. 22, 2021).

[171] *See* https://keepa.com/#!product/1-B004TPU7LO (last visited Oct.22, 2021); *see also* https://camelcamelcamel.com/product/B004TPU7LO (last visited Oct. 22, 2021).

[172] *See* https://keepa.com/#!product/1-B07HL1NRGQ (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B07HL1NRGQ (last visited Oct. 22, 2021).

[173] *See* https://keepa.com/#!product/1-B011W21U0I (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B011W21U0I (last visited Oct. 22, 2021).

[174] *See* https://keepa.com/#!product/1-B010OW4KMW (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B010OW4KMW (Oct. 22, 2021).

[175] *See* https://keepa.com/#!product/1-B004XVZG1U (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B004XVZG1U (last visited Oct. 22, 2021).

[176] *See* https://keepa.com/#!product/1-B019VPL9OK (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B019VPL9OK (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves | 230%[177] |
|---|---|
| Kirkland Signature Dried Cherries, 20 Ounce | 153%[178] |
| Better Than Bouillon Organic Chicken Base | 119%[179] |
| Elder Berry Whole, dried 1lb | 67%[180] |
| Kirkland Signature Ibuprofen Liquid Softgels | 66%[181] |

## F. Amazon is Responsible for Unlawful Price Increases on All Products Sold on Its Platform

102. Amazon is accountable for unlawfully increasing the prices on its own inventory of products sold or offered to consumers during the COVID-19 crisis. Amazon is also legally responsible for price gouging on the third-party products it markets to consumers. Far from serving as a passive intermediary, Amazon controls the sale and marketing of all third-party products on its platform and receives a portion of the transaction proceeds, typically around 15 percent of the sales price (in addition to assessing recurring fees on third-party suppliers).[182]

103. Amazon's control over third-party products extends to pricing. For certain third-party products, Amazon retains complete control of the prices at which they are offered. In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" ("SBA") program are guaranteed a "hands off the wheel selling experience," through which Amazon retains absolute discretion to price and reprice third-party inventory however Amazon sees fit. In the SBA program, the third-party supplier is guaranteed revenue from the sale of its product on Amazon.com based on the Minimum Gross Proceeds ("MGP") price, which Amazon sets unilaterally. Moreover, whatever the MGP price may be,

---

[177] *See* https://keepa.com/#!product/1-B002XXO5US (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B002XXO5US (last visited Oct. 22, 2021).

[178] *See* https://keepa.com/#!product/1-B004CSGRS0 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B004CSGRS0 (last visited Oct. 22, 2021).

[179] *See* https://keepa.com/#!product/1-B00415IRQO (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00415IRQO (last visited Oct. 22, 2021).

[180] *See* https://keepa.com/#!product/1-B076JMVSW5 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B076JMVSW5 (last visited Oct. 22, 2021).

[181] *See* https://keepa.com/#!product/1-B000VK2QPQ (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B000VK2QPQ (last visited Oct. 22, 2021).

[182] *See* Dave Hamrick, *Amazon FBA Fees: How They Work and How to Profit as a Seller*, JUNGLESCOUT (Mar. 24, 2021), https://www.junglescout.com/blog/amazon-fba-fees/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*the price listed for and sold to the Amazon consumer* is set solely by Amazon, and may be more or less than the MGP price—it is controlled by Amazon.[183]

104. In other cases involving "large or strategic" third-party suppliers, Amazon also negotiates all pricing terms,[184] or negotiates most-favored-nation protections assuring that third-party suppliers do not undercut Amazon's prices when offering their products through other retail outlets.[185]

105. Amazon also offers third-party suppliers "Automated Pricing" services, whereby Amazon will automatically adjust the prices for third-party-supplied products based on preset "rules" Amazon makes available to the suppliers.[186] With Automated Pricing, Amazon generally adjusts the pricing of third-party products to match or stay in some relationship to competitor prices.[187] This service coordinates pricing across Amazon's platform. If competitive benchmarks increase for any reason—including price gouging—Amazon adjusts all automatically priced products accordingly across its ecosystem. If Amazon were concerned that certain products supplied by third parties were being inflated compared to pre-emergency prices, it could have turned off its automatic repricing software that set prices for specific products and sales beyond lawful limits.

106. Even in instances where third-party suppliers retain some authority to set prices, Amazon establishes the price ceiling and retains the ultimate right to reject a price. Amazon has a "fair pricing policy" pursuant to which it "regularly monitors the prices" set by third-party suppliers.[188] If Amazon identifies a price it considers too high relative to other prices (on or off Amazon's platform),

---

[183] *See* John Robb, *The Amazon SBA Program (aka Sold by Amazon.com)*, ECOMCREW (Jan. 2020), https://www.ecomcrew.com/the-amazon-sba-program-aka-sold-by-amazon/.

[184] *See Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing of the H. Subcomm. on Antitrust, Commercial, & Admin. Law, Comm. on the Judiciary,* 116th Cong. 23 (July 16, 2019) (responses of Amazon to Questions for the Record), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf.

[185] *See id*. at 1.

[186] *See* Amazon, *Create a Pricing Rule*, https://sellercentral.amazon.com/gp/help/external/help-page.html?itemID=201995750 (last visited July 1, 2021).

[187] *See id.*

[188] *See* Amazon, Amazon Marketplace Fair Pricing Policy, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V (last visited July 1, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 57
010923-11/2753066 V1



Amazon may, among other things, remove the offer or suspend the seller.[189] Amazon may also remove the product from the "Buy Box" (discussed *infra*), the vehicle through which nearly all Amazon products are sold.[190] Amazon also polices the price ceiling by suggesting that third-party sellers lower their prices.[191] In other instances, Amazon will unilaterally reduce the price of third-party-supplied products by providing the consumer with a "discount, which appears as a credit" in the consumer's account.[192] These "discounts" are provided exclusively by Amazon, not the third-party supplier.

107. Beyond pricing, Amazon controls all other aspects of transactions involving third-party-supplied products. Consumers who purchase third-party products generally have no direct interaction with the third-party suppliers. Amazon promotes the products on its website, the contents of which Amazon controls entirely. Pursuant to the Amazon Services Business Solutions Agreement, which third-party suppliers are required to sign to have their products sold on Amazon.com, "Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [a third-party supplier's] use of the same. Amazon may assign any of these rights or delegate any of its responsibilities."[193] The Agreement also grants Amazon a royalty-free, non-exclusive, worldwide right and license to commercially or non-commercially exploit in any manner the information provided by third-party suppliers.[194]

108. When a consumer purchases a third-party supplied product, Amazon collects the order, shipping, and payment information from the customer, and it processes all payments. Amazon maintains the right to use mechanisms to rate, or allow shoppers to rate, these products and suppliers

---

[189] *See id.*

[190] *See id.*; *see also* H. Subcomm. on Antitrust, Commercial, & Admin. Law, *supra* note 184, at 23.

[191] *See* H. Subcomm. on Antitrust, Commercial, & Admin. Law, *supra* note 184, at 1-2.

[192] *See id.* at 25.

[193] *See* Amazon, *Amazon Services Business Solutions Agreement* at S-6, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited July 1, 2021).

[194] *See id.* at 4.

SECOND AMENDED CLASS ACTION COMPLAINT – 58
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and to make the ratings publicly available, which it frequently does at the time the consumer is considering purchase.[195]

109. Most third-party-supplied products sold by Amazon are "Fulfilled by Amazon" or "FBA." This means Amazon warehouses the products at its own storage facilities. Amazon maintains electronic records tracking this inventory, which it can commingle with its own.[196] When a customer orders an FBA product, Amazon packages and ships the product directly, while handling customer service aspects of the transaction.[197] Amazon handles returns and reserves the right to fulfill customer returns with *any* "returned Amazon Fulfillment Units."[198] Amazon unilaterally determines which products may participate in the FBA program.[199]

110. Amazon also reserves "sole discretion" to "cancel[]" listings of third-party suppliers' products or "remov[e]" suppliers' listing privileges for violation of Amazon policies,[200] to permanently "withhold any payments" to suppliers for engaging in, *inter alia*, "illegal activity" or repeated violations of Amazon's "Program policies,"[201] and to "accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers."[202] Amazon prohibits third-party suppliers from sending unsolicited communications to customers, mandates that all communications

---

[195] *See id.* at S.1.2.

[196] *See id.* at F-4.

[197] *See* JungleScout, *The State of the Amazon Seller 2021* at 14, available at https://www.junglescout.com/amazon-seller-report/ (last visited July 1, 2021); *see also generally* Amazon Services Business Solutions Agreement, Fulfillment By Amazon Service Terms, *supra* note 193.

[198] *See* Amazon Services Business Solutions Agreement, *supra* note 193, at F-6.2.

[199] *See id.* at F-1.

[200] *See* Amazon, *Listing Restrictions*, https://sellercentral.amazon.com/gp/help/external/200832300 (last visited July 1, 2021).

[201] *See* Amazon Services Business Solutions Agreement, *supra* note 193, at 2.

[202] *See id.* at S-2.2.



must be sent through a service provided on the Amazon platform, and Amazon keeps a record of all correspondence using this service.[203]

111.    Amazon also controls the entire "shopping experience" on its platform, using proprietary ranking mechanisms to direct consumers to third-party products of Amazon's choosing. When a consumer searches for a generic product on Amazon—for example, "bleach"—the search results are curated and ranked by Amazon.[204] As any seller might, Amazon gives particular products prominence or "shelf space." Amazon does this not only by ranking search results, but also by assigning products certain designations, such as "Sponsored," or "Amazon's Choice," or "Best Seller," or "Amazon Prime."[205] The criteria for these designations is established by Amazon and, through them, Amazon places the weight of its brand behind particular third-party-supplied products.

112.    Amazon also determines which supplier will "win" particular transactions, effectively allocating sales between itself and different third-party suppliers without any meaningful involvement (or even knowledge) of the consumer. Specifically, from Amazon's general search results page, consumers can click on a particular product of interest and then are directed to a separate page for that product. Many suppliers—including both Amazon and third-party suppliers—provide the same products on Amazon and all of these suppliers share the same individual product page. Amazon pushes consumers to particular suppliers through a "Buy Box" at the top right corner of the product page. The Buy Box includes "Add to Cart" and "Buy Now" buttons for the supplier Amazon has chosen.[206] Only one supplier controls the Buy Box at any given point in time, and when users click the "Add to Cart"

---

[203] *See* Amazon, *Selling Policies and Seller Code of Conduct*, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801 (last visited July 1, 2021); Amazon, *Buyer-Seller Messaging Service Overview*, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=202125900 (last visited July 1, 2021). Amazon also requires that its third-party suppliers release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability arising from, *inter alia*, sales of the suppliers' products. *See* Amazon Services Business Solutions Agreement, *supra* note 193, at 6.1.

[204] Janger & Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform*, 14 BROOKLYN J. CORP., FIN & COMM. LAW 259 (Oct. 2019), https://brooklynworks.brooklaw.edu/bjcfcl/vol14/iss2/3/.

[205] *Id.* at 264-65.

[206] *Id.* at 268.



or "Buy Now" button, they are buying from that Amazon-selected supplier.[207] Over 90 percent of sales on Amazon occur using the Buy Box.[208]

113. Amazon allocates shares of the Buy Box such that the chosen supplier can change throughout the day. Thus, a consumer who clicks "Add to Cart" for a particular product at 6:00 a.m. may be purchasing a product supplied by Supplier X, while a consumer who clicks the same button for the same product at 6:30 a.m. may be purchasing a product from Supplier Y, or a product supplied by Amazon itself.[209] Thus, not only does Amazon control which supplied products will win transactions, and how many transactions Amazon itself will supply, Amazon allocates these shares down to the minute.

114. Text at the bottom of the "Buy Box" gives consumers some information as to who the supplier may be. The text generally states either "(1) sold by [name of third party] and shipped by [name of third party]; (2) sold by [name of third party] and fulfilled by Amazon; or (3) sold and shipped by Amazon." But the reality is that Amazon substitutes freely between suppliers after the sale.[210] As noted above, most third-party-supplied products are "Fulfilled by Amazon" or "FBA." By default, Amazon warehouses FBA products by product type, not by supplier. Unless a supplier opts out of this program, and Amazon makes it disadvantageous to do so, all products of the same type are "commingled."[211] Accordingly, when a consumer purchases, for example, Clorox Disinfecting Wipes from Amazon, Amazon will generally fulfill this order from its commingled stock of Clorox Disinfecting Wipes regardless of what "supplier" was identified at the time of sale. The actual product the consumer receives could thus be one supplied by *any* third-party supplier, *or* by Amazon itself. And again, Amazon choses whose product the consumer will receive without any input from the consumer or third-party suppliers involved.

---

[207] *See* Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2020), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[208] *Id.*

[209] Janger & Twerski, *supra* note 204, at 270.

[210] *Id.* at 269.

[211] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 61
010923-11/2753066 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

115. For all of the foregoing reasons, Amazon functions as the "seller" of all third-party-supplied products on its platform. At an absolute minimum, Amazon facilitates these sales. Not only does Amazon control pricing—either by fixing the price point or price ceiling—Amazon interacts directly with customers to execute transactions, promotes particular third-party-supplied products, and often fulfills orders from a commingled stock. Amazon controls the entire shopping experience on its platform, regardless of who supplies the products sold. Amazon is responsible when it sells third-party-supplied products at prices that exceed legal prohibitions on price gouging. Nothing is sold on Amazon, at any price, without Amazon's active participation and facilitation.

116. Amazon cannot deflect blame on third parties for a separate but related reason—Amazon knew third-party suppliers would increase prices by unconscionable amounts during the pandemic, and knowingly allowed it to happen.

117. As Amazon is aware, third-party suppliers have previously inflated prices to unlawfully capitalize on emergencies, most prominently during Hurricane Irma in 2017.[212] Moreover, wherever COVID-19 spread, it led to scarcity of essential consumer items and substantial price inflation. Amazon was on notice that the same dynamic would play out in the United States once the virus reached its shores, or even sooner.

118. Price inflation on third-party-supplied products was not only foreseeable; Amazon *knew* that it was occurring in real time and has claimed to have longstanding rules and systems to prevent and stop price gouging as a violation of its "fair pricing" policies (those claims, as shown in this Second Amended Complaint, have been proven false). Amazon assiduously tracks pricing on its platform to best position itself in the marketplace. Amazon thus knew that prices on third-party-priced products were exceeding legal thresholds, often by unconscionable amounts. Amazon had an obligation to prevent this from occurring, and to stop it once it occurred, which Amazon could readily

---

[212] *See* Jennifer Calfas, *Amazon Is Removing $100 Packs of Water After Being Accused of Hurricane Irma Price Gouging*, MONEY (Sept. 7, 2017), https://money.com/amazon-bottled-water-price-gouging-hurricane-irma-florida/.

SECOND AMENDED CLASS ACTION COMPLAINT – 62
010923-11/2753066 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

do by capping prices or, where necessary, excising offending third-party suppliers. Amazon retains contractual authority to take these very steps.[213]

119.    Amazon did not act, however, until late February 2020, when it first began to suspend and take down some (but not close to all) products priced excessively by third parties.[214] Moreover, while Amazon's actions made for good publicity, they did not effectively address—much less eliminate—the problem. Amazon continued to sell third-party priced products at unconscionably inflated prices, as the examples cited in this Second Amended Complaint demonstrate. Notably in this regard, after Amazon took its limited initial steps to address price gouging by third-party suppliers, Senator Markey commented on Amazon's claim that it was addressing price gouging, writing on March 4, 2020, that despite Amazon's purported efforts, there had been "continued reports of price gouging" on the platform.[215]

120.    As public outcry swelled, Amazon was compelled on March 23, 2020, to suspend 3,900 United States accounts associated with products Amazon offered at excessive prices.[216] On that same date, Amazon issued a blog post stating that it has "zero tolerance for price gouging" and claimed to have had "longstanding policies and systems to prevent this harmful practice."[217] But those assertions already had been proven false with the gouging ramping up and ongoing for months. And Amazon's actions, even at that point, were again inadequate. Just two days later, 33 attorneys general, including

---

[213]  *See* Amazon Marketplace Fair Pricing Policy, *supra* note 188.

[214]  *See* Annie Palmer, *Amazon cracks down on coronavirus price gouging and products making false claims*, CNBC (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html.

[215]  *See* Markey, *supra* note 116.

[216]  *See* Josh Rivera, *Amazon removes more than 3,900 seller accounts from US store due to 'coronavirus-based price gouging'*, USA TODAY (updated Mar. 24, 2020), https://www.usatoday.com/story/money/2020/03/23/coronavirus-amazon-price-gouging-removed-accounts/2904729001/. In a letter to shareholders published on April 16, 2020, Amazon CEO Jeff Bezos indicated that Amazon had suspended "more than 6,000 selling accounts globally." Amazon Annual Report, Ex. 99.1 (2020), available at https://www.sec.gov/Archives/edgar/data/1018724/000119312520108427/d902615dex991.htm. The letter did not specify how many of these accounts were operating in the United States, or whether that number is any greater than the 3,900 United States accounts suspended previously.

[217]  *See* Amazon, "Price gouging has no place in our stores," *supra* note 1.

SECOND AMENDED CLASS ACTION COMPLAINT – 63
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Washington Attorney General Bob Ferguson, advised Amazon the "new protections" implemented by Amazon had "failed to remove unconscionably priced critical supplies during the COVID-19 pandemic."[218]

121. Amazon should have had adequate systems in place long before COVID-19 reached the United States to monitor and eliminate price gouging on its platform. As 33 attorneys general have advised, Amazon should not simply react to third-party price inflation—it should have policies to "prevent unconscionable price increases from occurring in the first place."[219] Amazon has the technology and sophistication to do this. In a May 13, 2020 blog post, Amazon acknowledged that it maintains "dynamic automated technology to proactively seek out and pull down unreasonably priced offers."[220] Amazon did not, however, deploy this system proactively to prevent unlawful price increases.

122. Ultimately, the most troubling aspect of Amazon's "efforts" to address third-party price gouging is not that they came late, or were ineffectual, or that Amazon profited on these sales, all of which is true; **it is that while Amazon actively publicized these efforts, Amazon itself continued to inflate prices on its own inventory of products in amounts that satisfy any definition of "price gouging."**

123. Amazon also cannot attribute the price increases on its platform—on either goods supplied by third parties or Amazon itself—to increased costs. Putting aside that third parties' costs are not borne by Amazon, the price increases at issue, often topping 1000 percent, exceed any plausible cost increase in supplying the price-gouged goods. With prices escalating on its platform, Amazon's overall profits—accounting for any cost increases—skyrocketed during the pandemic, jumping 220 percent in the first three month of 2021 over the year prior.[221] In fact, the "high volume of orders during

---

[218] *See* Letter from 33 state attorneys general, *supra* note 124.

[219] *See id.*

[220] *See* Brian Huseman, Amazon Vice President of Public Policy, *It's time for Congress to establish a federal price gouging law* (May 13, 2020), https://blog.aboutamazon.com/policy/its-time-for-congress-to-establish-a-federal-price-gouging-law.

[221] *See* Karen Weise, NYT, *Amazon's profit soars 2020 percent as pandemic drives shopping online* (April 29, 2021), https://www.nytimes.com/2021/04/29/technology/amazons-profits-triple.html.

SECOND AMENDED CLASS ACTION COMPLAINT – 64
010923-11/2753066 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

the pandemic [] let Amazon operate more efficiently."[222] As analysts have observed, Amazon was able to run its warehouses "closer to full capacity" such that while the number of products sold by Amazon increased 44 percent during the first year of the pandemic, its "cost to fulfill those orders was up only 31 percent."[223]

## G. End of Emergency Lockdowns

124. In the fall of October 2022 Washington and other states began to end their COVID-19-related State of Emergency Orders. In May 2023, the Federal Public Health Emergency Order related to Covid-19 expired.

## H. Amazon Price-Gouged Its Way to Unprecedented Revenues During the COVID-19 Crisis

125. With rampant price gouging, Amazon has exploited unprecedented consumer demand during the COVID-19 pandemic to reap extraordinary profits. Amazon's 2020 first-quarter net sales reached $75.5 billion, up 26 percent from the first quarter of 2019.[224] This means that through the first quarter Amazon had generated $10,000 every second of every day in 2020. Amazon continued to profit throughout the pandemic. Its 2020 revenues were up 38%, an increase of more than $100 billion, and its net profits spiked a remarkable 84%.[225]

126. Despite the stock market's collapse in early 2020, there was never a better time to be an Amazon shareholder. As one leading analyst stated in April 2020:

> [Amazon] has achieved a feat that many investors on Wall Street would regard as impossible in a stock market that's fallen sharply off its highs this year. Amazon's shares have soared more than 40% in the past month alone to a new record high as of early afternoon trading on

---

[222] *Id.*

[223] *Id.*

[224] *See* Amazon, Press Release, *Amazon.com Announces First Quarter Results* (Apr. 30, 2020), https://s2.q4cdn.com/299287126/files/doc_financials/2020/Q1/Amazon-Q1-2020-Earnings-Release.pdf.

[225] *See* Shelley E. Kohan, *Amazon's Net Profit Soars 84% With Sales Hitting $386 Billion*, FORBES (Feb. 2, 2021), https://www.forbes.com/sites/shelleykohan/2021/02/02/amazons-net-profit-soars-84-with-sales-hitting-386-billion/?sh=51d2e1b71334.

SECOND AMENDED CLASS ACTION COMPLAINT – 65
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Thursday, giving the company a market value of more than $1.2 trillion.[226]

127. Jeff Bezos, Amazon's president and CEO, has seen his personal fortune swell during the COVID-19 pandemic. Among other assets, Mr. Bezos owns approximately an 11.2 percent stake in Amazon. On April 14, 2020 alone, when Amazon stock surged more than 5 percent, Mr. Bezos's fortune grew by some $6.3 billion. Overall, Jeff Bezos's personal wealth increased by $75 billion (or approximately $205 million per day) as the pandemic raged throughout 2020.[227]

## V. CHOICE OF LAW ALLEGATIONS

128. There is no actual conflict between Washington law and the laws of the states in which Plaintiffs reside—namely, California, Arizona, and North Carolina—on the claims alleged herein. Price gouging is unlawful under statutes, and/or the common law, in each of these states.

129. Accordingly, Washington law can apply to Plaintiffs' claims by virtue of a Washington choice-of-law provision that is set forth in "conditions of use" that appear on Amazon's website. These conditions of use are available to consumers when they sign up for an Amazon account and make subsequent purchases. In pertinent part, the choice-of-law clause contained in the conditions of use provides:

> By using any Amazon Service, you agree that applicable federal law, and the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

## VI. CLASS ACTON ALLEGATIONS

130. Plaintiffs bring this proposed action on behalf of themselves and, pursuant to Rules 23(a), 23(b)(2) & 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased any consumer good or food item, including any listed on Appendix A, on Amazon.com between January 31, 2020 and October 20, 2022 whose price was set at an unfair level. The

---

[226] *See* Nathan Reiff, *Amazon Earnings: What Happened*, INVESTOPEDIA (updated July 30, 2020), https://www.investopedia.com/amazon-earnings-4692665.

[227] *See* Taylor, *supra* note 4.

SECOND AMENDED CLASS ACTION COMPLAINT – 66
010923-11/2753066 V1



precise identification of unfair prices and when they were in place will be refined after discovery and expert analysis.

131. This class definition is conservative because, by the time of the HHS' January 31, 2020 emergency declaration, prices were already on the rise. Amazon was also aware long before January 31, 2020, that consumers were turning to online retail to safely obtain the consumer goods they required.

132. Plaintiffs reserve the right to revisit the Class definition as to the products in the Class based upon information learned through discovery.

133. Excluded from this proposed Class are Defendant; Defendant's affiliates and subsidiaries; Defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

134. This action may appropriately proceed as a class action because Plaintiffs seek injunctive relief that will apply to the Class as a whole and, further, because Plaintiffs will prove the elements of their damages claims with predominantly common evidence.

135. **Numerosity:** The proposed Class includes thousands (and potentially millions) of consumers who paid unlawfully inflated prices for products on Amazon.com. The members of this Class are so numerous that individual joinder of all class members is impracticable. The precise number of class members is not available to Plaintiffs at this time, but the number and identity of individual class members can be ascertained from Amazon's books and records.

136. **Commonality and Predominance:** Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed Class, and these common questions predominate over any questions affecting only individual class members. These include, but are not limited to:

(a) Whether Amazon inflated prices during the COVID-19 pandemic;

(b) Whether those price increases were "unfair" under the WCPA;

(c) Whether Amazon unlawfully increased prices on its own inventory of products;

SECOND AMENDED CLASS ACTION COMPLAINT – 67
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(d)     Whether Amazon is liable for price increases on products supplied by third-parties;

(e)     Whether Amazon exercised reasonable care to monitor and prevent price inflation by third-party Amazon suppliers;

(f)     Whether and the extent to which consumers were harmed by unlawful price increases on Amazon, and the extent of their damages;

(g)     The extent to which Amazon was enriched unjustly;

(h)     Whether Amazon should be subjected to punitive damages, and the appropriate amount; and

(i)     Whether Plaintiffs are entitled to injunctive relief and the appropriate scope of any equitable decree.

137.    **Typicality:** Plaintiffs' claims are typical of the claims of all class members because, among other things, all class members were comparably and similarly injured by Amazon's wrongful conduct alleged herein. Plaintiffs, like all class members, purchased products from Amazon at prices that were unlawfully inflated during the COVID-19 pandemic.

138.    **Adequacy:** Plaintiffs will represent and protect the interests of the proposed Class adequately and fairly. Plaintiffs have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed class members they seek to represent.

139.    **Injunctive and declaratory relief:** By way of the conduct described in this Second Amended Class Action Complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

140.    **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here,

SECOND AMENDED CLASS ACTION COMPLAINT – 68
010923-11/2753066 V1



the class-action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VII.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT ("WCPA")
### (WASH. REV. CODE § 19.86)

141.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

142.   The WCPA renders unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

143.   Although the WCPA does not define what constitutes an "unfair" act or practice, the prohibition must "be liberally construed" to ensure "that its beneficial purposes may be served." *Id.*

144.   The conduct of Amazon described above is "in violation of the public interest," and as such violates the WCPA.

145.   The conduct of Amazon described above offended public policy or is immoral, unethical, oppressive or unscrupulous and therefore violates the WCPA.

146.   Interpretation of the WCPA is informed, but not confined "by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters." *Id.* Section 5(a) of the Federal Trade Commission Act (FTC Act) (15 U.S.C. § 45) likewise prohibits "[u]nfair or deceptive acts or practices in or affecting commerce." An act or practice may be deemed unfair under the FTC Act if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n). Amazon's conduct also violates this test as well.

147.   A nationwide emergency related to COVID-19 was first declared by the HHS on January 31, 2020, and a national emergency existed by executive through May 11, 2023.[228] This

---

[228] *See* HHS, *supra* note 5. On March 13, 2020, President Trump followed the Health and Human Services Division by declaring a national emergency (effective March 1, 2020) pursuant to the



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Second Amended Complaint's January 31, 2020, cut-off date for price-gouging is conservative because public alarm and retail hoarding were occurring prior to the January 31, 2020 emergency declaration. Amazon knew no later than January 31, 2020 (and likely far earlier) that there was increased demand for online retail, and its services in particular. Amazon had a responsibility not to gouge consumers who turned to online retail increasingly as a means of obtaining essential goods safely during an escalating and alarming public health crisis.

148.    Increasing prices excessively during a pandemic offends basic public policy and also is unethical, oppressive, and unscrupulous, and thus "unfair" for purposes of the WCPA. Indeed, it is difficult to imagine an act more unscrupulous than profiteering off a pandemic. As the Washington Attorney General stated when imploring Amazon to address price-gouging on its platform, "[a]s COVID-19 spreads throughout the country, it is important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[229]

149.    Under the FTC Act framework, the price increases on the items listed in Appendix A are unfair because they cause substantial consumer injury, particularly where, as here, the increases were widespread, affecting potentially millions of consumers across the country and greatly affecting the public interest. Consumers lacked reasonable means to avoid their injuries, as the exorbitant prices they paid attest. And as detailed above, Plaintiffs looked elsewhere for the products they purchased, or alternatives, and found none.

150.    There are no countervailing consumer or competition benefits to price gouging. The only party that benefitted here was Amazon, which has reaped blockbuster profits by charging excessive prices throughout the pandemic. These were illicit profits, earned only by exploiting

---

National Emergencies' Act. *See* 85 Fed. Reg. 15,337 (2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak. On February 24, 2021, President Biden extended the national emergency declaration for another year. *See* Pres. Joseph R. Biden, Jr., Letter to U.S. Congress (Feb. 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/24/a-letter-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.

[229] *See* https://oag.dc.gov/sites/default/files/2020-03/Price-Gouging-Multistate-Letter-Amazon.pdf (last visited Oct. 21, 2021).

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

consumers who have been forced to rely on Amazon to obtain essential goods during this unprecedented public health crisis. Consumers do not "benefit" when they are forced to overpay for the goods they need to remain safe and healthy.

151. On information and belief, Amazon's price increases were not directly attributable to additional costs imposed on Amazon by suppliers, and Amazon increased prices on many products in excessive and unfair amounts even when accounting for any additional costs and the markup Amazon customarily applies to such products.

152. Amazon sells, and facilitates the sale of, all products available on Amazon.com. Thus, Amazon is liable under the WCPA for all unlawful prices on its platform. This includes sales involving Amazon's own inventory of products. It also includes sales involving products supplied by third parties. Consumers purchasing third-party-supplied products interact almost exclusively with Amazon, which, functioning as the seller, controls virtually all aspects of the transaction, including by establishing a price ceiling, in many cases setting the specific selling price below that ceiling, and maintaining final authority to remove any product listing. Amazon promotes third-party-supplied products on its platform, including by offering them for sale through its "Buy Box," and otherwise choosing to rank, curate, and give prominence to the sale of specific products. Amazon asserts effective control over which supplied products will win transactions and how many products Amazon itself will supply, and allocates these shares down to the minute. Amazon accepts payment when third-party-supplied products are purchased and handles all material aspects of the transaction. As with any seller, Amazon profits when it sells third-party-supplied products, collecting per-transaction and other fees. And because Amazon's fees are tied to the purchase price, Amazon profits directly when third-party products are sold at higher prices.

153. For all of these reasons, and as elaborated further herein, Amazon causes and is responsible for all price-gouging on its platform, including sales (or sales offers) involving third-party-supplied products.

154. As a direct and proximate result of Amazon's unfair business acts and practices, Plaintiffs are entitled to injunctive relief and actual damages, trebled to the extent permitted under

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Wash. Rev. Code § 19.86.090. Plaintiffs are also entitled to the cost of suit, including reasonable attorney's fees.

## SECOND CAUSE OF ACTION

### NEGLIGENCE

155. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

156. Amazon has a non-delegable duty to apply a level of reasonable care commensurate with the foreseeable harms arising from its control, maintenance, and management of the largest online retail platform in the world. This encompasses a duty to ensure that, during a declared public emergency, consumer goods or food items are not sold on the platform at excessive prices.

157. As the COVID-19 crisis emerged in January 2020, and even prior, it was foreseeable that third-party suppliers on Amazon would attempt to inflate prices excessively for many goods essential to enduring and combatting the public health crisis. Such price inflation has occurred on Amazon's platform in prior emergencies, and was occurring wherever COVID-19 spread. Amazon knew it would occur in response to COVID-19.

158. Amazon has the ability, technological capacity, and contractual right to prevent price gouging during a declared emergency. Amazon maintains complete control over its platform. It has oversight on the prices of all products sold on the platform and, by contract with its third-party suppliers, may unilaterally remove or suspend any listing priced excessively.

159. Amazon, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

- Failing to maintain and/or implement systems to detect and cap price increases by third-party suppliers;

- Listing products with excessive price increases during the COVID-19 pandemic;

- Failing to adequately investigate reports of excessive price inflation on third-party-supplied products; and

- Facilitating the listing, sale, and delivery of products priced at excessive levels on its platform.

SECOND AMENDED CLASS ACTION COMPLAINT – 72
010923-11/2753066 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

160. Given the foreseeability of price gouging during the COVID-19 pandemic, a reasonable online retailer in Amazon's position would have had systems in place to prevent price gouging from ever occurring, and would have taken prompt, aggressive steps to stamp it out entirely. Amazon did not do so. Despite Amazon's vast resources and sophistication, it lacked or failed to implement systems to prevent unlawful price increases on third-party-supplied products, and the acts Amazon ultimately did take to address price gouging came far too late, and were ineffectual.

161. Amazon knew that, because of its failure to exercise reasonable care, consumers such as Plaintiffs would be overcharged.

162. Amazon's negligence was the proximate cause and substantial factor in causing Plaintiffs' economic loss. Had Amazon exercised reasonable care, Plaintiffs would not have paid excessive amounts for products they purchased from Amazon. Plaintiffs are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**

163. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

164. Amazon has exploited vulnerable consumers by selling, and offering for sale, products at excessive prices during COVID-19 pandemic. Facing retail scarcity and official warnings as to the risks of public interaction, consumers have turned to Amazon as a lifeline to obtain goods vital to their safety, health, and well-being. Basic principles of equity, justice, and fair dealing, prohibit sellers from capitalizing on such exigencies to charge consumers excessive prices.

165. By selling consumer goods and food items at excessive and inflated prices during the COVID-19 pandemic, Amazon was unjustly enriched. Amazon profited on both the sale of its own inventory as well as products supplied by third parties, for which Amazon retains a portion of the transaction proceeds. All of these inflated profits were conferred by Plaintiffs and the class they seek to represent, and retained unjustly by Amazon.

166. In selling goods at excessive prices during a public health crisis, Amazon knew that it was overcharging consumers, that consumers would be harmed, and that by retaining the sale proceeds Amazon would be unjustly enriched.

SECOND AMENDED CLASS ACTION COMPLAINT – 73
010923-11/2753066 V1



167. Amazon has no contractual or other right to charge Plaintiffs' or the proposed class the excessive prices identified in this Second Amended Complaint. Any contract purporting to authorize Amazon's price gouging, as herein alleged, would be unenforceable and void.

168. In the event Plaintiffs lack an adequate remedy at law, Amazon is required to make restitution in equity pursuant to the common law of unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief on their own behalf and on behalf of all those similarly situated:

A. That the Court certify the proposed Class and appoint Plaintiffs as Class representatives and their counsel as Class counsel;

B. That the Court award them and the proposed Class all appropriate relief, to include, but not be limited to, treble damages, restitution, and injunctive relief prohibiting Amazon from forever engaging in the wrongful conduct alleged herein, which has harmed Plaintiffs, the Class, and the public at large;

C. That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein;

D. That the Court award them and the proposed Class reasonable attorneys' fees, costs, and pre- and post-judgment interest;

E. That the Court impose punitive damages; and

F. That the Court award them and the proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

SECOND AMENDED CLASS ACTION COMPLAINT – 74
010923-11/2753066 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

DATED: September 20, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
    Steve W. Berman (WSBA #12536)
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Ben Harrington (*pro hac vice*)
Benjamin J. Siegel (*pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: benh@hbsslaw.com
Email: bens@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

SECOND AMENDED CLASS ACTION COMPLAINT – 75
010923-11/2753066 V1



## APPENDIX A

### PRODUCTS IN THE CLASS BEFORE
### FURTHER DISCOVERY AND EXPERT ANALYSIS

- 3M Full Facepiece Reusable Respirator 6700

- Almond Milk

- Baking Soda, including Arm & Hammer Pure Baking Soda

- Barilla Pasta, Spaghetti

- Better Than Bouillon Organic Chicken Base

- Black Beans, including Faraon Black Beans, Goya Black Beans Dry 14 oz.

- Bleach, including Clorox Concentrated Germicidal Bleach

- Bottled water, including Ice Mountain 199% Natural Spring Water and Smartwater distilled water

- Chef Boyardee, Spaghetti & Meatballs

- Cold Remedies, including Cold-EEZE Cold Remedy Lozenges Honey Lemon

- Cottonelle Flushable Wet Wipes

- Curad Alcohol Prep Pads

- Disinfectant Wipes, including CaviWipes, Clorox Commercial Solutions Disinfecting Wipes, Clorox Hydrogen Peroxide Disinfecting Wipes, and Lysol Disinfecting Wipes

- Disposable Gloves, including Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves

- Dynarex Alcohol Prep Pad

- Dynarex Corporation Surgical Procedure Masks

- Elder Berry Whole, dried 1lb

- Face Masks, including Disposable 3-Layer Masks, and Disposable Earloop Face Masks

- Flour, including King Arthur Flour

- Germ Guardian Pluggable Air Purifier & Sanitizer

- GoYoga Yoga Mat

- Hibiclens Antibacterial / Antiseptic Skin Cleanser

- Ivermectin

- KIND Bars, Dark Chocolate Nuts & Sea Salt

SECOND AMENDED CLASS ACTION COMPLAINT – 76
010923-11/2753066 V1



- Kirkland Signature Dried Cherries, 20 Ounce

- Kraft Easy Mac Microwavable Macaroni and Cheese

- Kraft Macaroni & Cheese

- Logitech HD Pro Webcam C920

- Marachan Beef Ramen Noodles

- Medline Iodine Pads

- Meyenberg Whole Powdered Goat Milk

- North 760008A Silicone Full Facepiece Respirators – Face Piece Only

- Pain Relievers, including Advil Coated Tablets Pain Reliever and Fever Reducer, Aleve Arthritis Cap Pain Relief, Aleve Back & Muscle Pain Tablets, and Kirkland Signature Ibuprofen Liquid Softgels

- Paper Towels, including Bounty Select-A-Size Paper Towels

- Planters Salted Peanuts (48 Pack)

- Rice, including Asian Best Jasmine Rice, RiceSelect Jasmati Rice, and Nishiki Medium Grain Rice

- Spectrum Essential Organic Ground Flaxseed

- StarKist Chunk Light Tuna in Water

- Tide PODS Free and Gentle Laundry Detergent

- Toilet Paper, including Quilted Northern Ultra Plush Toilet Paper 18 Rolls

- Vegetable Glycerin, including NOW Solutions Vegetable Glycerin

- Yeast, including Red Star Active Dry Yeast

- Zodiac Flea & Tick Spray

SECOND AMENDED CLASS ACTION COMPLAINT – 77
010923-11/2753066 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALVIN GREENBERG, MICHAEL STEINBERG,
JULIE HANSON, CHRISTINA KING, and
RONNELL ROBERTSON, on behalf of themselves
and all others similarly situated,

              Plaintiffs,

      v.

AMAZON.COM, INC., a Delaware corporation,

              Defendant.

No. 2:21-cv-00898-RSL

STIPULATED PROTECTIVE
ORDER

## 1. **PURPOSES AND LIMITATIONS**

Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this agreement is consistent with LCR 26(c). It does not confer blanket protection on all disclosures or responses to discovery, the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles, and it does not presumptively entitle parties to file confidential information under seal.  The availability of protection pursuant to this Stipulated Protective Order does not preclude a party from withholding information protected by any applicable privilege. Nothing in this Stipulated Protective Order shall restrict in any way the

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 1

right of a Producing Party to disclose or make use of its own documents or Discovery Material. Under LCR 26(c)(2), the parties began with the District's Model Protective Order, and have identified departures from the model in a redlined copy, attached as Exhibit 1.

**2.      DEFINITIONS**

2.1      <u>Challenging Party</u>:  A Party or Non-Party that challenges the designation of information or items under this Order.

2.2      <u>Counsel (without qualifier)</u>: Outside Counsel of Record and In-House Counsel (as well as their support staff).

2.3      <u>Designating Party</u>:  A Party, Non-Party, person, or entity designating documents or information as Protected Information under this Order.

2.4      <u>Discovery Material</u>:  All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.5      <u>Expert</u>:  A person with specialized knowledge or experience in an area pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.6      <u>In-House Counsel</u>:  Attorneys (and their support staff, including legal secondees and economists) who are employees or contractors of a Party and whose responsibilities include overseeing, working on, or supporting this action. In-House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.7      <u>Non-Party</u>:  Any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.8      <u>Outside Counsel of Record</u>:  Attorneys who are not employees of a Party to this action but are retained to represent or advise a Party to this action or any related action and have

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) **-** 2

appeared in this action or any related action on behalf of that Party or are affiliated with a law firm that has appeared on behalf of that Party in this action or any related action.

2.9     Party:  Any Party to this action, including all its officers, directors, employees, consultants, retained Experts, and Outside Counsel of Record (and their support staff).

2.10    Producing Party:  A Party or Non-Party that produces Discovery Material in this action.

2.11    Protected Material:  Any Discovery Material that is designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only."

2.12    Receiving Party:  A Party that receives Discovery Material from a Producing Party.

**3.     PROTECTED MATERIAL**

3.1     "CONFIDENTIAL" Material:  Documents and tangible things that may be produced or otherwise exchanged that the Designating Party reasonably believes contain, describe, or disclose sensitive, non-public, confidential information, such as (a) court records, whether in this District or other courts, currently maintained under seal; (b) information subject to a non-disclosure or confidentiality agreement; (c) employee personnel information; (d) either Party's financial or accounting information; (e) either Party's commercially sensitive internal communications or information; (f) either Party's business negotiations, transactions, and dealings with third parties; (g) either Party's trade secrets or competitive or strategic initiatives that are not readily ascertainable and for which the Designating Party has taken reasonable steps to maintain confidentiality; or (h) Non-Party commercially sensitive information.

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 3

3.2     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Material: Extremely sensitive materials that qualify as "CONFIDENTIAL" and that the Designating Party reasonably believes contain highly sensitive business or personal information, the disclosure of which to another Party or Non-Party would create a risk of competitive or commercial disadvantage to the Designating Party.

3.3     Should the Parties agree to source code discovery, or be ordered to produce such discovery, they will enter a separate stipulated source code supplement to this Order.

## 4.   SCOPE

The protections conferred by this agreement cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel, Non-Parties, and/or Experts that might reveal Protected Material.

However, the protections conferred by this agreement do not cover information that is in the public domain or becomes part of the public domain through trial or otherwise.

## 5.   ACCESS TO AND USE OF PROTECTED MATERIAL

5.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation.  Protected Material may be disclosed only to the categories of persons and under the conditions described in this agreement. Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this agreement.

5.2     Disclosure of "CONFIDENTIAL" Material. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any Confidential Material only to:

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 4

(a) the Receiving Party's Outside Counsel of Record, as well as employees of Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b) the officers, directors, and employees (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation;

(c) Experts to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court, court personnel, and court reporters and their staff;

(e) copy, imaging, document management, and electronic discovery services retained by Counsel to assist in the management of Confidential Material, provided that counsel for the Party retaining such services instructs the service not to disclose any Confidential Material to third parties and to immediately return all originals and copies of any Confidential Material;

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Confidential Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this agreement;

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

5.3 Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Material. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any Highly Confidential – Attorney's Eyes Only Material only to:

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 5

(a)     the Receiving Party's Outside Counsel of Record, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation;

(b)     Experts of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     the court and its personnel;

(d)     court reporters and their staff; professional jury or trial consultants to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(f)     employees of the Producing Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by Protective Order" attached as Exhibit A; and

(g)     copy, imaging, document management, and electronic discovery services retained by Counsel to assist in the management of Highly Confidential – Attorneys' Eyes Only Material and who have signed the "Agreement to Be Bound by Protective Order" attached as Exhibit A, provided that counsel for the Party retaining such services instructs the service not to disclose any Highly Confidential – Attorneys' Eyes Only Material to third parties and to immediately return all originals and copies of any Confidential Material.

5.5     Filing Protected Material. Before filing Protected Material or discussing or referencing such material in court filings, the filing Party shall confer with the Designating Party, in accordance with Local Civil Rule 5(g)(3)(A), to determine whether the Designating Party will remove the designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted.  During the meet and confer process, the Designating Party must identify the basis for sealing the specific protected information at issue,

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 6

and the filing Party shall include this basis in its motion to seal, along with any objection to sealing the information at issue. Local Civil Rule 5(g) sets forth the procedures that must be followed and the standards that will be applied when a Party seeks permission from the court to file material under seal. Any motion to seal filed by the Receiving Party, where a Designating Party must make the showing required by Local Civil Rule 5(g)(3)(B) in response to the motion, must be noted for consideration no earlier than the fourth Friday after filing. A Party who seeks to maintain the designation must satisfy the requirements of Local Civil Rule 5(g)(3)(B), even if it is not the Party filing the motion to seal. Failure to satisfy this requirement will result in the motion to seal being denied, in accordance with the strong presumption of public access to the Court's files.

5.6     Disclosure of Protected Material at Hearings or Trial._ In the event a person receiving Protected Material intends to use Protected Material in any pre-trial hearing or other proceeding open to individuals not entitled to receive Protected Materials, such person shall give the Designating Party at least ten (10) days' written notice. The Parties, including any non-party Designating Party, shall thereafter meet and confer to determine whether the Protected Material can be so used. If the Parties cannot reach agreement, the Designating Party may file a motion to seal the proceeding.

6.     **DESIGNATING PROTECTED MATERIAL**

6.1     Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this agreement must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify, so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this agreement.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (*e.g.*, to

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 7

unnecessarily encumber or delay the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, the Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

6.2     Manner and Timing of Designations. Except as otherwise provided in this agreement (*see, e.g.*, second paragraph of section 6.2 (a) below), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this agreement must be clearly so designated before or when the material is disclosed or produced.

(a)     Information in documentary form: (*e.g.*, paper or electronic documents and deposition exhibits, but excluding transcripts of depositions or other pretrial or trial proceedings), the Designating Party must affix the word(s) "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY" to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (*e.g.*, by making appropriate markings in the margins).  With respect to documents containing Protected Material produced in native format, the Designating Party shall include the appropriate designation at the end of the filename for each document.

(b)     Testimony given in deposition or in other pretrial ~~or trial~~ proceedings: The Parties and any participating Non-Parties must identify on the record, during the deposition, hearing, or other pretrial proceeding, all protected testimony, without prejudice to their right to so designate other testimony after reviewing the transcript. Any Party or Non-Party may, within 30 days after receiving the transcript of the deposition or other pretrial proceeding, designate portions of the transcript, or exhibits thereto, as confidential.  Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 8

asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Until the expiration of the 30-day period for designation, any deposition transcript shall be treated as if it had been designated "HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY" in its entirety, unless otherwise agreed.

If a Party or Non-Party desires to protect confidential information at trial, the issue should be addressed during the pre-trial conference.

(c)     Other tangible items:  The Producing Party must affix in a prominent place on the exterior of the container or containers in which the information or item is stored the words "CONFIDENTIAL " or "HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY."  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

6.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this agreement for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to ensure that the material is treated in accordance with the provisions of this agreement.

**7.     CHALLENGING CONFIDENTIALITY DESIGNATIONS**

7.1     Timing of Challenges.  Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.  A Party challenging a designation must provide the Bates number for each item of Protected Material being challenged.

7.2     Meet and Confer.  The Parties must make every attempt to resolve any dispute regarding confidential designations without court involvement. Any motion regarding confidential designations or for a protective order must include a certification, in the motion or in

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 9

a declaration or affidavit, that the movant has engaged in a good faith meet and confer conference with other affected Parties in an effort to resolve the dispute without court action. The certification must list the date, manner, and participants to the conference. A good faith effort to confer requires a face-to-face meeting or a telephone conference.

      7.3    <u>Judicial Intervention</u>.  If the Parties cannot resolve a challenge without court intervention, the Designating Party may file and serve a motion to retain confidentiality under Local Civil Rule 7 (and in compliance with Local Civil Rule 5(g), if applicable), or may use the expedited joint motion procedure set forth in Local Civil Rule 37(a)(2). The burden of persuasion in any such motion shall be on the Designating Party.  Frivolous challenges, and those made for an improper purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging Party to sanctions. All Parties shall continue to maintain the material in question as confidential until the court rules on the challenge.

**8.    <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>**

      If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEY'S EYES ONLY," that Party must:

      (a)    promptly notify the Designating Party in writing and include a copy of the subpoena or court order;

      (b)    promptly notify in writing the Party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this agreement. Such notification shall include a copy of this agreement; and

      (c)    cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

      If the Designating Party timely seeks a protective order from the court from which the subpoena or order issued, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 10

CONFIDENTIAL—ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its Protected Material, and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9.     **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this agreement, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized access or disclosure, (b) investigate and report to Designating Party the scope of and circumstances of the unauthorized access or disclosure; (c) take immediate and reasonable steps to rectify the unauthorized access or disclosure, including using its best efforts to retrieve all unauthorized copies of the Protected Material and instituting additional security to prevent any further access or disclosure, (d) comply with all obligations under applicable laws relating to unauthorized access or disclosure, including security breach notification laws and other applicable laws, (e) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (f) request that such person or persons execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

10.     **INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL**

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order or agreement that provides for production without prior privilege review.  This Order invokes the protections afforded by Fed. R. Evid. 502(b) and 502(d).

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 11

## 11. <u>NON -TERMINATION AND RETURN OF DOCUMENTS</u>

Within 60 days after the termination of this action, including all appeals, each Receiving Party must destroy all Protected Material, including all copies, extracts and summaries thereof.

The Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that affirms that the Receiving Party has used reasonable efforts to destroy copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material.

Notwithstanding this provision, Counsel are entitled to retain one archival copy of all documents filed with the court, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Stipulated Protective Order.

Even after final disposition of this litigation, the confidentiality obligations imposed by this agreement shall remain in effect until a Designating Party agrees otherwise in writing or a court orders otherwise.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED this 15th day of September, 2022.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Amazon.com, Inc.

By *s/ Stephen M. Rummage*
    Stephen M. Rummage, WSBA #11168
    Jim Howard, WSBA #37259
    920 Fifth Avenue, Suite 3300
    Seattle, WA  98104-1610
    Telephone: (206) 622-3150
    Fax: (206) 757-7700
    E-mail: steverummage@dwt.com
           jimhoward@dwt.com

GIBSON, DUNN & CRUTCHER LLP
Attorneys for Amazon.com, Inc.


By *s/ Kristin A. Linsley*
    Kristin A. Linsley, *admitted pro hac vice*
    Rachel S. Brass, *admitted pro hac vice*
    Joseph R. Rose, *admitted pro hac vice*
    555 Mission St., Ste. 3000
    San Francisco, CA 94105
    Telephone: (415) 393-8200
    Fax: (415) 393-8306
    E-mail: klinsley@gibsondunn.com
           rbrass@gibsondunn.com
           jrose@gibsondunn.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Attorneys for Plaintiffs and the Proposed Class

By: */s/ Steve W. Berman*
    Steve W. Berman (SBN 12536)
    1301 Second Avenue, Suite 2000
    Seattle, Washington 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    Email: steve@hbsslaw.com

    Ben Harrington, *admitted pro hac vice*
    Benjamin J. Siegel, *admitted pro hac vice*
    715 Hearst Avenue, Suite 202
    Berkeley, California 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    Email: benh@hbsslaw.com
           bens@hbsslaw.com


### ORDER


PURSUANT TO STIPULATION, and with the identified edits to paragraph 6.2(b), IT IS SO ORDERED.


Dated this 23rd day of January, 2023.

*M̶ S Lasnik*
Hon. Robert S. Lasnik
United States District Court Judge

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) **- 13**

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of

perjury that I have read in its entirety and understand the Stipulated Protective Order that was

issued by the United States District Court for the Western District of Washington on [date] in the

case of *Greenberg v. Amazon.com, Inc.*, Case No. 2:21-cv-00898-RSL. I agree to comply with and

to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge

that failure to so comply could expose me to sanctions and punishment in the nature of contempt.

I solemnly promise that I will not disclose in any manner any information or item that is subject

to this Stipulated Protective Order to any person or entity except in strict compliance with the

provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Washington for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

STIPULATED PROTECTIVE ORDER
(2:21-cv-00898-RSL) - 14

# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, JULIE HANSON, CHRISTINA KING, and RONNELL ROBERTSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>Defendant. | CASE NO. 2:21-cv-00898-RSL<br><br>**ORDER REGARDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION**[1] |

Plaintiffs hereby propose the following provisions regarding the discovery of electronically stored information ("ESI") in this matter. Plaintiffs began with the District's Model ESI Agreement, and have identified departures from the model in a redlined copy, attached as Exhibit 1.

**A. General Principles**

1. An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate

---

[1] The Court declines to enter plaintiff's proposed order regarding expert discovery protocols.

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                PAGE - 1
(Case No. 2:21-CV-00898-RSL)

in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions.

2. As provided in LCR 26(f), the proportionality standard set forth in Fed. R. Civ. P. 26(b)(1) must be applied in each case when formulating a discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as possible. When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to meet and confer regarding the phasing and prioritization of productions.

3. This Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown. Any such modified Order will be titled sequentially as follows, "First Modified Order re: Discovery of Electronically Stored Information for Standard Litigation," and each modified Order will supersede the previous Order.

4. Nothing in this Order precludes the parties from reaching further agreements on topics related to this Order, or if agreement cannot be reached, moving the Court for an appropriate discovery order.

**B. ESI Disclosures**

Within 30 days of entry of this Order, or at a later time if agreed to by the parties, each party shall disclose:

1. <u>Custodians.</u> If a party has employees, directors or officers, that party shall identify the 25 custodians most likely to have discoverable ESI in their possession, custody, or control. The custodians shall be identified by name, title, connection to the instant litigation, and the type of the information under the custodian's control.

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                                    PAGE - 2
(Case No. 2:21-CV-00898-RSL)

2.     <u>Non-custodial Data Sources.</u> A list of non-custodial data sources (*e.g.*, shared drives, servers), if any, likely to contain discoverable ESI.

3.     <u>Third-Party Data Sources.</u> A list of third-party data sources, if any, likely to contain discoverable ESI (*e.g.*, third-party email providers, mobile device providers, cloud storage) and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

4.     <u>Inaccessible Data.</u> A list of data sources, if any, likely to contain discoverable ESI (by type, date, custodian, electronic system or other criteria sufficient to specifically identify the data source) that a party asserts is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(B).

5.     <u>Foreign data privacy laws.</u> Nothing in this Order is intended to prevent either party from complying with the requirements of a foreign country's data privacy laws, *e.g.*, the European Union's General Data Protection Regulation (GDPR) (EU) 2016/679. The parties agree to meet and confer before including custodians or data sources subject to such laws in any ESI or other discovery request.

**C.     ESI Discovery Procedures**

1.     <u>On-site inspection of electronic media.</u> Such an inspection shall not be required absent a demonstration by the requesting party of specific need and good cause or by agreement of the parties.

2.     <u>Search methodology.</u> The parties shall timely confer to attempt to reach agreement on appropriate search terms and queries, file type and date restrictions, data sources (including custodians), and other appropriate computer- or technology-aided methodologies, before any such effort is undertaken. The parties shall continue to cooperate in revising the appropriateness of the search methodology.

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                    PAGE - 3
(Case No. 2:21-CV-00898-RSL)

a. Prior to running searches:

i. The producing party shall disclose the data sources (including custodians), search terms and queries, any file type and date restrictions, and any other methodology that it proposes to use to locate ESI likely to contain responsive and discoverable information. The producing party shall provide unique hit counts for each search query, unless providing such hit counts amounts to an unreasonable burden.

ii. After disclosure, the parties will engage in a meet and confer process regarding additional terms sought by the non-producing party.

iii. The following provisions apply to search terms / queries of the requesting party. Focused terms and queries should be employed; broad terms or queries, such as product and company names, generally should be avoided. A conjunctive combination of multiple words or phrases (*e.g.*, "computer" and "system") narrows the search and shall count as a single search term. A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word. The producing party may identify each search term or query returning overbroad results demonstrating the overbroad results and a counter proposal correcting the overbroad search or query.

b. Upon reasonable request, a party shall disclose information relating to network design, the types of databases, database dictionaries, the ESI document retention policy, organizational chart for information systems personnel, or the backup and systems recovery routines, including, but not limited to, tape rotation and destruction/overwrite policy.

3. Format.

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                                     PAGE - 4
(Case No. 2:21-CV-00898-RSL)

a.    ESI will be produced to the requesting party with searchable text, in a format to be decided between the parties.

b.    Unless otherwise agreed to by the parties, files that are not easily converted to image format, such as spreadsheet, database, and drawing files, will be produced in native format.

c.    Each document image file shall be named with a unique number (Bates Number). Documents produced in native format will be assigned a Bates Number and produced with a corresponding load file.  Original file names should be preserved and included in the load file metadata.  File names should not be more than twenty characters long or contain spaces. When a text-searchable image file is produced, the producing party must preserve the integrity of the underlying ESI, *i.e.*, the original formatting, the metadata (as noted below) and, where applicable, the revision history.

d.    If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as they existed in the original document.

f.    The full text of each electronic document shall be extracted ("Extracted Text") and produced in a text file. The Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a foreign language) and shall be named with a unique Bates Number (*e.g.*, the unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

4.    <u>De-duplication.</u> The parties may de-duplicate their ESI production across custodial and non-custodial data sources after disclosure to the requesting party, and the duplicate custodian information removed during the de-duplication process tracked in a duplicate/other custodian field in the database load file. If processing and production is done on a rolling basis, an updated

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION          PAGE - 5
(Case No. 2:21-CV-00898-RSL)

Duplicate Custodians field with additional values shall be provided in an overlay. The producing party shall identify whether the overlay replaces previously produced fields for a file or supplement them.

5.      Email Threading.  The parties may use analytics technology to identify email threads and need only produce the unique most inclusive copy and related family members and may exclude lesser inclusive copies.  Upon reasonable request, the producing party will produce a less inclusive copy.

6.      Metadata fields. The parties shall timely confer to attempt to reach agreement on appropriate metadata fields.

7.      Hard-Copy Documents. The parties elect to produce hard-copy documents in an electronic format. The production of hard-copy documents will include a cross-reference file that indicates document breaks and sets forth the custodian or custodian/location associated with each produced document. Hard-copy documents will be scanned using Optical Character Recognition technology and searchable ASCII text files will be produced (or Unicode text format if the text is in a foreign language), unless the producing party can show that the cost would outweigh the usefulness of scanning (for example, when the condition of the paper is not conducive to scanning and will not result in accurate or reasonably useable/searchable ESI). Each file will be named with a unique Bates Number (*e.g.*, the unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

**D.      Preservation of ESI**

The parties acknowledge that they have a common law obligation, as expressed in Fed. R. Civ. P. 37(e), to take reasonable and proportional steps to preserve discoverable information in

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                PAGE - 6
(Case No. 2:21-CV-00898-RSL)

the party's possession, custody, or control. With respect to preservation of ESI, the parties agree as follows:

1. Absent a showing of good cause by the requesting party, the parties shall not be required to modify the procedures used by them in the ordinary course of business to back-up and archive data; provided, however, that the parties shall preserve all discoverable ESI in their possession, custody, or control.

2. The parties will supplement their disclosures in accordance with Fed. R. Civ. P. 26(e) with discoverable ESI responsive to a particular discovery request or mandatory disclosure where that data is created after a disclosure or response is made (unless excluded under Sections (D)(3) or (E)(1)-(2)).

3. Absent a showing of good cause by the requesting party, the following categories of ESI need not be preserved:

    a. Deleted, slack, fragmented, or other data only accessible by forensics.

    b. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

    c. On-line access data such as temporary internet files, history, cache, cookies, and the like.

    d. Data in metadata fields that are frequently updated automatically, such as last-opened dates (see also Section (E)(5)).

    e. Automatically saved interim versions of documents and emails (for the avoidance of doubt, this provision does not apply to any final versions of documents and emails whether saved manually or automatically).

    f. Dynamic fields of databases or log files that are not retained in the usual course of business.

    g. Back-up data that are duplicative of data that are more accessible elsewhere.

    h. Server, system or network logs.

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                            PAGE - 7
(Case No. 2:21-CV-00898-RSL)

i. Data remaining from systems no longer in use that is unintelligible on the systems in use.

j. Electronic data (*e.g.*, email, calendars, contact data, and notes) sent to or from mobile devices (*e.g.*, iPhone, iPad, Android devices), provided that a copy of all such electronic data is automatically saved in real time elsewhere (such as on a server, laptop, desktop computer, or "cloud" storage).

**E.     Privilege**

1.     The parties agree to abide by Fed. R. Civ. P. 26(b)(5) with respect to documents fully withheld from production on the basis of a privilege or other protection, unless otherwise agreed or excepted by this Agreement and Order. Privilege logs shall include a unique identification number for each document and the basis for the claim (attorney-client privileged or work-product protection). For ESI, the privilege log may be generated using available metadata, including author/recipient or to/from/cc/bcc names; the subject matter or title; and date created. Should the available metadata provide insufficient information for the purpose of evaluating the privilege claim asserted, the producing party shall include such additional information as required by the Federal Rules of Civil Procedure. Privilege logs will be produced to all other parties by the deadline for Substantial Completion of Document Production.

2.     Redactions need not be logged so long as the basis for the redaction is clear on the redacted document.

3.     With respect to privileged or work-product information generated after the filing of the complaint, parties are not required to include any such information in privilege logs.

4.     Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B).

5.     Pursuant to Fed. R. Evid. 502(d), the production of any documents in this proceeding shall not, for the purposes of this proceeding or any other federal or state proceeding,

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                        PAGE - 8
(Case No. 2:21-CV-00898-RSL)

constitute a waiver by the producing party of any privilege applicable to those documents, including the attorney-client privilege, attorney work-product protection, or any other privilege or protection recognized by law. Information produced in discovery that is protected as privileged or work product shall be immediately returned to the producing party, and its production shall not constitute a waiver of such protection.

**ORDER**

Based on the foregoing, IT IS SO ORDERED.

Dated this 16th day of February, 2023.

*MW S Lasnik*
Robert S. Lasnik
United States District Judge

ORDER REGARDING DISCOVERY OF ELECTRONICALLY
STORED INFORMATION                                                          PAGE - 9
(Case No. 2:21-CV-00898-RSL)

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALVIN GREENBERG, *et al.*,

                Plaintiffs,

       v.

AMAZON.COM, INC.,

                Defendant.

CASE NO. 2:21-cv-00898-RSL

ORDER DENYING MOTION FOR
PROTECTIVE ORDER AND
GRANTING MOTION TO COMPEL

      This matter comes before the Court on "Amazon's Motion for Protective Order Under Rule 26(c)(1)" (Dkt. # 78) and "Plaintiffs' Cross-Motion to Compel Withheld Data" (Dkt. # 154).[1] Plaintiffs allege that Amazon.com, an on-line retailer, engaged in unlawful price gouging during the COVID-19 pandemic, raising (or allowing third-party vendors to raise) prices on a vast array of products and reaping extraordinary profits. Plaintiffs, five individuals from California, Arizona, and North Carolina, seek to represent a class of:

> All persons who purchased any consumer good or food item, including any listed on Appendix A, on Amazon.com between January 31, 2020 and October 20, 2022 whose price was set at an unfair level. The precise identification of unfair prices and when they were in place will be refined after discovery and expert analysis.

---

[1] This matter can be resolved on the papers submitted. The parties' requests for oral argument are DENIED. Amazon's motion to strike plaintiffs' motion to compel is also DENIED.

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 1

Dkt. # 66 at ¶ 130. The named plaintiffs purchased items such as cleaning products, dry yeast, flea and tick spray, ramen noodles, rice, hand sanitizer, and distilled water. The appendix referenced in the proposed class definition includes additional items, such as processed and unprocessed foods, face masks, household goods, over-the-counter medicines, ivermectin, computer peripherals, and yoga mats.

In September 2024, plaintiffs served written discovery seeking "[a]ll transactional data for purchases made on Amazon.com," "[a]ll data for product offers on Amazon.com," and "[d]ata sufficient to track the Buy Box price for all products sold on Amazon.com" between January 31, 2017, and the present. Dkt. # 79 at 8 (Request for Production Nos. 11-13). Amazon filed this motion for protective order, arguing that the requests do not seek relevant information insofar as they encompass data related to the offer and sale of goods that (a) were not purchased by the named plaintiffs, (b) are not essential, and/or (c) were available from other sources.

## A. Scope of Discovery Under Rule 26(b)

Rule 26 of the Federal Rules of Civil Procedure governs the permissible scope of discovery in federal civil litigation. Rule 26(b) sets forth the threshold requirement that the information sought must appear "relevant to any party's claim or defense and proportional to the needs of the case...." The information plaintiffs seek is clearly relevant. Plaintiffs allege that Amazon acted unfairly for purposes of the Washington Consumer Protection Act ("CPA") when it took advantage of a global pandemic and related market disruptions to raise prices at a time when consumers had few other options. The data they seek will enable them to identify which consumer goods and food items saw a price spike during the first few years of the pandemic. While the data will not, standing alone, prove plaintiffs' price gouging claim, establishing that a price increase occurred is a necessary first step.

Amazon argues that the request is impermissibly overbroad because it encompasses consumer goods and food items that are not essential to the purchaser's health and safety.

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 2

Plaintiffs' burden under the CPA is to show that Amazon's conduct was unfair. The Washington Supreme Court recently made clear that where conduct is alleged to be unfair but is not regulated by statute, plaintiffs "need[] show only that the defendant's conduct is in violation of public interest." *Greenberg v. Amazon.com, Inc.*, 3 Wn.3d 434, 459 (2025). A violation of public interest related to price gouging can be shown in a number of ways that do not require plaintiffs to establish that the purchased items were essential for health or safety. *Id.*, at 455-56 (discussing various criteria the Federal Trade Commission has used to make fairness determinations). Amazon asserts that, even if essentiality is not a necessary element of unfairness, plaintiffs are bound by the allegations of the Second Amended Complaint wherein they affirmatively limited their claims to purchases of essential items. A fair reading of the complaint does not support such an interpretation. While some of the products purchased by the named plaintiffs are described in the Second Amended Complaint as "essential," others are simply food or consumer goods that were desired by the purchaser for one reason or another, such as the beef ramen Christina King purchased to ease her mother's anxiety about product shortages. Appendix A, referenced in the proposed class definition, includes many items that may have been "essential" to making a particular recipe or to participating in a desired activity but that can hardly be characterized as indispensable, necessary, or extremely important.

Amazon also suggests that the requests for production are impermissibly overbroad because data regarding all offers and sales of consumer goods and food items will undoubtedly include information regarding products for which there was no price increase during the class period. No evidence is provided for this supposition, and plaintiffs' theory of the case is that Amazon used a global pandemic and ensuing market disruptions as an excuse to increase prices on a wide array of products. The Court will not assume otherwise at this stage of the litigation. Even if there are items whose prices remained relatively stable during the relevant period, the production is relevant in that it will enable plaintiffs

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 3

to (1) identify products with significant price fluctuations and (2) test their theory that price-gouging occurred unless products were readily available elsewhere or were simply not in demand during a global pandemic. Amazon offers no other means by which plaintiffs can accomplish these tasks.

Recognizing that the discovery sought is relevant to the class claims asserted in the Second Amended Complaint, Amazon filed a separate motion to strike the class allegations. If successful, the motion to strike would limit the scope of this lawsuit to only the named plaintiffs and the handful of products they purchased during the first few years of the pandemic. Such a limitation would make the vast majority of the transactional data plaintiffs seek largely irrelevant. Given the standard used to evaluate motions to strike class allegations, however,[2] the Court cannot presume that the motion will be successful and will not restrict otherwise permissible discovery simply because the motion might be granted in the future.

With regards to the proportionality requirement, courts consider factors such as "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). If plaintiffs are going to prove their claim that Amazon engaged in price gouging during the COVID-19 pandemic, they need discovery regarding the prices charged before, during, and after the declared

_____

[2] A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). But Rule 12(f) does not authorize the resolution of disputed and substantial factual or legal issues. The function of a Rule 12(f) motion is to avoid the expenditure of time and money that would arise from litigating spurious issues (*i.e.*, those that are redundant, immaterial, impertinent, or scandalous), not to act as a substitute for a Rule 12(b) motion. Rule 12(f) motions to strike are generally disfavored because the motions may be used as delay tactics and because of the strong policy favoring resolution on the merits. *In re Amazon Serv. Fee Litig.*, 705 F. Supp. 3d 1255, 1263 (W.D. Wash. 2023). This is especially true of motions to strike class action allegations, as "the shape and form of a class action evolves only through the process of discovery." *Hoffman v. Hearing Help Express, Inc.*, No. C19-5960, 2020 WL 4729176, at *2 (W.D. Wash. Mar. 27, 2020) (citations omitted); *see also Dorian v. Amazon Web Servs., Inc.*, No. C22-269, 2022 WL 3155369, at *2 n.1 (W.D. Wash. Aug. 8, 2022) (refusing to consider "premature" request to strike class allegations at the motion to dismiss stage).

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 4

emergency. Only Amazon has access to the information plaintiffs need. Amazon acknowledges that this litigation involves billions of transactions, suggesting that the amount in controversy is extraordinary. The importance of the issues at stake in the action, the importance of the discovery in resolving those issues, the amount in controversy, defendants' exclusive access to the information, and Amazon's resources all support a finding that the discovery requests are proportional. The only remaining issue is whether the burden or expense of the proposed discovery outweighs its likely benefit, an issue that is discussed below.

**B. Protective Order Under Rule 26(c)**

Even if a discovery request seeks relevant and proportional information, discovery may nevertheless be prohibited under Rule 26(c) upon a showing of "annoyance, embarrassment, oppression, or undue burden or expense" in connection with a particular request. The Court is authorized to "forbid[ ] inquiry into certain matters, or limit[ ] the scope of disclosure or discovery to certain matters . . . ." Fed. R. Civ. P. 26(c)(1)(D). To establish good cause for a protective order under Rule 26(c), the movant must show "'that specific prejudice or harm will result' if the protective order is not granted." *In re Roman Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 424 (9th Cir. 2011) (quoting *Foltz v. State Farm Mut. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

Amazon argues that responding to the discovery requests would require a manual review of each product page because searching for the categories of goods purchased by the named plaintiffs, such as "face masks", would return hits for items ranging from Halloween masks to N95 respirators to moisturizing face mask products. Dkt. # 80 at ¶¶ 5-12. But plaintiffs have not requested transactional data for the categories of goods they

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 5

themselves purchased. Changing the nature, scope, and reach of a discovery request in order to preclude automated searching does not mean that the actual discovery request poses an undue burden.

With regards to the fact that plaintiffs' actual discovery requests are limited to transaction data related to "consumer goods" and "food items," Amazon states that it does not categorize its offerings using those labels. Dkt. # 80 at ¶ 4. Amazon does not say that it has no tools at its disposal to identify what it considers "consumer goods" and/or "food items." Rather, it argues that it would be unfair to require it to perform searches and make productions based on its own understanding of the terms, when plaintiffs could then take issue with that understanding and demand that Amazon start the search process all over again. Amazon's definition of "consumer good" as an item sold for personal consumption, Dkt. # 78 at 10, appears to be consistent with the ordinary use of the phrase. *See* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/consumer-goods (defining "consumer goods" as "products that people buy for their own use"); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/consumer%20goods (defining "consumer goods" as "goods that directly satisfy human wants"). Plaintiffs offer no alternative definition, nor do they take issue with Amazon's interpretation of the phrase. For purposes of Amazon's search in response to Requests for Production 11-13, "consumer goods" shall include all items sold for personal consumption or use. Because neither party has identified any ambiguity in the phrase "food item," no further clarification is necessary.

The party seeking to defeat discovery on the ground that a request is unduly burdensome must allege specific facts showing the nature and extent of the burden. "[B]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Foltz*, 331 F.3d at 1130 (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)). *See also Raya v. Barka*,

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 6

No. 3:19-CV-2295-WQH-AHG, 2022 WL 686460, at *7 (S.D. Cal. Mar. 8, 2022); *Dunlap v. Alaska Radiology Assocs., Inc.*, No. 3:14-CV-00143-TMB, 2019 WL 13193359, at *3 (D. Alaska Mar. 22, 2019); *Awosika v. Target Corp.*, No. 11-0185-RSM, 2011 WL 13048452, at *1 (W.D. Wash. May 26, 2011); *Jackson v. Montgomery Ward & Co.*, 173 F.R.D. 524, 528–29 (D. Nev. 1997)). Amazon has not argued, much less shown, that searching for or producing offer data, transaction data, pricing notices, and/or "contribution profit" data for all products would be technically difficult or would impose a burden that is out of line with the claims and damages at issue in this case. With regards to the "price error prevention" ("PEP") and "atypical pricing – featured offer disqualification" ("AP-FOD") data, Amazon argues that the raw data would have to be collected from multiple sources and a document created to provide plaintiffs "the necessary business logic and know-how" to compile the data in a reasonably accurate fashion, a task that would take approximately 40-80 hours to complete. Dkt. # 169 at ¶¶ 8-9. If Amazon were to do the compilation, it would take another 40-80 hours. Dkt. # 169 at ¶ 10. Verifying the accuracy of the compilation and ensuring, to the extent possible, that the combined data set reflects the way Amazon's systems worked at any given time would take at least 160 additional hours to complete. Dkt. # 169 at ¶ 11. Given the data's central relevance to this case, the number of people employed by Amazon, and the company's extraordinary technical capabilities and familiarity with the data at issue, the Court finds that a production which may take up to 320 hours (two months of a single employee's time) is not undue in terms of either time or expense.

//

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 7

For all of the foregoing reasons, Amazon's motion for protective order (Dkt. # 78) is DENIED and plaintiffs' cross-motion to compel (Dkt. # 154) is GRANTED.

DATED this 18th day of July, 2025.


Robert S. Lasnik
United States District Judge

ORDER DENYING MOTION FOR PROTECTIVE ORDER
AND GRANTING MOTION TO COMPEL - 8

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALVIN GREENBERG, *et al.*,

          Plaintiffs,

    v.

AMAZON.COM, INC.,

          Defendant.

CASE NO. 2:21-cv-00898-RSL

ORDER GRANTING IN PART
ALDI'S MOTION TO QUASH

This matter comes before the Court on "Non-Party Aldi Inc.'s Motion to Quash Subpoena." Dkt. # 120.[1] Plaintiffs in the above-captioned matter allege that Amazon.com, an on-line retailer, engaged in unlawful price gouging during the COVID-19 pandemic, raising prices on a vast array of products and reaping extraordinary profits. One of the ways Amazon can defend itself against a price gouging claim is by showing that plaintiffs' injuries were reasonably avoidable, that is, that plaintiffs could have shopped elsewhere and purchased the desired items at better prices. Amazon has therefore issued subpoenas under Fed. R. Civ. P. 45 to approximately 150 non-party retailers seeking pricing, cost, inventory, discount, and purchase data regarding the items purchased by the named plaintiffs ("Tier 1 Requests") and all consumer goods and food items sold between January 1, 2017, and the present ("Tier 2 Requests"). Amazon also seeks any analyses the retailers

---

[1] This matter can be resolved on the papers submitted. The parties' requests for oral argument are DENIED.

ORDER GRANTING IN PART ALDI'S MOTION TO
QUASH - 1

performed regarding competitors' prices during the COVID-19 pandemic and any policies/procedures/actions related to price gouging or health and safety. Aldi, a limited-assortment retail grocery chain that primarily offers private-label products, objects to the subpoena on the grounds that (1) it does not carry most of the brands Amazon carries, (2) the production would be unduly burdensome, (3) the information sought is highly confidential, and (4) Amazon objected when plaintiffs served similar discovery requests on it.

Both litigants and third parties are subject to discovery under the Federal Rules of Civil Procedure. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30-35 (1984). The scope of discovery is generally governed by Rule 26(b)(1), which provides that parties:

> [m]ay obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). *See* Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970); *Lozano v. Does I-X*, No. C22-1477JLR, 2022 WL 16744880, at *3 (W.D. Wash. Nov. 7, 2022). Specific procedures and obligations for discovery from non-parties are set forth in Rule 45. When discovery is sought by subpoena under that rule, the party issuing a subpoena has an affirmative obligation to "take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." Fed. R. Civ. P. 45(d)(1).

District courts have significant discretion to control discovery. Fed. R. Civ. P. 26(b)(1); *see also Little v. City of Seattle*, 863 F.2d 691, 685 (9th Cir. 1988). Because discovery must be both relevant and proportional, the right to discovery, even plainly relevant discovery, is not limitless. "A party seeking to enforce a subpoena bears the

ORDER GRANTING IN PART ALDI'S MOTION TO QUASH - 2

burden of establishing that the subpoena seeks relevant information within the appropriate scope of discovery. The objecting party has the burden of persuasion to show that discovery should not be allowed." *Life Fitness, LLC v. Forward Motion Pictures, LLC*, No. 2:24-MC-00494 DC CKD, 2025 WL 435834, at *3 (E.D. Cal. Feb. 7, 2025) (internal citations omitted). Discovery may be denied where a response would be unduly burdensome. Fed. R. Civ. P. 26(c)(1); Fed. R. Civ. P. 45(d)(3)(A)(iv). In making that determination, "[t]he court must balance the relevance of discovery sought, the need of the requesting party, and any potential hardship to the party subject to the subpoena." *Life Fitness,* 2025 WL 435834, at *3. In addition, "[n]on-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue." *Whitlow v. Martin*, 263 F.R.D. 507, 512 (C.D. Ill. 2009) (citations omitted). Specifically, "[w]hile discovery is a valuable right and should not be unnecessarily restricted, the 'necessary' restriction may be broader when a non-party is the target of discovery." *Dart Industries Co., Inc. v. Westwood Chemical Co.*, 649 F.2d 646, 649 (9th Cir. 1980) (also noting that "[t]here appear to be quite strong considerations indicating that discovery would be more limited to protect [non-]parties from harassment, inconvenience, or disclosure of confidential documents.") (citation and quotation marks omitted). As the Ninth Circuit has recognized, "[n]onparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party." *U.S. v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982).

## A.    Relevance

Over 90% of Aldi's everyday product offerings are private label, but Aldi also offers on a regular basis "iconic" national brands such as Coca Cola, Windex, and Honey Nut Cheerios, as well as certain limited-quantity, limited-time "ALDI Finds" offerings. Of the nine products purchased by the named plaintiffs, Aldi carries only one of them

ORDER GRANTING IN PART ALDI'S MOTION TO
QUASH - 3

(Maruchan Beef Ramen Noodles) and has substitute, though not necessarily comparable, alternatives for five others. Aldi does not stock, and offers no similar products to, Zodiac Flea & Tick Spray, NOW Solutions Vegetable Glycerin, or Smartwater Distilled Water on a regular basis (it is possible that the products could be offered as "ALDI Finds"). Aldi argues that pricing data regarding the vast majority of the products it offers would be irrelevant and useless because they are not identical to the products Amazon offers.

The Court disagrees. Whether white rice was available from Aldi in March 2020 when Christina King was looking for staples, the price at which it was offered, and whether Aldi had in place protocols or policies that would have enabled Ms. King to safely shop at Aldi during a pandemic are relevant to plaintiffs' price gouging claim and Amazon's defense thereto. If Ms. King could have safely purchased basmati rice at Aldi for less than what she paid for jasmati rice on Amazon, that fact would inform the jury's determination of whether plaintiff could reasonably have avoided the injury of which she complains. On the other hand, the requested production could show that Aldi was not a viable alternative source at all because its safety protocols were insufficient to meet the COVID-19 risks and/or its delivery options were too limited to handle the surge in demand. The fact that Ms. King found a certain brand of jasmati rice on Amazon and would have found a different brand of basmati rice at Aldi may lessen the weight of the evidence, but it does not make it irrelevant.[2]

**B.      Undue Burden and Confidentiality**

Through the meet and confer process, Amazon has offered to limit the temporal scope of its discovery requests to the period spanning January 2020 through October 2022.

---

[2] Amazon, which has the burden of establishing the relevance of the discovery sought, points out that its requests for any policies or actions related to the prevention of price gouging are relevant to plaintiffs' negligence claim in that the information may help establish the standard of care in the retail and grocery industries.

ORDER GRANTING IN PART ALDI'S MOTION TO
QUASH - 4

The Court finds this limitation appropriate given the purposes for which Amazon needs the information sought.[3]

As discussed above, determining whether the burdens associated with a particular discovery request are "undue" requires consideration of the relevance of the information sought, the needs of the requesting party, the affirmative duty to avoid imposing undue burden or expense when issuing a Rule 45 subpoena, the non-party status of the recipient, the need to protect against the disclosure of confidential materials, and other potential hardships to the responding party. Amazon has explained why it needs information regarding the prices at which Aldi offered consumer goods and food items for sale, Aldi's health and safety protocols, and Aldi's anti-price gouging policies/actions between January 2020 and October 2022. This information is critical to Amazon's defenses and, while collecting pricing data from Aldi's various divisions and software systems will be burdensome, the burdens described by Tim Peters, Aldi's Manager of Information Governance, are significantly ameliorated by the curtailment of the relevant time frame. There does not appear to be any burden, undue or otherwise, to producing the protocols and policies Amazon seeks. Responses to these inquiries will therefore be compelled.

Amazon justifies its request for Aldi's cost data by arguing that evidence of Aldi's rising costs would help Amazon prove that the increased prices on its platform were the result of increased costs rather than profiteering. If increased costs were to blame for the higher prices Amazon charged during the pandemic, Amazon's own cost data would establish that fact. Non-party competitors will not be forced to disclose highly confidential

---

[3] Amazon also offered to limit the geographical scope of its requests to Aldi stores near the named plaintiffs' homes and to postpone responses to the Tier 2 Requests until after the Court rules on Amazon's objections to plaintiffs' similar requests. Now that the Court has issued its ruling, *see* Order Denying Motion for Protective Order and Granting Motion to Compel, it presumes that Amazon is no longer willing to forego discovery regarding the sale of consumer goods and food items or to limit the Aldi locations at issue.

ORDER GRANTING IN PART ALDI'S MOTION TO
QUASH - 5

data regarding costs and margins to provide additional support for what Amazon already knows.

Finally, Amazon has not attempted to show that Aldi's inventory data, transactional data, or analyses of competitor prices are needed to defend itself from plaintiffs' claims. Where the documents sought do not appear to be relevant, any burden or disclosure of confidential information is undue.

## C.      Amazon's Objections

The Court has overruled Amazon's objections to plaintiffs' discovery requests. The fact that Amazon raised the objections does not, in and of itself, make the discovery improper.

For all of the foregoing reasons, Aldi's motion to quash (Dkt. # 120) is GRANTED in part.

DATED this 18th day of July, 2025.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART ALDI'S MOTION TO
QUASH - 6

# EXHIBIT 3

The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

| | |
|---|---|
| ALVIN GREENBERG, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | Case No. 2:21-cv-00898-RSL<br><br>**NON-PARTY MAPLEBEAR INC. D/B/A INSTACART'S OBJECTIONS AND RESPONSES TO DEFENDANT AMAZON.COM, INC'S SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION** |

Case No. 2:21-cv-00898-RSL

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

Non-Party Maplebear Inc. d/b/a Instacart ("Instacart") hereby responds to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated December 18, 2024, from Defendant Amazon.com, Inc. ("Defendant" or "Amazon"), on the following grounds:

**GENERAL OBJECTIONS**

Instacart objects to the Subpoena in its entirety as, on its face, propounding vague and confusing Requests that fundamentally misunderstand, misstate, and/or mischaracterize Instacart's business model as one of direct sales of products to consumers. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

Instacart objects to the Subpoena in its entirety as, on its face, calling for the disclosure of privileged or immune information, including, without limitation, information subject to the attorney-client privilege, work-product doctrine, common interest privilege, privacy rights under Washington and/or federal law and/or any other privilege or immunity from discovery. Instacart hereby claims such privileges and immunities and objects to the disclosure of any documents or information subject thereto.

Instacart objects to the Subpoena to the extent that it calls for the disclosure of information that would violate the legitimate privacy rights and expectations of Instacart's employees, directors, officers, affiliates, subsidiaries, customers, or third-party businesses and corporations with whom Instacart contracts, both current and former, or other individuals, to the extent that such privacy rights or expectations and confidential business information are protected by law, contract, or public policy.

Instacart objects to each and every Topic and Request in the Subpoena as duplicative of or unreasonably cumulative to other discovery propounded and/or produced in this action.

Instacart objects to the Subpoena and each and every Definition, Instruction, Topic and Request in the Subpoena on the grounds that it purports to impose burdens upon Instacart in this

action that are not permitted by law or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law.

Instacart objects to the Subpoena on the grounds that the burden, expense, and intrusiveness of the Subpoena clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence.

Instacart objects to the Subpoena to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Instacart further objects to the extent that any request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise.

Instacart objects to each and every Definition, Instruction, Topic and Request in the Subpoena on the grounds that it is overbroad, unduly burdensome, and oppressive as to a non-party.

Instacart objects to the Subpoena to the extent that it seeks identification and disclosure of information that is irrelevant, immaterial, or not reasonably calculated to lead to the discovery of admissible evidence.

To the extent any request, definition, or instruction may be construed as requiring Instacart to characterize documents or their contents or to speculate as to what documents may or may not show, Instacart objects to such request, definition, or instruction as vague, ambiguous, and calling for legal conclusions and speculation.

## OBJECTIONS TO DEFINITIONS

Instacart objects to the entirety of Defendant's Definitions to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law.

Instacart specifically objects to the definitions of YOU and YOUR to the extent they include counsel, and to the extent they purport to impose obligations beyond those imposed by Federal Rule of Civil Procedure 34 and applicable law. Instacart objects to the definitions of YOU and YOUR to the extent they seek to encompass entities other than Instacart and persons under its control. Instacart further objects to the definitions of YOU and YOUR to the extent they call for the disclosure of privileged or immune information, including, without limitation, information subject to the attorney-client privilege, the work-product doctrine, common interest privilege, or privacy rights under Washington and/or federal law. Instacart hereby claims such privileges and immunities and objects to the disclosure of any documents or information subject thereto.

Instacart specifically objects to the definitions of COMMUNICATION, COMMUNICATIONS, DOCUMENT, and DOCUMENTS to the extent they purport to impose obligations beyond those imposed by Federal Rule of Civil Procedure 34 and applicable law. Instacart further objects to the extent the definitions call for the disclosure of privileged or immune information, including, without limitation, information subject to the attorney-client privilege, the work-product doctrine, common interest privilege, or privacy rights under Washington and/or federal law. Instacart hereby claims such privileges and immunities and objects to the disclosure of any documents or information subject thereto.

Instacart specifically objects to the definitions of RELATED TO or RELATING TO as overly broad, unduly burdensome, and vague and ambiguous. Instacart further specifically objects to the definitions of RELATED TO or RELATING TO to the extent they purport to impose obligations beyond those imposed by Federal Rule of Civil Procedure 34 and applicable law.

## **OBJECTIONS TO INSTRUCTIONS**

Instacart objects to the entirety of Defendant's Instructions to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. By way of non-limiting example, Instacart will not segregate or reference documents to particular requests, because Fed. R. Civ. P. 34 does not so require.

Instacart further objects to Defendant's purported instructions to the extent they seek to encompass entities other than Instacart and persons under its control. Instacart further objects to the instructions to the extent they call for the disclosure of privileged or immune information, including, without limitation, information subject to the attorney-client privilege, work-product doctrine, common interest privilege, or privacy rights under Washington and/or federal law. Instacart hereby claims such privileges and immunities and objects to the disclosure of any documents or information subject thereto.

All of the foregoing objections are hereby incorporated into each response below as though fully set forth therein. To the extent that Instacart, in a particular response, restates one or more, but not all, of the General Objections and Objections to Definitions or Instructions, all of these Objections are intended to be and are set forth as part of the response to that Topic or Request. Any agreement to provide or provision of information by Instacart in response to a Topic or Request is made subject to and without waiving these General Objections and Objections to Definitions or Instructions, and any specific objection stated in the response.

By providing or identifying any information, documents, or things in response to the Topics and Requests, Instacart does not waive any objection to the Topics or Requests, nor does Instacart waive any claim of privilege or immunity, whether expressly asserted or not.

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

**OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS**

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and/or data related to Your pricing of the Tier 1 Products during the COVID-19 Pandemic, in stores and online, including but not limited to any price increases or decreases.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "[Instacart's] pricing of the Tier 1 Products"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting "[a]ll Documents and/or data" related to the Request during the specified time period. Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and/or data related to Your Costs for the Tier 1 Products sold by You during the COVID-19 Pandemic, in stores and online, including but not limited to Your unit costs associated with sales in stores and online, and any cost increases or decreases incurred by You.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "[Instacart's] Costs for the Tier 1 Products sold by [Instacart]"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting "[a]ll Documents and/or data" related to the Request during the specified time period. Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks

information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request No. 1.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and/or data related to Your inventory of the Tier 1 Products during the COVID-19 Pandemic, including but not limited to Documents and/or data reflecting decreasing inventory or out-of-stock Tier 1 Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "[Instacart's] inventory of Tier 1 Products"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting "[a]ll Documents and/or data" related to the Request during the specified time period" Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1 and 2.

**REQUEST FOR PRODUCTION NO. 4:**

Transactional data for Purchases of the Tier 1 Products sold by You or by third-parties on your website made between January 1, 2017 and the present sufficient to show, at least, (i) products sold, (ii) transaction date and time, (iii) SKU, (iv) price, (v) any applicable discount, (vi) identity of the purchaser, (vii) identity of the seller, to the extent that the Tier 1 Products were sold by a third-party on your website, (viii) geographic location of the purchaser and/or the store location from which the purchase was made, (ix) margin, (x) cost of acquisition, (xi) shipping cost, (xii) whether the product is new or used, and (xiii) mode of purchase, e.g., whether the purchase was made in-store by the consumer, through a delivery app, through Your website for pickup, or online.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the

Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information that either does not exist, i.e., "Tier 1 Products sold by [Instacart]," or is the proprietary information of third-party vendors (and so is more easily and appropriately obtained directly from them), i.e. a product's margin, cost of acquisition, shipping cost, and whether the product is new or used. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period.

Moreover, this Request is so broad as to scope as to be oppressive, including by requesting eight years' worth of "transactional data" across thirteen separate categories when the Instacart platform hosts thousands of retailer storefronts, all of which contain their own sets of individual data. It is also vague and unclear in requesting data relating to products "sold by third-parties on your website" while also requesting "mode of purchase, e.g., whether the purchase was made instore by the consumer, through a delivery app, through Your website for pickup, or online," and in requesting data in undefined categories such as "margin," "cost of acquisition," and "shipping cost." It is not clear how this Request seeks to measure each of these categories, and how they would apply to Instacart as a digital platform. Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or third parties who have greater and more ready access to the information sought than Instacart does. Instacart further objects to this Request because it seeks confidential,

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-3.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents and/or data related to Your analysis of competitors' prices for Tier 1 Products during the COVID-19 Pandemic.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart further objects to this Request as vague and ambiguous as to its use of the term "competitors." The Request is not clear as to whether it is referencing Instacart's competitors, Instacart's vendors' competitors, or otherwise. Assuming the Request references Instacart's competitors, Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "competitors' prices"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting "[a]ll Documents" from this time period. Instacart further objects to this Request to the extent it purports to require Instacart to disclose private or personally identifiable information of Instacart and Instacart employees, customers, business partners, and/or third parties. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and/or Communications related to any policies, procedures, processes, or controls You had in place during the Relevant Time Period related to price gouging, unusual price increases, avoiding inventory shortages or exhaustion, purchase limits for individual products or categories of products, limitations on price increases, and/or fair pricing, including policies governing sales by authorized third-parties, where applicable. This request is limited to policies, procedures, processes or controls applicable to the Tier 1 Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as Instacart's policies relating to pricing is not probative of any of the claims or defenses asserted in this case. Moreover, Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period. Further, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or Communications" that could possibly be related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose private or personally identifiable information of Instacart and Instacart employees, customers, business partners, or third parties. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-4.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and/or Communications related to any actions taken by You to prevent, remediate and/or remove products that were subject to price gouging and/or unfair pricing, or actions taken by You to manage inventories, including by imposing or removing purchase limits or price caps for products in high demand. This request is limited to actions taken by You with respect to any of the Tier 1 Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request to the extent the language "prevent, remediate and/or remove products" suggests Instacart has a third-party obligation as a platform to enforce or alter retailers' pricing. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as Instacart operates a digital platform that provides customers with the ability to order

products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products or a mandated regulator of retailers and resellers who may utilize Instacart's platform, nor was it during the Relevant Time Period. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or Communications" that could possibly be related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-4 and 6.

**REQUEST FOR PRODUCTION NO. 8:**

All data for Your discount offers on the Tier 1 Products between January 1, 2017 and the present, in store and online.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as Instacart operates a digital platform that provides customers with the ability to order products from

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll data" related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1-4, 6, and 7.

**REQUEST FOR PRODUCTION NO. 9:**

Documents or data related to any changes to Your health and safety protocols implemented in response to the COVID-19 Pandemic at each of your brick-and-mortar retail locations that sold Tier 1 Products during the Relevant Time Period, including changes to Your standard operating hours, reduced-contact or contactless shopping options, social distancing requirements, face covering requirements, cleaning and sanitization protocols, and employee trainings and guidance offered on such health and safety protocols.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely documents or data related to "[Instacart's] brick-and-mortar retail locations"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period. Instacart likewise does not maintain and has never maintained its own brick-and-mortar stores.

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting all "Documents or data" related to the Request over a span of eight years. Instacart further objects to this Request to the extent it purports to require Instacart to disclose private or personally identifiable information of Instacart and Instacart employees, customers, business partners, or third parties. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents and/or data related to Your pricing of Your consumer goods and/or food items during the COVID-19 Pandemic, in stores and online, including but not limited to any price increases or decreases.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the

request seeks information—namely "[Instacart's] pricing of [Instacart's] consumer goods and/or food items"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or data" related to the Request during the specified time period.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1-4 and 6-8.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and/or data related to Your Costs for consumer goods and food items sold by You during the COVID-19 Pandemic, in stores and online, including but not limited to Your unit costs associated with sales in stores and online, and any cost increases or decreases incurred by You.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "[Instacart's] Costs for consumer goods and food items sold by [Instacart]"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor did it during the COVID-19 pandemic. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or data" related to the Request during the specified time period.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1-4, 6-8 and 10.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents and/or data related to Your inventory of consumer goods and food items during the COVID-19 Pandemic, including but not limited to Documents and/or data reflecting decreasing inventory or out-of-stock consumer goods or food items.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the

creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "[Instacart's] inventory of consumer goods and food items"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or data" related to the Request during the specified time period.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1-4, 6-8, 10, and 11.

**REQUEST FOR PRODUCTION NO. 13:**

Transactional data for Purchases of Your consumer goods and food items or consumer goods and food items sold by third-parties on your website made between January 1, 2017 and the

present sufficient to show, at least, (i) products sold, (ii) transaction date and time, (iii) SKU, (iv) price, (v) any applicable discount, (vi) identity of the purchaser, (vii) identity of the seller, to the extent that the consumer goods or food items were sold by a third-party on your website, (viii) geographic location of the purchaser and/or the store location from which the purchase was made, (ix) margin, (x) cost of acquisition, (xi) shipping cost, (xii) whether the product is new or used, and (xiii) mode of purchase, e.g., whether the purchase was made instore by the consumer, through a delivery app, through Your website for pickup, or online.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information that either does not exist, i.e., "[Instacart's] consumer goods and food items," or is the proprietary information of third-party vendors (and so is more easily and appropriately obtained directly from them), i.e. a product's margin, cost of acquisition, shipping cost, and whether the product is new or used. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup and delivery. Retailers with storefronts on Instacart's platform set their own pricing and inventory selection. Instacart is not a retailer or reseller of products and therefore does not maintain its own pricing, nor did it during the Relevant Time Period.

Moreover, this Request is so broad as to scope as to be oppressive, including by requesting eight years' worth of "transactional data" across thirteen separate categories when the Instacart platform hosts thousands of retailers' storefronts, all of which contain their own sets of individual

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS

data. It is also vague and unclear in requesting data relating to products "sold by third-parties on your website" while also requesting "mode of purchase, e.g., whether the purchase was made instore by the consumer, through a delivery app, through Your website for pickup, or online," and in requesting data in undefined categories such as "margin," "cost of acquisition," and "shipping cost." It is not clear how this Request seeks to measure each of these categories, and how they would apply to Instacart as a digital platform. Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to the extent that this Request seeks documents or information in the possession, custody, or control of Defendant, or that are equally or more readily available to Defendant from parties to this action or otherwise. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-4, 6-8, and 10-12.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents and/or data related to Your analysis of competitors' prices for consumer goods and food items during the COVID-19 Pandemic.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart further objects to this Request as vague and

ambiguous as to its use of the term "competitors." The Request is not clear as to whether it is referencing Instacart's competitors, Instacart's vendors' competitors, or otherwise. Assuming the Request references Instacart's competitors, Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as the request seeks information—namely "competitors' prices"—that does not exist. Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the COVID-19 pandemic.

Moreover, this Request is so broad and unlimited as to scope as to be oppressive, including in requesting "[a]ll Documents" from this time period. Instacart further objects to this Request to the extent it purports to require Instacart to disclose private or personally identifiable information of Instacart and Instacart employees, customers, business partners, or third parties. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request No. 5.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents and/or Communications related to any policies, procedures, processes, or controls You had in place during the Relevant Time Period related to price gouging, unusual price increases, avoiding inventory shortages or exhaustion, purchase limits for individual products or categories of products, limitations on price increases, and/or fair pricing, including policies governing sales by authorized third-parties, where applicable.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the

creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or Communications" that could possibly be related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose private or personally identifiable information of Instacart and Instacart employees, customers, business partners, or third parties. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-4, 6-8, and 10-13.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents and/or Communications related to any actions taken by You to prevent, remediate and/or remove products that were subject to price gouging and/or unfair pricing, or actions taken by You to manage inventories, including by imposing or removing purchase limits or price caps for products in high demand.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request to the extent the language "prevent, remediate and/or remove products" suggests Instacart has a third-party obligation as a platform to enforce or alter retailers' pricing. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, as Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products or a mandated regulator of retailers and resellers who may use Instacart's platform, nor was it during the Relevant Time Period. It does not engage in direct sales, pricing, or inventory management of individual products. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll Documents and/or Communications" that could possibly be related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart objects to this Request as duplicative of Request Nos. 1-4, 6-8, 10-13, and 15.

**REQUEST FOR PRODUCTION NO. 17:**

All data for Your discount offers on consumer goods and food items between January 1, 2017 and the present, in store and online.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Instacart hereby incorporates its General Objections as if fully set forth herein. Instacart objects to this Request as unduly burdensome to a non-party to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business and to the extent that it purports to impose obligations broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Local Rules of the District Court for the Western District of Washington, or any applicable Order of this Court, regulation or case law. Instacart objects to this Request as vague and confusing, and to the extent that the burden, expense, and intrusiveness of the request clearly outweighs the likelihood that the information sought will lead to the discovery of admissible evidence, Instacart operates a digital platform that provides customers with the ability to order products from nearby retailers for pickup or delivery. Instacart is not a retailer or reseller of products, nor was it during the Relevant Time Period. Moreover, this Request is so broad in scope as to be oppressive, including in requesting Instacart review and produce "[a]ll data" related to the Request over a span of eight years.

Instacart further objects to this Request to the extent it purports to require Instacart to disclose competitively sensitive, private or personally identifiable information of Instacart and third-party retailers that utilize the Instacart platform. Instacart objects to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and/or any other applicable privilege or immunity. Instacart objects to this Request because it seeks confidential, financial, proprietary, trade secret, or other competitively sensitive or confidential information. Defendant is a competitor of Instacart, and Instacart may suffer a competitive disadvantage if such information were disclosed. Instacart further objects to this Request as duplicative of Request Nos. 1-4, 6-8, 10-13, and 15-16.

Dated:  January 17, 2025

BRAUNHAGEY & BORDEN LLP

By:    /s/ *Adam S. Cashman*
             Adam S. Cashman

747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
Fax: (415) 276-1808

*Attorneys for Maplebear Inc. d/b/a Instacart*

INSTACART'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS